# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| U.S. CONCRETE, INC., *et al.*,[1] | ) | Case No. 10-11407 (PJW) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ROBERT D. HARDY, EXECUTIVE VICE PRESIDENT AND CHIEF FINANCIAL OFFICER OF U.S. CONCRETE, INC., *ET AL.*, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Robert D. Hardy, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of U.S. Concrete, Inc., a corporation organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, if any, include: U.S. Concrete, Inc. (6680); Alberta Investments, Inc. (1497); Alliance Haulers, Inc. (3236); American Concrete Products, Inc. (3187); Atlas Redi-Mix, LLC (3123); Atlas-Tuck Concrete, Inc. (1542); Beall Concrete Enterprises, LLC (3536); Beall Industries, Inc. (2872); Beall Investment Corporation, Inc. (9865); Beall Management, Inc. (9839); Breckenridge Ready Mix, Inc. (2482); Central Concrete Supply Co., Inc. (1859); Central Precast Concrete, Inc. (9358); Concrete Acquisition III, LLC (5638); Concrete Acquisition IV, LLC (5720); Concrete Acquisition V, LLC (5777); Concrete Acquisition VI, LLC (5840); Concrete XXXIII Acquisition, Inc. (6120); Concrete XXXIV Acquisition, Inc. (6167); Concrete XXXV Acquisition, Inc. (6206); Concrete XXXVI Acquisition, Inc. (6240); Eastern Concrete Materials, Inc. (1165); Hamburg Quarry Limited Liability Company (3592); Ingram Concrete, LLC (6753); Local Concrete Supply & Equipment, LLC (6597); Master Mix Concrete, LLC (0135); Master Mix, LLC (8532); MG, LLC (9279); NYC Concrete Materials, LLC (0666); Pebble Lane Associates, LLC (6520); Redi-Mix Concrete, L.P. (4765); Redi-Mix GP, LLC (N/A); Redi-Mix, LLC (6751); Riverside Materials, LLC (3588); San Diego Precast Concrete, Inc. (6282); Sierra Precast, Inc. (4227); Smith Pre-Cast, Inc. (0673); Superior Concrete Materials, Inc. (6503); Titan Concrete Industries, Inc. (6374); U.S. Concrete On-Site, Inc. (0662); USC Atlantic, Inc. (6002); USC Management Co., LLC (6749); USC Payroll, Inc. (0665); and USC Technologies, Inc. (6055). The location of the debtors' corporate headquarters and the debtors' service address is: 2925 Briarpark, Suite 1050, Houston, Texas 77042.

2.     On the date hereof (the "Petition Date"), U.S. Concrete, Inc. and 43 of its affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtor entities continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.     I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and "first day" motions (each, a "First Day Motion," and collectively, the "First Day Motions").[2] Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

4.     As discussed in further detail below, the past few years have seen an unparalleled, precipitous decline in demand for concrete and other building products as a result of the collapse of the real estate and construction markets in mid 2006 and the contraction of capital markets

---

[2]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

2

stemming from the financial crisis in the U.S., and, ultimately, the global recession beginning in late 2008. The Debtors experienced a significant drop in production by volume from a high of 7.3 million cubic yards of concrete in 2006 and 7.6 million cubic yards in 2007 to 6.5 million cubic yards in 2008 and 4.6 million cubic yards in 2009, leading to a decline in revenues from $728.5 million in 2006 and $803.8 million in 2007 to $754.2 million in 2008 and $534.5 million in 2009, and a corresponding decline in EBITDA from $75.6 million in 2006 and $68.2 million in 2007 to $40.5 million in 2008 and $22.4 million in 2009. As a result, it became necessary for the Debtors to effectuate a balance-sheet restructuring. As such, the Debtors engaged in extensive good faith, arm's-length negotiations with their major creditor constituents and, ultimately, reached an agreement with their key economic stakeholders on the terms of a prearranged chapter 11 restructuring. The Debtors filed these chapter 11 cases to effectuate that agreement.

5.     The Debtors are a major producer of ready-mixed concrete, precast concrete products, and concrete-related products in select markets in the United States. Since their inception in 1999, the Debtors have been, and continue to be, dedicated to strategic growth. To fund certain acquisitions in connection therewith and to promote internal organic growth, the Debtors issued a total of $285 million in senior subordinated notes in 2004 and 2006, and entered into a senior secured credit facility with up to $150 million of borrowing base.

6.     The Debtors believed that their industry position and projected market conditions would support their debt load; however, as now is well-documented, an unprecedented downturn in the U.S. housing and construction markets combined with the collapse of the financial markets caused a significant contraction in demand for construction-related services.

DOCS_DE:159488.1

7.      In light of the current and expected market conditions, the Debtors must de-lever their balance sheet.  In connection therewith, the Debtors have engaged in discussions with their key stakeholders, which has resulted in a negotiated consensual balance-sheet restructuring.  The agreement reached amongst the parties contemplates a significant deleveraging of the Debtors' balance sheet—including satisfaction in full of the existing secured facility and equitization of the outstanding bonds—and provides for a full recovery to unsecured trade creditors.  The Debtors agreed to implement this balance-sheet restructuring through a prearranged chapter 11 plan of reorganization (the "Plan").

8.      Accordingly, the Debtors commenced these chapter 11 cases to effectuate the consensual debt restructuring proposed under the prearranged Plan.  Contemporaneously herewith, the Debtors have filed the Plan and accompanying disclosure statement (the "Disclosure Statement").  Importantly, because the Debtors already have a deal negotiated with their primary stakeholders and because substantially all general unsecured claims will "ride through" the chapter 11 restructuring unimpaired, the Debtors expect these chapter 11 cases to move swiftly, which will reduce, to the extent practicable, any adverse effects of the bankruptcy filing on their business operations.  To that end, the Debtors have obtained an executed restructuring support agreement with a significant majority of the  Debtors' prepetition bondholders—the only class of impaired creditors entitled to vote under the proposed Plan.  Moreover, by deleveraging their capital structure through a prearranged bankruptcy, the Debtors intend to emerge from chapter 11 better-situated to weather the current economic conditions and well-positioned to take advantage of any future recovery in the United States ready-mixed concrete and building products industry in their respective markets.

4

9.     To familiarize the Court with the Debtors and the relief they will seek on the first day of these chapter 11 cases, this First Day Declaration is organized as follows: Part I describes the Debtors' corporate history, business operations, and organizational and prepetition capital structure. Part II describes the events leading to the commencement of these chapter 11 cases. Part III sets forth the relevant facts in support of each First Day Motion.

## I.     The Debtors' Corporate History, Business Operations, and Organizational and Prepetition Capital Structure.

### A.     Corporate History.

10.     U.S. Concrete, Inc. is a Delaware corporation incorporated in 1997. Since that time, the Debtors quickly have become a leading provider of ready-mixed concrete and concrete-related products in certain construction markets throughout the United States. The Debtors' product offerings and services are designed to provide contractors and developers with performance-based, high-quality concrete materials, extensive industry expertise, emerging concrete technologies, and sustainable solutions to environmental challenges.

### B.     The Debtors' Business Operations.

11.     The Debtor's principal executive offices are located in Houston, Texas. The Debtors employ approximately 2,100 people throughout their more than 140 locations in the United States. The Debtors' business operations are comprised of two business segments: the ready-mixed concrete and concrete-related products segment (the "Ready-Mixed Segment"); and the precast products concrete segment (the "Precast Segment"). Ready-mixed and precast concrete products are important building materials used in a vast majority of commercial, residential, and public works construction projects. As discussed above, the Debtors' consolidated revenues from continuing operations for 2009 were $534.5 million, of which the

5

Debtors derived approximately 91% from the Ready-Mixed Segment and 9% from the Precast Segment.

12.     The Ready-Mixed Segment engages principally in the formulation, preparation, and delivery of ready-mixed concrete. The Debtors' ready-mixed concrete plants consist of fixed and portable facilities that produce ready-mixed concrete in wet or dry batches. The fixed-plant facilities produce ready-mixed concrete that the Debtors transport to job sites by mixer trucks. The portable plant operations deploy twelve portable plant facilities to produce ready-mixed concrete at job sites. The Debtors also provide services intended to reduce their customers' overall construction costs by lowering the installed, or "in-place," cost of concrete. These services include the formulation of mixtures for specific design uses, on-site and lab-based product quality control, and customized delivery programs to meet the needs of the Debtors' customers. The Ready-Mixed Segment also is engaged in the mining and sale of aggregates, including crushed stone, sand, and gravel, and the resale of building materials, primarily to the Debtors' ready-mixed concrete customers.

