IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| U.S. CONCRETE, INC., *et al.*,[1] ) | |
| ) | Case No. 10-11407 (PJW) |
| Debtors. ) | |
| ) | (Joint Administration Requested) |

## MOTION OF U.S. CONCRETE, INC., *ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES

U.S. Concrete, Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (this "Motion"), for the entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, determining adequate assurance of payment for future utility services. In support of this Motion, the Debtors respectfully state as follows.[2]

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, if any, include: U.S. Concrete, Inc. (6680); Alberta Investments, Inc. (1497); Alliance Haulers, Inc. (3236); American Concrete Products, Inc. (3187); Atlas Redi-Mix, LLC (3123); Atlas-Tuck Concrete, Inc. (1542); Beall Concrete Enterprises, LLC (3536); Beall Industries, Inc. (2872); Beall Investment Corporation, Inc. (9865); Beall Management, Inc. (9839); Breckenridge Ready Mix, Inc. (2482); Central Concrete Supply Co., Inc. (1859); Central Precast Concrete, Inc. (9358); Concrete Acquisition III, LLC (5638); Concrete Acquisition IV, LLC (5720); Concrete Acquisition V, LLC (5777); Concrete Acquisition VI, LLC (5840); Concrete XXXIII Acquisition, Inc. (6120); Concrete XXXIV Acquisition, Inc. (6167); Concrete XXXV Acquisition, Inc. (6206); Concrete XXXVI Acquisition, Inc. (6240); Eastern Concrete Materials, Inc. (1165); Hamburg Quarry Limited Liability Company (3592); Ingram Concrete, LLC (6753); Local Concrete Supply & Equipment, LLC (6597); Master Mix Concrete, LLC (0135); Master Mix, LLC (8532); MG, LLC (9279); NYC Concrete Materials, LLC (0666); Pebble Lane Associates, LLC (6520); Redi-Mix Concrete, L.P. (4765); Redi-Mix GP, LLC (N/A); Redi-Mix, LLC (6751); Riverside Materials, LLC (3588); San Diego Precast Concrete, Inc. (6282); Sierra Precast, Inc. (4227); Smith Pre-Cast, Inc. (0673); Superior Concrete Materials, Inc. (6503); Titan Concrete Industries, Inc. (6374); U.S. Concrete On-Site, Inc. (0662); USC Atlantic, Inc. (6002); USC Management Co., LLC (6749); USC Payroll, Inc. (0665); and USC Technologies, Inc. (6055). The location of the debtors' corporate headquarters and the debtors' service address is: 2925 Briarpark, Suite 1050, Houston, Texas 77042.

[2] The facts and circumstances supporting this Motion are set forth in the Declaration of Robert D. Hardy, Executive Vice President and Chief Financial Officer of U.S. Concrete, Inc., in Support of First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

## Jurisdiction and Venue

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105(a) and 366 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Case Overview

4. The Debtors commenced these chapter 11 cases to effectuate a pre-negotiated and fully consensual balance sheet restructuring. The Debtors have filed a chapter 11 plan (the "Plan") that provides for the full equitization of approximately $285 million in principal amount and accrued interest. Holders of a significant majority of the bond debt have signed lock-up agreements in support of the Plan. Other than these bondholders, no creditors are impaired under the Plan. With the support of the bondholders, the Debtors have filed a motion for authority to pay all prepetition unsecured claims in the ordinary course of business. The bondholders have agreed to convert all $285 million of their debt into equity in the reorganized Debtors and, to facilitate a consensual transaction, have agreed to grant the Debtors' existing shareholders warrants to acquire 7.5% of the equity in the reorganized Debtors struck at a price where the equity of the reorganized Debtors is worth $285 million and warrants to acquire an additional 7.5% of the equity in the reorganized Debtors struck at a price where the equity value of the reorganized Debtors is worth $335 million.

## Background

5. On the date hereof (the "Petition Date"), U.S. Concrete, Inc. and 43 of its affiliates each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

6. The Debtors are a major producer of ready-mixed concrete, precast concrete products, and concrete-related products in select markets in the United States. The Debtors are a public company that employs approximately 2,100 people throughout their more than 140 locations in the United States. They operate principally in Texas, California, New Jersey/ New York, and Michigan, with those operations representing approximately 35%, 30%, 15%, and 9%, respectively, of the Debtors' 2009 consolidated revenue.