13.     The Precast Segment consists of fixed plant sites where precast products are produced, staged, and shipped to customers and distribution yards. The Debtors stage precast products at distribution facilities to serve markets beyond the normal reach of their existing manufacturing sites. Precast concrete has a variety of architectural applications, including free-standing walls used for landscaping, soundproofing and security walls, panels used to clad a building facade, and storm water drainage. The Precast Segment also specializes in a variety of finished products, including utility vaults, manholes, catch basins, highway barriers, curb inlets, pre-stressed bridge girders, concrete piles, and custom-designed architectural products.

6

14.     The Debtors operate principally in Texas, California, New Jersey/New York, and Michigan, with those states representing 35%, 30%, 15%, and 9%, respectively, of the Debtors' consolidated revenues from continuing operations for 2009. According to publicly available industry information, those states represented an aggregate of 31.4% of the consumption of ready-mixed concrete in the U.S. in 2009. The Debtors believe that, because of the size and geographic scope of their operations, they are able to achieve cost savings through consolidated purchasing, which reduces administrative costs on both a national and regional level and aids in moderating the impact of regional economic cycles and weather conditions.

15.     As of the Petition Date, the Debtors have 125 fixed and 11 portable ready-mixed concrete plants, seven precast concrete plants, and seven aggregate-producing facilities, including several quarries, and 27 fixed ready-mixed concrete plants operated by a joint venture enterprise of the Debtors. During 2009, these plants and facilities produced approximately 4.5 million cubic yards of ready-mixed concrete and 3.1 million tons of aggregates. The Debtors also own two aggregates facilities that they lease to third parties and retain a royalty on production from those facilities.

**C.     The Debtors' Prepetition Organizational Structure.**

16.     The chart attached hereto as **Exhibit A** generally depicts the Debtors' prepetition organizational structure.

**D.     The Debtors' Prepetition Capital Structure.**

17.     As of the Petition Date, the Debtors had total consolidated funded debt of approximately $315 million, including approximately $40 million in secured bank debt (excluding approximately $17.9 million in issued and unfunded letters of credit), and approximately $285 million in principal amount and accrued interest of 8.375% unsecured notes.

7

## 1. Prepetition Secured Credit Agreement.

18.     U.S. Concrete, Inc., as borrower, and certain of its affiliates, as guarantors, JPMorgan Chase Bank, N.A., as administrative agent (the "Prepetition Secured Agent"),[3] Bank of America, N.A., as syndication agent, JPMorgan Chase Bank, as documentation agent, and the lenders party thereto (collectively, the "Prepetition Secured Lenders") are parties to that certain Amended and Restated Credit Agreement, as further amended (the "Prepetition Secured Credit Agreement"), dated as of June 30, 2006. The Prepetition Secured Credit Agreement provides for up to $60 million of revolving credit, the availability of which is determined by a formula based on the Debtors' current accounts receivable outstanding, inventory, and trucks. As of the Petition Date, the Debtors had approximately $40 million outstanding under the Prepetition Secured Credit Agreement (excluding $17.9 million of unfunded letters of credit obligations) (the "Prepetition Secured Credit Agreement Obligations"). The Prepetition Secured Credit Agreement matures on June 30, 2013. Apart from U.S. Concrete, Inc., which serves as borrower, and Beall Investment Corporation, Inc., each of the Debtors guarantee the Prepetition Secured Credit Agreement Obligations, which are secured by substantially all assets of the Debtors pursuant to that certain Security Agreement, dated as of March 12, 2004 (as amended by the Fifth Amendment).[4]

---

[3]     As discussed in further detail herein, pursuant to the Fifth Amendment (as defined herein), JPMorgan Chase Bank, N.A. replaced Citicorp North America, Inc., as Secured Agent.

[4]     The following entities guarantee the Prepetition Secured Credit Agreement: Alberta Investments, Inc.; Alliance Haulers, Inc.; American Concrete Products, Inc.; Atlas Redi-Mix, LLC; Atlas-Tuck Concrete, Inc.; Beall Concrete Enterprises, LLC; Beall Industries, Inc.; Beall Management, Inc.; Breckenridge Ready Mix, Inc.; Builders' Redi-Mix, LLC; BWB, Inc. of Michigan; Central Concrete Supply Co., Inc.; Central Precast Concrete, Inc.; Concrete Acquisition III, LLC; Concrete Acquisition IV, LLC; Concrete Acquisition V, LLC; Concrete Acquisition VI, LLC; Concrete XXXIII Acquisition, Inc.; Concrete XXXIV Acquisition, Inc.; Concrete XXXV Acquisition, Inc.; Concrete XXXVI Acquisition, Inc.; Eastern Concrete Materials, Inc.; Hamburg Quarry Limited Liability Company; Ingram Concrete, LLC; Kurtz Gravel Company; Local Concrete Supply & Equipment, LLC; Master Mix Concrete, LLC; Master Mix, LLC; MG, LLC; NYC Concrete
(Continued...)

8

### 2. 8.375% Senior Subordinated Notes Due 2014.

19. U.S. Concrete, Inc., as issuer, certain of its affiliates, as guarantors,[5] and Wells Fargo Bank, National Association, as indenture trustee, are parties to that certain Indenture, dated as of March 31, 2004, and as supplemented by a Supplemental Indenture, dated July 5, 2006 (the "Note Indenture" and, together with the Prepetition Secured Credit Agreement, the "Debt Instruments"). Under the Note Indenture, U.S. Concrete, Inc. issued a total of approximately $285 million in 8.375% Senior Subordinated Notes due 2014 (the "Notes") to holders (the "Noteholders"). As of the Petition Date, approximately $285 million in principal balance and accrued interest on the Notes remains outstanding.

### 3. Interests in the Debtors.

20. As shown in the corporate organizational chart attached hereto as **Exhibit A**, U.S. Concrete, Inc. is the Debtors' top-level parent entity. The equity in U.S. Concrete, Inc. is

---

Materials, LLC; Pebble Lane Associates, LLC; Redi-Mix Concrete, L.P.; Redi-Mix GP, LLC; Redi-Mix, LLC; Riverside Materials, LLC; San Diego Precast Concrete, Inc.; Sierra Precast, Inc.; Smith Pre-Cast, Inc.; Superior Concrete Materials, Inc.; Superior Holdings, Inc.; Titan Concrete Industries, Inc.; U.S. Concrete On-Site, Inc.; USC Atlantic, Inc.; USC Management Co., LLC; USC Michigan, Inc.; USC Payroll, Inc.; and USC Technologies, Inc.

5   The following entities are guarantors under the Notes: Alberta Investments, Inc.; Alliance Haulers, Inc.; American Concrete Products, Inc.; Atlas Redi-Mix, LLC; Atlas-Tuck Concrete, Inc.; Beall Concrete Enterprises, LLC; Beall Industries, Inc.; Beall Management, Inc.; Breckenridge Ready Mix, Inc.; Builders' Redi-Mix, LLC; BWB, Inc. of Michigan; Central Concrete Supply Co., Inc.; Central Precast Concrete, Inc.; Concrete Acquisition III, LLC; Concrete Acquisition IV, LLC; Concrete Acquisition V, LLC; Concrete Acquisition VI, LLC; Concrete XXXIII Acquisition, Inc.; Concrete XXXIV Acquisition, Inc.; Concrete XXXV Acquisition, Inc.; Concrete XXXVI Acquisition, Inc.; Eastern Concrete Materials, Inc.; Hamburg Quarry Limited Liability Company; Ingram Concrete, LLC; Kurtz Gravel Company; Local Concrete Supply & Equipment, LLC; Master Mix Concrete, LLC; Master Mix, LLC; MG, LLC; NYC Concrete Materials, LLC; Pebble Lane Associates, LLC; Redi-Mix Concrete, L.P.; Redi-Mix GP, LLC; Redi-Mix, LLC; Riverside Materials, LLC; San Diego Precast Concrete, Inc.; Sierra Precast, Inc.; Smith Pre-Cast, Inc.; Superior Concrete Materials, Inc.; Superior Holdings, Inc.; Titan Concrete Industries, Inc.; U.S. Concrete On-Site, Inc.; USC Atlantic, Inc.; USC Management Co., LLC; USC Michigan, Inc.; USC Payroll, Inc.; and USC Technologies, Inc.

9

publicly traded. The Debtors do not believe any individual equity holder owns more than 9% of the equity in U.S. Concrete, Inc.[6]

## II.     Events Leading to these Chapter 11 Cases.

21.     As discussed above, the Debtors have approximately $312 million of indebtedness. Over the course of the last eighteen months, a series of events has occurred that ultimately led to the Debtors' filing of these chapter 11 cases. Those events include (A) the unprecedented downturn in the United States construction industry, (B) the cost savings initiatives implemented by the Debtors as a result thereof, (C) the Debtors' prepetition restructuring negotiations, (D) amendments to the Prepetition Secured Credit Agreement, (E) defaults under the Debt Instruments, and (F) the Debtors' successful negotiations with certain of the Noteholders in connection with the pre-arranged Plan.