7. As of the Petition Date, the Debtors owed approximately $40 million under a prepetition secured credit facility. The Debtors' prepetition secured credit facility (the "Prepetition Secured Credit Facility") provides for up to $60 million of revolving credit, the availability of which is determined by a formula based on the Debtors' current accounts receivable, inventory and equipment. JPMorgan Chase Bank, N.A., serves as administrative agent (the "Prepetition Secured Agent") for the Prepetition Secured Credit Facility. In addition to the amount of revolving loans drawn on the Prepetition Secured Credit Facility, as of the Petition Date the Debtors had also issued approximately $17.9 million in undrawn letters of credit under the Prepetition Secured Credit Facility. The Debtors also owe approximately $285 million in unsecured notes, including principal and accrued interest. The Debtors' unsecured notes were issued pursuant to an indenture dated March 31, 2004 and a supplemental indenture

3

dated July 5, 2006 (collectively, the "Note Indenture"). Under the Note Indenture, U.S. Concrete, Inc. issued a total of approximately $285 million in 8.325% notes due 2014 (the "Notes").

8. As is well-documented, the capital markets collapsed in September 2008. The resulting economic crisis and the related downturn in the real estate industry had a substantial negative impact on the United States concrete industry. The Debtors experienced a dramatic drop in production by volume from a high of 7.3 million cubic yards of concrete in 2006 and 7.6 million cubic yards in 2007 to 6.5 million cubic yards in 2008 and 4.6 million cubic yards in 2009, leading to a decline in revenues from $728.5 million in 2006 and $803.8 million in 2007 to $754.2 million in 2008 and $534.5 million in 2009, and a corresponding decline in EBITDA from $75.6 million in 2006 and $68.2 million in 2007 to $40.6 million in 2008 and $22.4 million in 2009.

9. In response to the protracted, declining sales volumes, the Debtors implemented extensive cost reduction efforts in an effort to restore profitability. From 2007 through 2009, the Debtors implemented workforce reductions, plant idling, equipment dispositions, and divestitures of nonperforming business units to reduce structural costs. In 2010, the Debtors implemented further cost-cutting measures, including wage freezes, elimination of their 401(k) company match program, and other reductions in other employee benefits, and a significant scaling back of capital investment in their plants and equipment.

10. Nonetheless, the continued weakening economic conditions, including ongoing softness in residential construction, further softening of demand in the commercial sector, and delays in public works projects in many of the Debtors' markets, have placed significant stress on the Debtors' liquidity position. The Debtors expect this trend will continue through at least

the duration of 2010. Given the decline in production volumes and the sharp drop off in revenue and EBITDA, the Debtors were no longer able to continue to service the interest on the Notes and recognized the need to de-lever their balance sheet.

11. Prior to the Petition Date, the Debtors negotiated extensively with an ad hoc committee (the "Informal Noteholders Committee") representing holders of more than 80% of the Notes. The Debtors commenced these chapter 11 cases to implement a consensual balance sheet restructuring. Concurrently herewith, the Debtors have filed the Plan that provides for the full equitization of the Notes. Shortly before the Petition Date, holders of a substantial majority of the Notes executed a lock-up agreement in support of the Plan. The Plan provides that the Notes will be converted into 100% of the equity in the reorganized debtors and that existing shareholders will receive warrants to acquire up to 15% of the reorganized equity, with exercise prices to be set forth based upon achievement of certain valuation hurdles for the reorganized Debtors. These equity allocations are subject to dilution, as set forth in more detail in the Plan.

12. Other than the Notes, no other creditors are impaired under the Plan. The Debtors have filed a motion seeking authority to continue to pay all unsecured claims (other than the Notes) in their discretion in the ordinary course of business.

13. The Debtors anticipate funding these chapter 11 cases through a debtor-in-possession facility to be provided by certain of the existing Secured Lenders (the "DIP Credit Facility"). Upon approval of the DIP Credit Facility by the Court, proceeds thereof will be used to, among other things, repay in full the obligations under the Prepetition Secured Credit Facility and to fund the ongoing operating expenses of the Debtors' businesses and the costs of these chapter 11 cases.

14. The Debtors are extremely pleased with the highly consensual nature of the Plan and hope to exit chapter 11 as quickly as possible. The Debtors look forward to emerging from chapter 11 with a strong balance sheet and with a much-improved ability to compete, to invest in their business, and to gain market share going forward.