### A.     The Downturn in the United States Construction Industry.

22.     Since the middle of 2006, the United States building materials construction market has become increasingly challenging. In recent years, the construction industry, particularly the ready-mixed concrete industry, has been characterized by significant overcapacity, fierce competition, and rapidly declining sales. The Debtors' business has not been immune to these pressures. The steep decline in new home construction in the United States residential construction market, stemming from the turmoil in the global credit markets and, in particular, the United States recession, has severely affected the Debtors' financial position.

---

[6]     Approximately 2.57% of the interest in U.S. Concrete, Inc. is held by employees of the Debtors pursuant to a restricted stock plan.

23.     As the following chart demonstrates, the downturn in the construction industry has had a dramatic impact on demand for the Debtors' products in each of the last four years.



Figure 1: U.S. Housing Start History (1999 - 2009)

24.     The housing market downturn in the United States intensified during 2007, with housing starts in 2007 falling almost 25% from the 2006 rate to 1.4 million, and continued during 2008 and 2009, with housing starts in 2008 falling over 33% from the 2007 rate to approximately 905,000.  Housing starts in 2009 fell over 38% from the 2008 rate to approximately 554,000. Moreover, while it is unclear whether the housing market will begin to recover in 2010 given the uncertainties in forecasting housing starts, housing starts are unlikely to reach mid-2000 levels for several years.

25.     The overall decline in the construction industry coupled with market saturation of building products suppliers is also causing a drop in the price the Debtors are able to charge for their products.  The Debtors expect ready-mixed concrete pricing declines in 2010 compared to 2009 in most of their markets, which will have a negative effect on their revenues and gross margins.

11

26.     The substantial deterioration in the construction industry was followed by the rapid softening of the economy and tightening of the U.S. financial markets in the second half of 2008, which resulted in the effective collapse of the U.S. credit markets.

27.     Notwithstanding that the U.S. credit market has begun to show some signs of improvement during the first few months of 2010, commercial construction starts are expected to be down significantly from prior year levels. The Debtors also faced significant delays in the delivery of products and services to job sites during in January and February of this year due to severe inclement weather in their markets. Because of the time-sensitive nature of wet concrete, the Debtors generally maintain only a few days' inventory of raw materials on hand and coordinate their daily materials purchases with the time-sensitive delivery requirements of their customers. Even minor weather delays can result in production delays and lost profits.

**B.     Cost Savings Initiatives.**

28.     In response to the protracted, declining sales volumes, the Debtors have implemented cost reduction programs in an effort to return to profitability. From 2007 through 2009, the Debtors implemented workforce reductions, plant idling, rolling stock dispositions, and divestitures of nonperforming business units to reduce structural costs. In 2010, the Debtors implemented further cost-cutting measures, including wage freezes, elimination of their 401(k) company match program, and other reductions in other employee benefits, and a significant scaling back of capital investment in their equipment.

29.     Nonetheless, the continued weakening economic conditions, including ongoing softness in residential construction, further softening of demand in the commercial sector, and delays in public works projects in many of the Debtors' markets, have placed significant distress on the Debtors' liquidity position, a trend which is expected to continue throughout 2010.

DOCS_DE:159488.1

C.      **The Debtors' Prepetition Restructuring Negotiations.**

30.     Over the course of the last three months, the Debtors have been engaged in extensive discussions with legal and financial advisors to an informal committee of Noteholders (the "Informal Noteholder Committee") regarding the terms of a consensual out-of-court restructuring. However, because the Debtors' parent entity is a public company with numerous small retail Noteholders, it was not feasible for the Debtors to complete the proposed debt-for-equity exchange on an out-of-court basis. As a result, the Debtors shifted their efforts towards accomplishing a reorganization through a consensual chapter 11 plan.

D.      **Amendments to the Prepetition Secured Credit Agreement.**

31.     As the Debtors continued to engage in discussions with counsel to the Informal Noteholder Committee toward a consensual prearranged restructuring, the depressed state of the concrete industry undermined the Debtors' ability to avoid defaults under the Debt Instruments.

32.     In order to continue their prenegotiated plan discussions, on February 19, 2010, the Debtors entered into an amendment (the "Fourth Amendment") to the Prepetition Secured Credit Agreement. The Fourth Amendment provided additional liquidity so that the Debtors could meet their financial obligations by, among other things, waiving the Debtors' solvency representation and warranty through April 30, 2010 and increasing short-term liquidity by providing an additional $2.5 million of available credit through March 10, 2010 and an additional $5 million of available credit through April 30, 2010.

33.     On March 24, 2010, the Debtors further amended the Prepetition Secured Credit Agreement, again in connection with their continued negotiations of a prearranged plan (the "Fifth Amendment"). The Fifth Amendment, among other things, increased short-term liquidity by providing an additional $18.5 million of available credit. In return, the Prepetition Secured Lenders were granted a first priority security interest in certain previously excluded collateral,

13

including any real estate assets owned by the Debtors. In addition, as previously stated herein, JPMorgan Chase Bank, N.A. replaced Citicorp North America, Inc. as Secured Agent.

**E.     Defaults under the Debt Instruments.**

34.     Recognizing the need for maximum liquidity while the Debtors continued to negotiate a prearranged restructuring with the Noteholders, the Debtors elected not to make an interest payment due under the Note Indenture on April 1, 2010 (the "Interest Payment Default").

35.     Although the Note Indenture provided for a 30-day grace period before the Interest Payment Default became an actionable event of default, the Interest Payment Default would have an immediate and actionable event of default under the Prepetition Secured Credit Agreement; however, in connection with the Fourth Amendment, the Prepetition Secured Lenders temporarily agreed to waive any default or event of default arising from the Interest Payment Default through April 30, 2010.

**F.     The Debtors Successful Negotiations with the Informal Noteholder Committee in connection with the Prearranged Plan.**

36.     After good-faith, arm's-length negotiations, the Debtors reached an agreement with counsel to the Informal Noteholder Committee with respect to a consensual restructuring on the terms set forth in the Restructuring Term Sheet (the "Term Sheet") and formalized by the Restructuring and Lock-Up Agreement, substantially in the form attached hereto as **Exhibit B** (the "Restructuring and Lock-Up Agreement"), dated April 28, 2010.[7] The Debtors received an executed Restructuring and Lock-Up Agreement from a significant majority of the Noteholders.

---

[7]     A copy of the Plan is attached as **Exhibit 1** to the Restructuring and Lock-Up Agreement and incorporated by reference as though fully set forth herein.

### G. The Debtors Commence These Chapter 11 Cases.

37.    The Debtors filed these chapter 11 cases to effectuate the terms of the Restructuring and Lock-Up Agreement.  Based on the Restructuring and Lock-Up Agreement, the Debtors are prepared to seek confirmation of the Plan shortly after the filing of these chapter 11 cases.  Indeed, because the Plan is based on a consensual deal with the Debtors' key stakeholders and contemplates a significant de-leveraging of the Debtors' balance sheet—including satisfaction in full of the Prepetition Secured Credit Agreement Obligations through debtor-in-possession financing proceeds, equitization of the Notes, and a full recovery to holders of General Unsecured Claims (as defined in the Plan)—confirmation of the Plan is expected to occur over a relatively short timeframe.  Specifically, pursuant to the Restructuring and Lock-Up Agreement, the Debtors have agreed that the Disclosure Statement must be filed within 10 days of the Petition Date, the Disclosure Statement and accompanying solicitation materials must be approved and a hearing to confirm the Plan must be scheduled, within 40 days after the filing of the Plan, the Plan must be confirmed within 60 days of the date on which the Disclosure Statement is approved (subject to a 15-day extension under certain circumstances), and the Plan must be effective within 25 days of the confirmation date (subject to a 15-day extension under certain circumstances).

### III.    Evidentiary Support for First Day Motions.[8]

38.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief

---

[8]    Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of these chapter 11 cases. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

A.   **Motion of U.S. Concrete, Inc., *et al.*, for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases (the "<u>Joint Administration Motion</u>").**

39.   The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b). Specifically, the Debtors request that the Court maintain one file and one docket for all of these chapter 11 cases under the case of U.S. Concrete, Inc. and also request that an entry be made on the docket of each of the Debtors' chapter 11 cases, other than U.S. Concrete, Inc., to reflect the joint administration of these chapter 11 cases.