## The Utility Providers

15. As set forth in the First Day Declaration, in the ordinary course of business, the Debtors incur expenses for gas, water, sewer, electric, telecommunications, and other similar utility services provided by approximately 250 utility providers (as such term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers"), a list of which is attached as **Exhibit C** hereto (the "Utility Service List").[3] On average, the Debtors spend approximately $600,000 each month on utility costs. As of the Petition Date, the Debtors estimate that approximately $200,000 in utility costs may be outstanding. The Debtors do not believe that any past due amounts are owed to the Utility Providers.

16. Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, recoveries to creditors. It, therefore, is critical that utility services continue uninterrupted during these chapter 11 cases.

---

[3] Although the Debtors believe that the Utility Service List includes all of their Utility Providers as of the Petition Date, the Debtors reserve the right to supplement the Utility Service List if any Utility Provider has been omitted. Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

## Relief Requested

17. By this Motion, the Debtors seek the entry of an interim order (the "Interim Order") and a final order (the "Final Order"): (a) determining that the Utility Providers (as defined herein) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order; (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion, pending entry of the Final Order; and (e) setting a final hearing (the "Final Hearing") on the Debtors' proposed adequate assurance.

### I. The Proposed Adequate Assurance.

18. The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. The Debtors expect that their cash flow from operations and cash on hand will be sufficient to pay postpetition obligations related to their utility service.

19. Nevertheless, to provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit $300,000 (the "Adequate Assurance Deposit"), into a segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within 20 days of the Petition Date. The amount of the Adequate Assurance Deposit equals the estimated aggregate cost for two weeks of utility service, calculated as a historical average over

the past 12 months. The Adequate Assurance Deposit will be held for the benefit of Utility Providers during the pendency of these chapter 11 cases.[4]

20.  The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business (together, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers. If any Utility Provider believes additional assurance is required, that Utility Provider may request such assurance pursuant to the procedures set forth below.

21.  In light of the severe consequences to the Debtors of any interruption in services by the Utility Providers, but recognizing the right of the Utility Providers to evaluate the Proposed Adequate Assurance on a case-by-case basis, the Debtors propose that the Court approve and adopt the following procedures (the "Adequate Assurance Procedures").

    a.    Within two business days after entry of the Interim Order, the Debtors will mail a copy of the Interim Order to the Utility Providers on the Utility Service List.

    b.    If a Utility Provider is not satisfied with the Proposed Adequate Assurance and seeks additional assurance of payment in the form of deposits, prepayments, or otherwise, it must serve a request (an "Additional Assurance Request") upon (i) U.S. Concrete, Inc., 2925 Briarpark, Suite 1050, Houston, Texas 77042, Attn: Curt Lindeman, General Counsel; (ii) proposed counsel to U.S. Concrete, Inc., Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Ross Kwastenient and Scott Kitei; (iii) proposed local counsel to U.S. Concrete, Inc., Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705, Attn: Laura Davis Jones; (iv) proposed counsel to the Informal Noteholders Committee, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064, Attn: Andrew Rosenberg and Lauren Shumejda; and (v) The Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: David M. Klauder (collectively, the "Notice Parties").

---

[4] The Debtors further request that any Adequate Assurance Deposit required by, and deposited into the Adequate Assurance Deposit Account on behalf of, any Utility Provider pursuant to the procedures described herein be returned to the Debtors upon confirmation of a plan of reorganization, if not applied or returned earlier.

c. Any Additional Assurance Request must: (i) be made in writing; (ii) set forth the location for which utility services are provided; (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits; (iv) certify the amount that is equal to two weeks of utility service it provides to the Debtors, calculated as a historical average over the past 12 months; (v) certify that it currently is not paid in advance for its services; and (vi) explain why the Utility Provider believes the Debtors' Adequate Assurance is not sufficient adequate assurance of future payment.

d. Upon the Debtors' receipt of any Additional Assurance Request at the addresses set forth above, the Debtors shall have 20 days from the receipt of such Additional Assurance Request (the "Resolution Period") to negotiate with such Utility Provider to resolve such Utility Provider's request for additional assurance of payment.

e. The Debtors may, upon giving notice to counsel to the Informal Noteholders Committee, resolve any Additional Assurance Request by mutual agreement with the Utility Provider and without further order of the Court, and may, in connection with any such agreement, provide a Utility Provider with additional adequate assurance of future payment, including, but not limited to, cash deposits, prepayments, and other forms of security, without further order of the Court if the Debtors believe such additional assurance is reasonable.

f. If the Debtors determine that the Additional Assurance Request is not reasonable and are not able to reach an alternative resolution with the Utility Provider during the Resolution Period, the Debtors, during or immediately after the Resolution Period, will request a hearing before the Court to determine the adequacy of assurances of payment with respect to a particular Utility Provider (the "Determination Hearing") pursuant to section 366(c)(3) of the Bankruptcy Code.

g. Pending resolution of any such Determination Hearing, the Utility Provider filing such Additional Assurance Request shall be prohibited from altering, refusing, or discontinuing service to the Debtors on account of unpaid charges for prepetition services or on account of any objections to the Proposed Adequate Assurance.

h. The Proposed Adequate Assurance shall be deemed adequate assurance of payment for any Utility Provider that does not make an Additional Assurance Request.