40.   Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect U.S. Concrete, Inc. and each of its affiliates that also have filed chapter 11 cases. The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

41.   I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.** **Motion of U.S. Concrete, Inc., *et al.*, for Entry of an Order (a) Authorizing (i) Continued Use of Existing Cash Management System, (ii) Maintenance of Existing Bank Accounts, (iii) Continued Use of Existing Business Forms, and (iv) Continued Investment Activities; and (b)(i) Granting Administrative Priority Status to Postpetition Intercompany Claims, and (ii) Authorizing Continued Performance Under Intercompany Arrangements and Historical Practices (the "<u>Cash Management Motion</u>").**

42.    The Debtors request the authority to: (a) continue to use, with the same account numbers, all of the Bank Accounts in their Cash Management System; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; (c) open new debtor-in-possession accounts, if needed; (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to the Debtors' status as debtors in possession; (e) continue their existing investment practices; and (f) continue performing Intercompany Transactions in the ordinary course of business.

43.    In addition, the Debtors further request that the Court authorize the Banks to: (a) continue to maintain, service, and administer the Bank Accounts; and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashier's checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

DOCS_DE:159488.1

44.     In the ordinary course of business, the Debtors utilize an integrated Cash Management System to collect, transfer, and disburse funds generated by their operations and maintain current and accurate accounting records of all daily cash transactions. If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, instructing customers to redirect payments, and the immediate ordering of new checks with a "Debtor in Possession" legend, would disrupt the Debtors' business at this critical time. The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

45.     In addition, in the ordinary course of business, the Debtors maintain a large and complex system of Intercompany Transactions for, among other reasons, facilitating intercompany sales, centralizing accounting and purchasing departments, and moving cash between entities. If the Intercompany Transactions are discontinued, a number of services provided by and to the Debtors would be disrupted and could affect the Debtors' ability to pay wages and benefits to their employees and make timely payments to vendors.

46.     The relief requested in the Cash Management Motion is vital to ensuring the Debtors' seamless transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of these chapter 11 cases.

47.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

18

the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

C.      **Motion of U.S. Concrete, Inc.,** *et al.,* **for Entry of Interim and Final Orders Authorizing the Payment of Prepetition (a) Wages, Salaries, and Other Compensation; (b) Reimbursable Employee Expenses; and (c) Employee Medical and Similar Benefits (the "Wages and Benefits Motion").**

48.     The Debtors request the authority, in their sole discretion, to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of business and consistent with past practices, relating to the Employee Obligations. In addition, the Debtors seek a waiver of the automatic stay under section 362 of the Bankruptcy Code as it applies to workers' compensation claims.

49.     As of the Petition Date, the Debtors employ approximately 2,100 employees, of which approximately 1,600 are paid on an hourly basis. Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for Employees may nevertheless be due and owing.

50.     The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors. In the absence of such payments, the Debtors believe their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors, thereby hindering the Debtors' ability to

19

meet their customer obligations, and likely diminish creditors' confidence in the Debtors. Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors should be focusing on stabilizing their operations.

51.     In addition, the Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit the Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the Automatic Stay because staying the workers compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.

52.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be approved.

> **D.**     **Motion of U.S. Concrete, Inc., *et al.*, for Interim and Final Orders Authorizing the Debtors to (a) Continue Insurance Coverage Entered into Prepetition, Including Self-Administered Insurance Programs, (b) Maintain Existing Financing of Insurance Premiums, and (c) Enter into New Postpetition Policies and Financing Agreements (the "<u>Insurance Motion</u>").**

53.     The Debtors request authority to continue insurance coverage currently in effect and pay any prepetition amounts related thereto, including prepetition deductibles and self-insured retentions and payments under two premium financing agreements (the "<u>PFAs</u>").

54.     The Debtors' insurance policies are essential to the preservation of the value of the Debtors' business, properties, and assets. In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern

20

the Debtors' commercial activities. By financing the premiums of certain of their insurance policies and broker's fees pursuant to secured premium financing agreements, the Debtors are able to spread out those premiums and fees over the applicable coverage periods and better manage their cash flow. Generally, lenders are unwilling to finance insurance premiums on an unsecured basis. Here, the PFAs provide financing at an interest rate that is considerably less than the Debtors' other financing sources.

55.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**E.     Motion of U.S. Concrete, Inc., *et al.*, for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "Taxes and Fees Motion").**

56.     The Debtors request authority to pay any Taxes and Fees that, in the ordinary course of business, accrued or arose before the Petition Date. In the ordinary course of business, the Debtors incur and/or collect certain Taxes and Fees and remit such Taxes and Fees to various Authorities. The Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases. Specifically, the Debtors' failure to pay the Taxes and Fees could affect adversely the Debtors' business operations because the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. In addition, certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes that undoubtedly would distract those individuals from their duties related to the Debtors' restructuring.

57.     I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be approved.

**F.   Motion of U.S. Concrete, Inc., *et al.*, for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion").**

58.    The Debtors request the entry of interim and final orders: (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order; (d) determining the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Utilities Motion, pending entry of the Final Order; and (e) setting a final hearing on the Debtors' proposed adequate assurance.

59.    In the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by approximately 250 utility providers.   Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.   Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.   It is, therefore, critical that utility services continue uninterrupted during these chapter 11 cases.

60.     I believe and am advised that the proposed procedures are necessary in these chapter 11 cases, because if such procedures were not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately assured of future performance and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could shut down operations, and any significant disruption of operations could jeopardize a successful reorganization in these chapter 11 cases.

61.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

G.      **Motion of U.S. Concrete, Inc., *et al.*, for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Customer Programs Motion").**

62.     The Debtors request the authority to maintain and administer customer programs and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice.

63.     To maintain the loyalty and goodwill of their customers, in the ordinary course of business the Debtors implemented Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill, and ensure that the Debtors remain competitive. The Debtors' ability to honor their Customer Program Obligations in the ordinary course of business is necessary to retain their customer base and reputation for quality. The Debtors believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their

23

business, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.

64.     I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**H.**     **Motion of U.S. Concrete, Inc.,** *et al.,* **For Entry of an Order Authorizing the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent and Epiq Financial Balloting Group, LCC as Balloting Agent (the "Epiq Retention Motion").**

65.     The Debtors request entry of an order pursuant to section 156(c) of title 28 of the United States Code, section 503(b) of the Bankruptcy Code, and Rule 2002-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware authorizing the employment and retention of Epiq Bankruptcy Solutions, LLC ("Epiq") as notice, claims, and balloting agent in connection with these chapter 11 cases, in accordance with the terms and conditions set forth in the Services Agreement.

66.     I believe that the relief requested in the Epiq Retention Motion is in the best interests of the Debtors estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Epiq Retention Motion should be approved.

24

**I.** **Motion of U.S. Concrete, Inc.,** *et al.,* **for Entry of Interim and Final Orders Authorizing, But Not Directing, U.S. Concrete to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business (the "General Unsecured Claims Motion").**

67.     The Debtors request the authority to pay prepetition claims of general unsecured creditors in their sole discretion and in the ordinary course of business and in accordance with the DIP Credit Facility and any budgets thereunder.

68.     The Debtors rely in the ordinary course of business on numerous trade creditors and other unsecured creditors to provide, among other things, raw materials, equipment, supplies, consulting, logistics, shipping services, and various other goods and services that are necessary at all stages of the Debtors' production of concrete and related products. Allowing payment of the General Unsecured Claims in the ordinary course of the Debtors' business will minimize any disruption to the Debtors' business and strengthen the perception among actual and potential counterparties that the Debtors intend to conduct business, allowing for a smooth reorganization in these chapter 11 cases. The refusal (or inability based on their own financial circumstances) of the General Unsecured Creditors to work with the Debtors during the chapter 11 cases has the potential to impede the Debtors' successful reorganization. Indeed, a refusal by any one of the General Unsecured Creditors to provide goods or services effectively could interrupt or shut down the Debtors' manufacturing process and jeopardize the Debtors' ability to fulfill commitments to their customers at a time when the loyalty and support of those customers is most important. The Debtors believe that the payment of the General Unsecured Claims in the ordinary course of business will allow them to continue their operations with minimal disruption and preserve their enterprise value for the benefit of their estates, creditors, and all parties in interest.

DOCS_DE:159488.1

69.     I believe that the relief requested in the General Unsecured Claims Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Without the relief requested in the General Unsecured Claims Motion, I believe that the Debtors' creditor constituencies will suffer significant harm, and that the amount of General Unsecured Claims that the Debtors believe may be satisfied in the ordinary course of business pales in comparison with the amount that stakeholders stand to lose if the Debtors' trade vendors refuse to continue doing business with the Debtors. Accordingly, on behalf of the Debtors, I respectfully submit that the General Unsecured Claims Motion should be approved.