22. Absent compliance with the Adequate Assurance Procedures, the Utility Providers are forbidden to alter, refuse, or discontinue service on account of any prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance, pending entry of the Final Order.

## II. Final Hearing Date.

23. Historically, under section 366 of the Bankruptcy Code, chapter 11 debtors were able to put the onus on utility providers to argue that the debtor's proposed form of adequate assurance was insufficient. However, as described in more detail below, section 366 of the Bankruptcy Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), arguably shifts the burden onto debtors to provide adequate assurance the utility provider finds satisfactory and to seek court review if the utility provider does not accept the proposed adequate assurance. Under this reading of revised section 366 of the Bankruptcy Code, a Utility Provider could, theoretically, on the 29th day following the Petition Date, announce that the Proposed Adequate Assurance is not acceptable and demand an extortionary deposit or prepayment from the Debtors and threaten to terminate utility service the next day unless the Debtors comply with the demand. While the Debtors do not concede that this is a correct reading of revised section 366 of the Bankruptcy Code, the Debtors nonetheless believe it is prudent to require Utility Providers to raise any objections to the Proposed Adequate Assurance and the proposed Adequate Assurance Procedures so that objections may be heard within the first 30 days following the Petition Date.

24. To resolve any objections to the Proposed Adequate Assurance and the Proposed Adequate Assurance Procedures no later than 30 days after the Petition Date, the Debtors request that the Court schedule the Final Hearing approximately 25 days after the Petition Date. The Debtors shall send notice of the Final Hearing, in substantially the form of **Exhibit 1** attached to **Exhibit A** hereto, along with the Interim Order to all Utility Providers listed on the Utility Service List, no later than two business days after entry of the Interim Order.

### III. Subsequent Modifications.

25.     To the extent that the Debtors subsequently identify additional providers of utility services, the Debtors seek authority to amend the Utility Service List to add or remove any Utility Provider. The Debtors further request that the Court make the Interim Order and the Final Order apply to any such subsequently identified Utility Provider, regardless of when each Utility Provider was added to the Utility Service List. The Debtors shall have the period specified in the proposed Adequate Assurance Procedures to seek to resolve any subsequently added Utility Provider's Additional Assurance Request by mutual agreement with the Utility Provider without further order of the Court or to schedule a Determination Hearing with the Court to determine the adequacy of assurance of payment with respect to such Utility Provider in accordance with such Adequate Assurance Procedures.

26.     The Debtors request that all Utility Providers, including subsequently added Utility Providers, be prohibited from altering, refusing, or discontinuing utility services to the Debtors absent further order of the Court.

### Basis for Relief

### I. The Utility Providers are Adequately Assured of Payment for Future Services.

27.     Section 366(c)(2) of the Bankruptcy Code provides that a utility provider may discontinue its services to a debtor if the debtor has not furnished adequate assurance of payment within 30 days after the petition date. Congress enacted section 366 of the Bankruptcy Code to protect debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services. *See* H.R. Rep. No. 95-595, at 350 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6306. Accordingly, section 366 of the Bankruptcy Code protects debtors by prohibiting utilities from altering, refusing, or discontinuing services to a debtor solely on account of unpaid prepetition

11

amounts for a period of 30 days after a chapter 11 filing. At the same time, it protects utilities by permitting them to alter, refuse, or discontinue service after 30 days if the debtor has not furnished "adequate assurance" of payment in a form "satisfactory" to the utility.

28. Section 366(c) of the Bankruptcy Code also restricts the factors that a court may consider when determining whether an adequate assurance payment is, in fact, adequate. Specifically, courts no longer may consider (a) the absence of a security deposit before a debtor's petition date, (b) a debtor's history of timely payments, or (c) the availability of an administrative expense priority when determining the amount of a deposit. Notwithstanding these changes, it does not appear that Congress intended to—or did—abrogate the bankruptcy court's ability to determine the amount of adequate assurance necessary or change the fundamental requirement that assurance of payment must simply be "adequate."