**J.     Motion of U.S. Concrete, Inc.,** *et al.* **for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Certain Transfers of Common Stock (the "NOL Preservation Motion").**

70.     The Debtors request the authority to establish notification and hearing procedures that must be satisfied before certain transfers of common stock in the Debtors, or of any beneficial interest therein, including options to acquire such stock, are deemed effective.

71.     The Procedures for Trading in Common Stock are necessary to protect and preserve the Debtors' valuable tax attributes, including NOLs and Tax Credits. If no restrictions on trading are imposed by the Court, such trading could severely limit or even eliminate the Debtors' ability to use their Tax Attributes, which represent a potential future tax savings of approximately $25 million, which could lead to significant negative consequences for the Debtors, their estates, and the overall reorganization process.

72.     I believe that the relief requested in the NOL Preservation Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

DOCS_DE:159488.1

Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Preservation Motion should be approved.

**K.**     **Motion of U.S. Concrete, Inc., *et al.*, for Entry of an Order Authorizing, But Not Directing, Payments of Prepetition Claims of Shippers, Warehousemen, and Other Lien Claimants (the "Shippers Motion").**

73.     The Debtors request the authority to pay, in the ordinary course of business, amounts due in respect of Outstanding Orders for goods ordered by the Debtors prior to the Petition Date and delivered after the Petition Date. In addition, the Debtors seek the authority to pay, in the ordinary course of business, and in their business judgment, prepetition Shipping and Warehouse Charges and Lien Claimaint Claims.

74.     Prior to the Petition Date, and in the ordinary course of business, the Debtors ordered goods pursuant to the Outstanding Orders, which will be delivered to the Debtors after the Petition Date. Suppliers may refuse to ship or transport these goods (or recall such shipments) unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (a) granting all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders administrative expense priority under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business. The granting of the relief sought in the Shippers and Claimants Motion with respect to the Outstanding Orders will not provide the suppliers with any greater priority then they otherwise would have if the relief herein were not granted, and will not prejudice any other party in interest. Absent such relief, the Debtors will suffer disruption to the continuous and timely flow of raw materials, which could result in substantial delays in their operations and lead to dissatisfied customers and an erosion of customer confidence in the Debtors.

75.     In addition, the Debtors rely on the services of Shippers to assure the timely shipping and delivery of raw materials to the Debtors in the ordinary course of the Debtors'

DOCS_DE:159488.1

business. Occasionally, the Debtors must use Warehousemen for storage of equipment and documents related to their operations. The Debtors also do business with a number of vendors who could potentially assert mechanic's liens and materialman's liens against the Debtors and their property for amounts the Debtors owe to those vendors. Paying the prepetition obligations owed to the Shippers, Warehousemen, and Other Lien Claimants will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

76.     I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers Motion should be approved.

**L.     Motion of U.S. Concrete, Inc., _et al._, For Entry of Interim and Final Orders (a) Authorizing the Debtors to Obtain Postpetition Financing, (b) Granting Liens and Superpriority Claims, (c) Authorizing the Debtors to Repay the Prepetition Credit Agreement Obligations, (D) Modifying the Automatic Stay, and (e) Scheduling a Final Hearing (the "DIP Motion").**

77.     The Debtors request the authority to obtain postpetition financing and prescribing the form and manner of notice and setting the time for the final hearing on the Motion. The Debtors need financing to ensure that the Plan remains on course and to ensure that the Debtors' operations are not negatively effected. Specifically, the Debtors have an urgent need to obtain postpetition financing for, among other things, continuing the operation of their business in an orderly manner, maintaining business relationships with vendors, suppliers, and customers, paying employees, and satisfying other working capital and operational needs—all of which are necessary to minimize disruption to the Debtors' business operations and ensure that the Debtors can consummate their balance-sheet restructuring. Moreover, the Debtors seek to use the proceeds of the proposed postpetition financing to repay in full the obligations outstanding under

28

the prepetition secured facility, as required by the Debtors' prepetition lenders as a condition precedent to the proposed postpetition financing.

78.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: 4/29 , 2010

By: _____

Robert D. Hardy
Executive Vice President
Chief Financial Officer
U.S. Concrete, Inc.



U.S. Concrete, Inc. (DE)

USC Management Co., LLC (TX)

USC Payroll, Inc. (DE)

Beall Industries, Inc. (TX)

Beall Investment Corporation, Inc. (TX)

Beall Management, Inc. (CA)

Beall Concrete Enterprises, LLC (TX)

Central Precast Concrete, Inc. (CA)

Central Concrete Supply Co., Inc. (CA)

Alliance Haulers, Inc. (TX)

Alberta Investments, Inc. (TX)

Redi-Mix, LLC (TX)

Redi-Mix GP, LLC (TX)

Redi-Mix Concrete, L.P. (TX)

Sierra Precast, Inc. (CA)

Smith Pre-Cast, Inc. (DE)

San Diego Precast Concrete, Inc. (CE)

American Concrete Products, Inc. (CA)

Atlas-Tuck Concrete, Inc. (OK)

Atlas Redi-Mix, LLC (TX)

Titan Concrete Industries, Inc. (DE)

Ingram Concrete, LLC (TX)

Breckenridge Ready Mix, Inc. (TX)

Superior Concrete Materials, Inc. (DC)

MG, LLC (MD)

U.S. Concrete On-Site, Inc. (DE)

USC Technologies, Inc. (DE)

NYC Concrete Materials, LLC (DE)

Pebble Lane Associates, LLC (DE)

Local Concrete Supply & Equipment, LLC (DE)

Master Mix, LLC (DE)

Master Mix Concrete, LLC (NJ)

USC Atlantic, Inc. (DE)

Eastern Concrete Materials, Inc. (NJ)

Hamburg Quarry Limited Liability Company (NJ)

Riverside Materials, LLC (DE)

Concrete Acquisition VI, LLC (DE)

Concrete Acquisition V, LLC (DE)

Concrete Acquisition IV, LLC (DE)

Concrete Acquisition III, LLC (DE)

Concrete XXXVII Acquisition, Inc. (DE)

Concrete XXXVI Acquisition, Inc. (DE)

Concrete XXXV Acquisition, Inc. (DE)

Concrete XXXIV Acquisition, Inc. (DE)

Concrete XXXIII Acquisition, Inc. (DE)

**EXHIBIT B**
**Restructuring and Lock-Up Agreement**

## RESTRUCTURING AND LOCK-UP AGREEMENT

This RESTRUCTURING AND LOCK-UP AGREEMENT (this "**Agreement**")[1] is made and entered into as of April [●], 2010, by and among (i) U.S. Concrete, Inc., Alberta Investments, Inc., Alliance Haulers, Inc., American Concrete Products, Inc., Atlas Redi-Mix, LLC, Atlas-Tuck Concrete, Inc., Beall Concrete Enterprises, LLC, Beall Industries, Inc., Beall Investment Corporation, Inc., Beall Management, Inc., Breckenridge Ready Mix, Inc., Central Concrete Supply Co., Inc., Central Precast Concrete, Inc., Concrete Acquisition III, LLC, Concrete Acquisition IV, LLC, Concrete Acquisition V, LLC, Concrete Acquisition VI, LLC, Concrete XXXIII Acquisition, Inc., Concrete XXXIV Acquisition, Inc., Concrete XXXV Acquisition, Inc., Concrete XXXVI Acquisition, Inc., Eastern Concrete Materials, Inc., Hamburg Quarry Limited Liability Company, Ingram Concrete, LLC, Local Concrete Supply & Equipment, LLC, Master Mix Concrete, LLC, Master Mix, LLC, MG, LLC, NYC Concrete Materials, LLC, Pebble Lane Associates, LLC, Redi-Mix Concrete, L.P., Redi-Mix GP, LLC, Redi-Mix, LLC, Riverside Materials, LLC, San Diego Precast Concrete, Inc., Sierra Precast, Inc., Smith Pre-Cast, Inc., Superior Concrete Materials, Inc., Titan Concrete Industries, Inc., U.S. Concrete On-Site, Inc., USC Atlantic, Inc., USC Management Co., LLC, USC Payroll, Inc., and USC Technologies (collectively, the "**Debtors**"), (ii) Builders' Redi-Mix, LLC, BWB, Inc. of Michigan, Kurtz Gravel Company, Superior Holdings, Inc., USC Michigan, Inc., (the "**Non-Filing Entities**," and together with the Debtors, the "**Company**"), and (iii) the undersigned holders or investment advisers or managers of discretionary accounts that hold the Unsecured Notes identified on the attached signature pages (each, a "**Consenting Noteholder**") (the Company and a Consenting Noteholder, each a "**Party**" and collectively, the "**Parties**").