29. Thus, while section 366(c) of the Bankruptcy Code limits the factors a court can consider when determining whether a debtor has provided adequate assurance of payment, it does not limit the court's ability to determine the amount of payment necessary, if any, to provide such adequate assurance. Instead, section 366(c) of the Bankruptcy Code gives courts the same discretion in determining the amount of payment necessary for adequate assurance that they previously had under section 366(b) of the Bankruptcy Code. *Compare* 11 U.S.C. § 366(b) (2005) ("On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.") *with* 11 U.S.C. § 366(c)(3)(a) (2005) ("On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance payment under paragraph (2).").

88614-001\DOCS_DE:159478.1

30. In addition, it is well-established that section 366(b) of the Bankruptcy Code permits a court to find that no adequate assurance payment at all is necessary to provide a utility with adequate assurance of payment. *See Virginia Elec. & Power Co. v. Caldor Inc.-N.Y.*, 117 F.3d 646, 650 (2d Cir. 1997) ("Even assuming that 'other security' should be interpreted narrowly, . . . a bankruptcy court's authority to 'modify' the level of the 'deposit or other security' provided for under § 366(b), includes the power to require 'no deposit or other security' where none is necessary to provide a utility supplier with 'adequate assurance of payment.'"). This principle may be applicable in cases where the debtor has made prepetition deposits or prepayments for services that utilities ultimately will render postpetition. *See* 11 U.S.C. § 366(c)(1)(A)(v) (recognizing a prepayment for postpetition services as adequate assurance). Accordingly, even after the 2005 revisions to section 366 of the Bankruptcy Code, courts continue to have discretion to determine the amount of adequate assurance payments and, where appropriate, to determine that no such payment is necessary.

31. Finally, section 366(c) of the Bankruptcy Code, like section 366(b) of the Bankruptcy Code, requires only that a utility's assurance of payment be "adequate." Courts recognize that adequate assurance of performance does not constitute an absolute guarantee of a debtor's ability to pay. *See, e.g., In re Adelphia Bus. Solutions, Inc.*, 280 B.R. 63, 80 (Bankr. S.D.N.Y. 2002) ("In determining adequate assurance, a bankruptcy court is not required to give a utility company the equivalent of a guaranty of payment, but must only determine that the utility is not subject to an unreasonable risk of nonpayment for postpetition services."); *see also In re Caldor, Inc.-N.Y.*, 199 B.R. 1, 3 (Bankr. S.D.N.Y. 1996) (stating that section 366(b) "does not require an 'absolute guarantee of payment'"), *aff'd sub nom. Virginia Elec. & Power Co. v. Caldor, Inc.-N.Y.*, 117 F.3d 646 (2d Cir. 1997). Courts also have recognized that, in determining

13

the requisite level of adequate assurance, bankruptcy courts should "focus 'upon the need of the utility for assurance, and to require that the debtor supply *no more than that*, since the debtor almost perforce has a conflicting need to conserve scarce financial resources.'" *Virginia Elec. & Power Co.*, 117 F.3d at 650 (emphasis in original); *see also In re Penn. Cent. Transp. Co.*, 467 F.2d 100, 103-04 (3d Cir. 1972) (affirming bankruptcy court's ruling that no utility deposits were necessary where such deposits likely would "jeopardize the continuing operation of the debtor merely to give further security to suppliers who already are reasonably protected"). Accordingly, demands by a Utility Provider for a guarantee of payment should be refused when the Debtors' specific circumstances already afford adequate assurance of payment.

32.  The Debtors submit that the Proposed Adequate Assurance, the Adequate Assurance Deposit Account, and the Adequate Assurance Procedures provide more than adequate assurance of future payment. Furthermore, the Debtors expect that revenue from continued operations, coupled with cash on hand, will be sufficient to pay their operating costs, including utility costs, as such costs come due. Moreover, the Debtors have a powerful incentive to stay current on utility obligations because of their reliance on utility services for the operation of their businesses. These factors, which the Court may (and should) consider when determining the amount of any adequate assurance payments, justify a finding that the Proposed Adequate Assurance, Adequate Assurance Deposit Account, and the Adequate Assurance Procedures are more than sufficient to assure the Utility Providers of future payment.