## RECITALS

**WHEREAS**, the Company and the Consenting Noteholders are negotiating restructuring and recapitalization transactions (collectively, the "**Transactions**"), pursuant to the terms and conditions set forth in this Agreement, with respect to the capital structure of the Company, including the Company's obligations under the Notes Indenture (collectively, the "**Claims**");

**WHEREAS**, the Company intends to commence voluntary reorganization cases for each of the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") to effect the Transactions through the Plan of Reorganization; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

---

[1]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Plan of Reorganization of U.S. Concrete, Inc., *et al.*, Pursuant to Chapter 11 of the Bankruptcy Code (the "**Plan of Reorganization**"), attached hereto as **Exhibit A**.

## *AGREEMENT*

**Section 1.**    *Agreement Effective Date.*  This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Time, on the first day immediately following the date on which:

(a)    the following conditions have been satisfied:  (i) the Company has executed and delivered counterpart signature pages of this Agreement to counsel to the Informal Noteholders Committee and (ii) holders of at least two-thirds in amount and more than one-half in number of outstanding Notes Claims shall have executed and delivered to the Company counterpart signature pages of this Agreement; and

(b)    the Company has given notice to counsel to the Informal Noteholders Committee in accordance with Section 8.11 hereof that the conditions in (a)(i) and (ii) have been satisfied and this Agreement is effective (the "**Agreement Effective Date**").

**Section 2.**    *Plan of Reorganization.*  The Plan of Reorganization is expressly incorporated herein and is made part of this Agreement.  The terms and conditions of the Transactions are set forth in the Plan of Reorganization.  In the event of any inconsistencies between the terms of this Agreement and the Plan of Reorganization, the Plan of Reorganization shall govern.

**Section 3.**    *Commitments Regarding the Transactions.*

3.01.  Agreement to Vote.

(a)    As long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Noteholder, agrees that it shall, subject to the receipt by such Consenting Noteholder of a disclosure statement and other solicitation materials in respect of the Plan of Reorganization, which disclosure statement and solicitation materials reflect the agreement set forth in the Plan of Reorganization and have been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code (it being understood and agreed that (x) any terms not set forth in the Plan of Reorganization that are set forth in such disclosure statement and other solicitation materials shall be in form and substance reasonably acceptable to counsel to the Informal Noteholders Committee and (y) each Consenting Noteholder must be entitled to vote to accept or reject the Plan of Reorganization):

(i)    vote its Claims to accept the Plan of Reorganization by delivering its duly executed and completed ballot accepting the Plan of Reorganization on a timely basis following the commencement of the solicitation and its actual receipt of the disclosure statement and solicitation materials (the "Solicitation Materials") and ballot;

(ii)    not change or withdraw (or cause to be changed or withdrawn) such vote; and

(iii)    not, in any material respect, (A) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan of Reorganization or (B) propose, file, support, or vote for any restructuring, workout, or plan of reorganization for the

Debtors other than the Plan of Reorganization and shall direct the Notes Indenture Trustee not to take any action contemplated in (A) and (B) of this Section 3.01(a)(iii).

(b)     For the avoidance of doubt, each Consenting Noteholder also agrees that upon the commencement by the Debtors of the chapter 11 cases, the automatic stay is invoked and each Consenting Noteholder agrees that it will not direct the Notes Indenture Trustee to exercise any right or remedy for the enforcement, collection, or recovery of any of the Claims against the Company, for so long as this Agreement has not been terminated in accordance with the terms hereof; *provided, however*, that, except as otherwise set forth in this Agreement, the foregoing prohibition will not limit any Consenting Noteholders' rights under the Notes Indenture and/or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case under the Bankruptcy Code concerning the Debtors, so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement or the Plan of Reorganization and does not directly hinder, delay, or prevent consummation of the Transactions contemplated by this Agreement or by the Plan of Reorganization.

3.02.   Commitment of Company.   The Company shall (a) support and complete the Transactions on the terms set forth in this Agreement and in the Plan of Reorganization, (b) do all things necessary and appropriate in furtherance of the Transactions contemplated by this Agreement and by the Plan of Reorganization, including, without limitation (i) commencing the Debtors' chapter 11 cases on or before April 30, 2010 (the "**Outside Petition Date**," and the actual commencement date, the "**Petition Date**"), (ii) taking all steps reasonably necessary to obtain an order of the Bankruptcy Court, reasonably acceptable in all material respects to counsel to the Informal Noteholders Committee, confirming the Plan of Reorganization within the timeframes contemplated by this Agreement, and (iii) taking all steps reasonably necessary and desirable to cause the effective date of the Plan of Reorganization to occur within the timeframes contemplated by this Agreement, (c) obtain any and all required regulatory and/or third-party approvals for the Transactions embodied in the Plan of Reorganization, (d) not take any action that is inconsistent with, or is intended or is likely to interfere with consummation of, the restructuring and the Transactions embodied in the Plan of Reorganization, and (e) if a member of the Company's management knows of a breach by the Company in any material respect of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement, furnish prompt written notice (and in any event within three business days of such actual knowledge) to the counsel to the Informal Noteholders Committee. Regardless of whether the Transactions are consummated, the Company shall promptly pay in cash upon demand any and all documented and reasonable accrued and unpaid out-of-pocket expenses incurred by the Informal Noteholders Committee (including all reasonable fees and out-of-pocket expenses of the legal counsel and financial advisors) in connection with the negotiation, documentation, consummation, and performance of this Agreement, the Plan of Reorganization, the Solicitation Materials, all other documents related to the Plan of Reorganization and the Transactions.

3.03.   Transfer of Interests and Securities.   Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Consenting Noteholder to sell, use, assign, transfer, or otherwise dispose of ("**Transfer**") any of the Claims; *provided, however*, that for the period commencing as of the date such Consenting Noteholder executes this Agreement until termination of this Agreement pursuant to the terms hereof (such period, the "**Restricted Period**"), no Consenting Noteholder shall Transfer any Claims and any purported

Transfer of any Claims shall be void and without effect, unless (a) the transferee is a Consenting Noteholder or (b) if the transferee is not a Consenting Noteholder prior to the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of **Exhibit B** attached hereto pursuant to which such Transferee shall assume all obligations of the Consenting Noteholder transferor hereunder in respect of the Claims being transferred (such transferee, if any, to also be a Consenting Noteholder hereunder). This Agreement shall in no way be construed to preclude any Consenting Noteholder from acquiring additional Claims; *provided, however*, that (a) any Consenting Noteholder that acquires, as legal or beneficial owner, additional Claims after executing this Agreement shall notify the Company and counsel to the Informal Noteholders Committee of such acquisition within five business days after the closing of such trade and (b) additional Claims shall automatically and immediately upon acquisition by a Consenting Noteholder, as legal or beneficial owner, be deemed subject to all of the terms of this Agreement whether or not notice is given to the Company or counsel to the Informal Noteholders Committee of such acquisition. This Section 3.03 shall not impose any obligation on (a) the Company to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Noteholder to Transfer any Claims or (b) counsel to the Informal Noteholders Committee to monitor or enforce the provisions of this Section 3.03 as they relate to the Consenting Noteholders.

3.04. <u>Representations of Consenting Noteholders</u>. Each of the Consenting Noteholders severally and not jointly represents and warrants that, as of the date such Consenting Noteholder executes and delivers this Agreement:

(a)    it is the beneficial owner of the face amount of the Notes, or is the nominee, investment manager, or advisor for beneficial holders of the Notes, as reflected in such Consenting Noteholder's signature block to this Agreement, which amount the Company and each Consenting Noteholder understands and acknowledges is proprietary and confidential to such Consenting Noteholder;

(b)    other than pursuant to this Agreement and applicable law, such Notes are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that would adversely affect in any way such Consenting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(c)    (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act or (B) an institutional accredited investor (as defined in the Rules) and (ii) any securities acquired by the Consenting Noteholder in connection with the transactions described herein will not have been acquired with a view to distribution.

**Section 4.    *Certain Additional Chapter 11 Related Matters.*** The Company shall provide draft copies of all "first day" motions or applications, the Plan of Reorganization and the disclosure statement, and other documents the Company intends to file with the Bankruptcy Court to counsel to the Informal Noteholders Committee at least three days prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court. The Company will use its reasonable best efforts to provide draft copies of all other

pleadings the Company intends to file with the Bankruptcy Court to counsel to the Informal Noteholders Committee at least two days prior to filing such pleading and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.

**Section 5.** *Mutual Representations, Warranties, and Covenants.* Each of the Parties represents, warrants, and covenants to the other Parties, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

5.01. Enforceability. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditor's rights generally or by equitable principles relating to enforceability.

5.02. No Consent or Approval. Except as expressly provided in this Agreement or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to carry out the Transactions contemplated by, and perform the respective obligations under, this Agreement.

5.03. Power and Authority. Except as expressly provided in this Agreement, it has all requisite power and authority to enter into this Agreement and to carry out the Transactions contemplated by, and perform its respective obligations under, this Agreement.