33.  The Court has granted similar relief to that requested herein in a number of cases in this district. *See, e.g., In re Stallion Oilfield Servs. Ltd.*, No. 09-13562 (BLS) (Bankr. D. Del. Nov. 16, 2009) (deeming utilities adequately assured where the debtor established a segregated account containing the aggregate estimated cost for two weeks of utility service); *In re Visteon*

*Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009) (same); *In re Masonite Corp.*, No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009) (same); *In re Portola Packaging, Inc.*, No. 08-12001 (CSS) (Bankr. D. Del. Aug. 29, 2008) (same); *In re Hines Horticulture, Inc.*, No. 08-11922 (KJC) (Bankr. D. Del. Aug. 22, 2008) (same); *In re Pierre Foods, Inc.*, No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008) (same); *In re ACG Holdings, Inc.*, No. 08-11467 (CSS) (Bankr. D. Del. July 16, 2008) (same); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 6, 2008) (same); *In re Leiner Health Prods. Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008) (same); *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Feb. 28, 2008) (same); *In re Am. Home Mortgage Holdings, Inc.*, No. 07-11047 (CSS) (Bankr. D. Del. Sept. 4, 2007) (same); *In re Global Home Prods. LLC*, No. 06-10340 (KG) (Bankr. D. Del. May 4, 2006) (same); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. D. Del. Apr. 24, 2007) (same); *In re Pliant Corp.*, No. 06-10001 (MFW) (Bankr. D. Del. Feb. 8, 2006) (same); *In re Nobex Corp.*, No. 05-20050 (MFW) (Bankr. D. Del. Dec. 21, 2005) (same); *In re FLYi, Inc.*, No. 05-20011 (MFW) (Bankr. D. Del. Dec. 2, 2005) (same).[5]

34. Moreover, if a Utility Provider disagrees with the Debtors' analysis, the Adequate Assurance Procedures will enable the parties to negotiate and, if necessary, seek Court intervention without jeopardizing the Debtors' continuing operations.

## II. The Adequate Assurance Procedures are Appropriate.

35. The Court has authority to approve the Adequate Assurance Procedures under section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the

---

[5] Because of the voluminous nature of the orders cited herein, such orders are not attached to the Motion. Copies of these orders are available upon request of the Debtors' counsel.

provisions of the Bankruptcy Code." The purpose of section 105(a) of the Bankruptcy Code is "to assure the bankruptcy courts sic power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. rev. 2007).

36. The proposed procedures are necessary in these chapter 11 cases. If they are not approved, the Debtors could be forced to address numerous requests by the Utility Providers in a disorganized manner during the critical first weeks of these chapter 11 cases. Moreover, a Utility Provider could blindside the Debtors by unilaterally deciding—on or after the 30th day following the Petition Date—that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service. Discontinuation of utility service could essentially shut down operations, and any significant disruption of operations could jeopardize these chapter 11 cases.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

37. Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

38. Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties. Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone. Rather, Bankruptcy Rule 6003 speaks of "immediate and

16

irreparable harm" generally. *Cf.* Bankruptcy Rule 4001(b)(2), (c)(2) (referring to "irreparable harm to the *estate*") (emphasis added). Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions. *See* 9 COLLIER ON BANKRUPTCY ¶ 4001.06[3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)). Courts will routinely consider third party interests when granting such relief. *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

39. It is imperative that the Debtors' Utility Providers continue to provide utility services in the ordinary course of business. Failure to do so would likely result in immediate and irreparable harm to the Debtors' customer relations. The Debtors require basic services such as gas, water, sewer, electric, and telecommunications in order to maintain day-to-day operations. Any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, recoveries to creditors. Accordingly, the Debtors meet the "immediate and irreparable harm" standard of Bankruptcy Rule 6003.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

40. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of a property under Bankruptcy Rule 6004(h).

### Notice

41. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the agent for the Debtors' prepetition and proposed postpetition secured lenders; and (c) the Informal Noteholders Committee. Following the first day hearing in this case, this Motion will

be served on (a) creditors holding the twenty (20) largest unsecured claims against the Debtors on a consolidated basis as identified in the Debtors' petitions, or their legal counsel (if known); (b) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (c) those Utility Providers listed on **Exhibit A** to the Motion, or their legal counsel (if known). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

42. No prior request for the relief sought in this Motion has been made to this or any other

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: April 29, 2010

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ Laura Davis Jones

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Mark M. Billion (Bar No. 5263)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
joneill@pszjlaw.com
mbillion@pszjlaw.com

and

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen (*pro hac vice* pending)
Patrick Nash (*pro hac vice* pending)
Ross Kwastenient (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-Mail: james.sprayregen@kirkland.com
patrick.nash@kirkland.com
ross.kwastenient@kirkland.com