5.04. Authorization. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

5.05. Representation by Counsel. It has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.

5.06. Actions under this Agreement. It is not aware of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement.

**Section 6.** *Termination Events.*

6.01. Consenting Noteholder Termination Events. This Agreement may be terminated by the delivery to the Company and to counsel to the Informal Noteholders Committee of a written notice in accordance with Section 8.11 hereof by the Consenting Noteholders holding no less than a majority in principal amount of the Note Claims held at such time by the Consenting Noteholders (unless otherwise provided in this Section 6.01), each in the exercise of its sole discretion, upon the occurrence and continuation of any of the following events (each a "**Consenting Noteholder Termination Event**"):

(a) failure of the Company to commence the Debtors' chapter 11 cases on or before the Outside Petition Date;

(b)     counsel to the Informal Noteholders Committee shall have reasonably determined that there are general unsecured claims not previously disclosed to it, the existence of which could have a material adverse effect on the Company, and provided reasonably prompt written notice of such determination to the Company;

(c)     failure of the Company to file the Plan of Reorganization and related disclosure statement with the Bankruptcy Court within 10 days after the Petition Date, each of which shall be materially consistent with this Agreement and shall be in a form and substance reasonably acceptable to counsel to the Informal Noteholders Committee;

(d)     the Bankruptcy Court's orders approving the Solicitation Materials and setting a hearing to confirm the Plan of Reorganization shall not have been entered by the Bankruptcy Court within 40 days after the filing of the Plan of Reorganization, or as soon thereafter as the Bankruptcy Court's schedule permits;

(e)     the Bankruptcy Court's order confirming the Plan of Reorganization (the "**Confirmation Order**"), which Plan of Reorganization, including all exhibits, appendices, plan supplement documents, and related documents, shall be reasonably acceptable to counsel to the Informal Noteholders Committee, shall not have been entered by the Bankruptcy Court within 60 days after the date that the Solicitation Materials are approved; *provided, however*, that so long as the Company is proceeding in good faith towards confirmation of the Plan of Reorganization, upon written notice from the Company to counsel to the Informal Noteholders Committee in accordance with Section 8.11 hereof, there shall be a 15-day extension of such 60-day period;

(f)     the effective date of the Plan of Reorganization shall not have occurred within 25 days after the date that the Plan of Reorganization is confirmed; *provided, however*, that so long as the Company is proceeding in good faith towards consummation of the Plan of Reorganization, upon written notice from the Company to counsel to the Informal Noteholders Committee in accordance with Section 8.11 hereof, there shall be a 15-day extension of such 25-day period;

(g)     other than with respect to the covenant and agreement in Section 3.02(e) of this Agreement, the breach in any material respect by the Company of any of the obligations, representations, warranties, or covenants of the Company set forth in this Agreement; *provided, however*, that the Company shall have five business days to cure any such breach;

(h)     failure to duly observe and perform the covenant and agreement contained in Section 3.02(e) of this Agreement;

(i)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Transactions in a way that cannot be reasonably remedied by the Company in a manner that does not prevent or diminish in a material way compliance with the terms of the Plan of Reorganization and this Agreement; *provided, however*, that the Company shall have five business days after receiving such ruling or order to cure any breach in a manner that does not

prevent or diminish in a material way compliance with the terms of the Plan of Reorganization and this Agreement;

(j)     the conversion of one or more of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code, unless such conversion is made with the prior written consent of the counsel to the Informal Noteholders Committee;

(k)     the appointment of a trustee, receiver, or examiner with expanded powers in one or more of the chapter 11 cases, unless such appointment is made with the prior written consent of the counsel to the Informal Noteholders Committee;

(l)     the amendment, modification, or filing of a pleading by the Debtors seeking to amend or modify the Plan of Reorganization, Solicitation Materials, or any documents related to the foregoing, including motions, notices, exhibits, appendices, and orders, in a manner not reasonably acceptable to the counsel to the Informal Noteholders Committee; or

(m)     the Company files any motion or pleading with the Bankruptcy Court that is not materially consistent in any respect to this Agreement or to the Plan of Reorganization and such motion or pleading has not been withdrawn prior to the earlier of (i) five business days of the Company receiving written notice in accordance with Section 8.11 hereof from the counsel to the Informal Noteholders Committee that such motion or pleading is inconsistent with this Agreement or the Plan of Reorganization and (ii) entry of an order of the Bankruptcy Court approving such motion

Notwithstanding any provision in this Agreement to the contrary, upon the written consent of the Consenting Noteholders holding a majority in principal amount of the Unsecured Note Claims held at such time by the Consenting Noteholders, the dates set forth in this Section 6.01 may be extended prior to or upon each such date and such later dates agreed to in lieu thereof and shall be of the same force and effect as the dates provided herein. If this Agreement is terminated by the Consenting Parties pursuant to this Section 6.01, this Agreement shall be automatically and simultaneously terminated as to any other Party that is a signatory to this Agreement. No Party shall terminate this Agreement if such Party is in breach of any provision hereof.

6.02.    Company Termination Events.    The Company may terminate this Agreement upon five business days' prior written notice, delivered in accordance with Section 8.11 hereof, upon the occurrence of any of the following events (each, a "**Company Termination Event**"):

(a)     the breach by any Consenting Noteholder of any of the representations, warranties, or covenants of such Consenting Noteholder set forth in this Agreement that would have a material adverse impact on the Company or the consummation of the Transactions that remains uncured for a period of five business days after the receipt by the Consenting Noteholder of written notice of such breach from the Company;

(b)     the board of directors of the Company reasonably determines based upon the advice of counsel that proceeding with the Transactions would be inconsistent with the exercise of its fiduciary duties; or

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Transactions.

6.03.     Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement between the Company and the Consenting Noteholders holding a majority in principal amount of the Note Claims held at such time by the Consenting Noteholders.

6.04.     Effect of Termination.  Upon termination of this Agreement under Section 6.01, 6.02, or 6.03, this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Upon the occurrence of any termination of this Agreement, any and all consents tendered by the Parties prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Transactions and this Agreement or otherwise.

6.05.     Termination Upon Effective Date of Plan.  This Agreement shall terminate automatically without any further required action or notice on the date that the Plan of Reorganization becomes effective (immediately following the effectiveness of the Plan of Reorganization).

**Section 7.     *Amendments.***  This Agreement may not be modified, amended, or supplemented (except as expressly provided herein or therein) except in writing signed by the Company and a majority in principal amount of the Consenting Noteholders.

**Section 8.     *Miscellaneous.***

8.01.     Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Transactions contemplated in this Agreement and in the Plan of Reorganization.

8.02.     Complete Agreement.  This Agreement and the attachments hereto represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between the Parties with respect thereto.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

8.03.     Parties.  This Agreement shall be binding upon, and inure to the benefit of, the Parties.  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.03 hereof.  Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

8.04.  Headings.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

8.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City in the Borough of Manhattan (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; *provided, however*, that if the Company commences one or more chapter 11 cases, then the Bankruptcy Court shall be the sole Chosen Court.  Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

8.06.  Execution of Agreement.  This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

8.07.  Interpretation.  This Agreement is the product of negotiations between the Company and counsel to the Informal Noteholders Committee and, in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

8.08.  Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

8.09.  Creditors' Committee.  Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to and serves on an official committee of creditors in the chapter 11 cases, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise (in its sole discretion) of its fiduciary duties to any person arising from its service on such committee, and any such exercise (in the sole discretion of such Consenting Noteholder) of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; *provided, however*, that nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any official committee in any such chapter 11 case.

8.10. <u>Relationship Among Consenting Noteholders</u>. It is understood and agreed that no Consenting Noteholder has any fiduciary duty or other duty of trust or confidence in any form with any other Consenting Noteholder, and, except as provided in this Agreement, there are no commitments among or between them.

8.11. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, if sent by telecopy, electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as shall be specified by like notice):

(a)     if to the Company, to:

U.S. Concrete, Inc.
2925 Briarpark
Suite 1050
Houston, Texas 77024
Facsimile: (713) 499-6201
Attention: Curt Lindeman, Esq.
E-mail address: clindeman@us-concrete.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle St.
Chicago, Illinois 60654
Facsimile: (312) 862-2200
Attention: Patrick Nash, Esq. and Ross Kwasteniet, Esq.
E-mail addresses: patrick.nash@kirkland.com and ross.kwasteniet@kirkland.com

(b)     if to a Consenting Noteholder or a transferee thereof, to the addresses or telecopier numbers set forth below following the Consenting Noteholder's signature (or as directed by any transferee thereof), as the case may be

with copies (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Andrew Rosenberg, Esq. and Laruen Shumejda, Esq.
E-mail addresses: arosenberg@paulweiss.com and lshumejda@paulweiss.com

(c)     if to the Informal Noteholders Committee, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Andrew Rosenberg, Esq. and Laruen Shumejda, Esq.
E-mail addresses: arosenberg@paulweiss.com and lshumejda@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by telecopier shall be effective upon oral or machine confirmation of transmission.

8.12. <u>Access</u>.    The Company will afford the Consenting Noteholders and their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to all properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Company; *provided, however,* that the Company's obligation hereunder shall be conditioned upon such Consenting Noteholder being party to an executed confidentiality agreement approved by and with the Company.    The Company acknowledges and agrees that certain members of the Informal Noteholders Committee have complied with the requirements of this Section 8.12 by virtue of their existing confidentiality arrangements with the Company.

8.13. <u>Waiver</u>.    Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Noteholder or the ability of each Consenting Noteholder to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against or interests in the Company.  If the Transactions are not consummated, or if this Agreement is terminated for any reason (other than Section 6.05 hereof, in which case the Parties shall have any rights set forth in the confirmed Plan of Reorganization, any other court-approved documents, and any other agreements between the Parties entered into after the Petition Date), the Parties fully reserve any and all of their rights.  Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.14. <u>Specific Performance</u>.    It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

8.15. <u>Several, Not Joint, Obligations</u>.    The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

8.16. <u>Remedies Cumulative</u>.    All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not

preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

8.17. <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

**Section 9.** *Disclosure.* The Company shall publicly disclose (a) the existence of this Agreement and the material terms of the Plan of Reorganization in a press release and/or filing with the Bankruptcy Court on or before 2 business days of the date upon which the Plan of Reorganization is filed and (b) any material amendment to this Agreement and the Plan of Reorganization in a filing with the Bankruptcy Court following the effective date of such amendment in form and substance reasonably acceptable to counsel to the Informal Noteholders Committee. To the extent reasonably practicable, the Company will submit to counsel for the Informal Noteholders Committee all press releases and public filings relating to this Agreement, the Plan of Reorganization, or the transactions contemplated hereby and thereby and any amendments thereof at least two days prior to releasing such press releases or making such public filings and shall consult in good faith with such counsel regarding the form and substance of such press releases and public filings. To the extent that the Company fails to make such initial disclosure within two business days of the date upon which the Plan of Reorganization is filed, or the effective date of any amendment hereto, each of the Consenting Noteholders shall have the right, but not the obligation, to disclose such terms publicly. The Company shall not (a) use the name of any Consenting Noteholders in any press release without such Consenting Noteholder's prior written consent or (b) disclose to any person other than legal and financial advisors to the Company the principal amount or percentage of any Notes Claims or any securities of the Company or any of their respective subsidiaries held by any Consenting Noteholder; *provided, however*, that the Company shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of the Notes Claims held by the Consenting Noteholders or by persons who have otherwise agreed to participate in the Solicitation as a group; *provided further, however*, that the legal and financial advisors to the Company may disclose the names of holders of Notes Claims to the extent such advisors deem necessary to satisfy the obligations to make disclosures of connections to parties in interest in connection with being retained to advise the Company under section 327(a) of the Bankruptcy Code.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

*[signature pages follow]*

**Signature Page to the Restructuring and Lock-Up Agreement**

**U.S. CONCRETE, INC.,**
a Delaware Corporation

By: _____
    Name: Robert D. Hardy
    Title:  Executive Vice President and Chief
           Financial Officer

**ALBERTA INVESTMENTS, INC.,**
a Texas Corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**ALLIANCE HAULERS, INC.,**
a Texas Corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**AMERICAN CONCRETE PRODUCTS, INC.,**
a California Corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**ATLAS-REDI-MIX, LLC,**
a Texas Limited Liability Company

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**ATLAS TUCK CONCRETE, INC.,**
an Oklahoma Corporation

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**BEALL CONCRETE ENTERPRISES, LLC,**
a Texas limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**BEALL INDUSTRIES INC.,**
a Texas Corporation

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**BEALL INVESTMENT CORPORATION, INC.,**
a Delaware corporation

By: _____
    Name: [•]
    Title:   [•]

**BEALL MANAGEMENT, INC.,**
a Texas corporation

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**BRECKENRIDGE READY MIX, INC.,**
a Texas corporation

By: _____
    Name: Robert D/ Hardy
    Title:   President

**BUILDERS' REDI-MIX, LLC,**
a Delaware limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**BWB, INC. OF MICHIGAN,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**CENTRAL CONCRETE SUPPLY CO., INC.,**
a California corporation

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**CENTRAL PRECAST CONCRETE, INC.,**
a California corporation

By: _____
    Name: Curt M. Lindeman
    Title:   Vice President and Secretary

**CONCRETE ACQUISITION III, LLC,**
a Delaware limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:   President

**CONCRETE ACQUISITION IV, LLC,**
a Delaware limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:  President

**CONCRETE ACQUISITION V, LLC,**
a Delaware limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:  President

**CONCRETE ACQUISITION VI, LLC,**
a Delaware limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:  President

**CONCRETE XXXIII ACQUISITION, INC.,**
a Delaware corporation

By: _____
    Name:  Curt M. Lindeman
    Title:  President

**CONCRETE XXXIV ACQUISITION, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  President

**CONCRETE XXXV ACQUISITION, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  President

**CONCRETE XXXVI ACQUISITION, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  President

**EASTERN CONCRETE MATERIALS, INC.,**
a New Jersey corporation

By: _____
    Name: Robert D. Hardy
    Title:  President and Secretary

**HAMBURG QUARRY LIMITED LIABILITY COMPANY,**
a New Jersey limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**INGRAM CONCRETE, LLC.,**
a Texas limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**KURTZ GRAVEL COMPANY**,
a Michigan corporation

By: _____
     Name: Robert D. Hardy
     Title:  Vice President and Secretary

**LOCAL CONCRETE SUPPLY & EQUIPMENT, LLC**,
a Delaware limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  President and Secretary

**MASTER MIX CONCRETE, LLC**,
a New Jersey limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  President and Secretary

**MASTER MIX, LLC**,
a Delaware limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  President and Secretary

**MG, LLC**,
a Maryland limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  Vice President and Secretary

**NYC CONCRETE MATERIALS, LLC,**
a Delaware limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  President and Secretary

**PEBBLE LANE ASSOCIATES, LLC,**
a Delaware limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  President and Secretary

**REDI-MIX CONCRETE, L.P.,**
a Texas limited partnership

By: _____
     Name: Curt M. Lindeman
     Title:  Vice President and Secretary

**REDI-MIX GP, LLC,**
a Texas limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  Vice President and Secretary

**REDI-MIX, LLC,**
a Texas limited liability company

By: _____
     Name: Curt M. Lindeman
     Title:  Vice President and Secretary

**RIVERSIDE MATERIALS, LLC,**
a Delaware limited liability company

By: _____
    Name: Robert D. Hardy
    Title:  President and Secretary

**SAN DIEGO PRECAST CONCRETE, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**SIERRA PRECAST, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**SMITH PRE-CAST, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**SUPERIOR CONCRETE MATERIALS, INC.,**
a District of Columbia corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**SUPERIOR HOLDINGS, INC.,**
a Michigan corporation

By: _____
    Name: Robert D. Hardy
    Title:  Vice President and Secretary

**TITAN CONCRETE INDUSTRIES, INC.,**
a Delaware corporation

By: _____
    Name: Robert D. Hardy
    Title:  Vice President and Secretary

**U.S. CONCRETE ON-SITE, INC.,**
a Delaware corporation

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**SMITH PRE-CAST, INC.,**
a Delaware corporation

By: _____
    Name: [•]
    Title:  [•]

**USC ATLANTIC, INC.,**
a Delaware corporation

By: _____
    Name: Sean Core
    Title:  Vice President and Secretary

**USC MANAGEMENT CO., LLC,**
a Texas limited liability company

By: _____
    Name: Curt M. Lindeman
    Title:  Vice President and Secretary

**USC MICHIGAN, INC.,**
a Delaware corporation

By: _____
    Name: Michael W. Harlan
    Title:  Vice President and Secretary

**USC PAYROLL, INC.,**
   a Delaware corporation

By: _____
       Name:  Curt M. Lindeman
       Title:   Vice President and Secretary

**USC TECHNOLOGIES INC.,**
   a Delaware corporation

By: _____
       Name:  Curt M. Lindeman
       Title:   Vice President and Secretary

**Signature Page to the Restructuring and Lock-Up Agreement**


Name of Entity:_____

By:_____
Name:
Title:

Address:


Attention:
Telephone:
Facsimile:

Principal Amount of Notes Claim Held: $_____