# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| U.S. CONCRETE, INC., *et al.*,[1] | ) | Case No. 10-11407 (PJW) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

---

## MOTION OF U.S. CONCRETE, INC., *ET AL.*, FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (C) AUTHORIZING THE DEBTORS TO REPAY THE PREPETITION CREDIT AGREEMENT OBLIGATIONS, (D) MODIFYING THE AUTOMATIC STAY, AND (E) SCHEDULING A FINAL HEARING

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (the "Motion") for entry of an interim order (the "Interim Order"), substantially in

the form attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the

Interim Order, the "DIP Orders") (i) authorizing the Debtors to obtain postpetition financing (the

"DIP Facility"), (ii) granting liens and superpriority claims in connection with the DIP Facility,

(iii) authorizing the Debtors to repay their obligations under the Prepetition Secured Credit

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, if any, include: U.S. Concrete, Inc. (6680); Alberta Investments, Inc. (1497); Alliance Haulers, Inc. (3236); American Concrete Products, Inc. (3187); Atlas Redi-Mix, LLC (3123); Atlas-Tuck Concrete, Inc. (1542); Beall Concrete Enterprises, LLC (3536); Beall Industries, Inc. (2872); Beall Investment Corporation, Inc. (9865); Beall Management, Inc. (9839); Breckenridge Ready Mix, Inc. (2482); Central Concrete Supply Co., Inc. (1859); Central Precast Concrete, Inc. (9358); Concrete Acquisition III, LLC (5638); Concrete Acquisition IV, LLC (5720); Concrete Acquisition V, LLC (5777); Concrete Acquisition VI, LLC (5840); Concrete XXXIII Acquisition, Inc. (6120); Concrete XXXIV Acquisition, Inc. (6167); Concrete XXXV Acquisition, Inc. (6206); Concrete XXXVI Acquisition, Inc. (6240); Eastern Concrete Materials, Inc. (1165); Hamburg Quarry Limited Liability Company (3592); Ingram Concrete, LLC (6753); Local Concrete Supply & Equipment, LLC (6597); Master Mix Concrete, LLC (0135); Master Mix, LLC (8532); MG, LLC (9279); NYC Concrete Materials, LLC (0666); Pebble Lane Associates, LLC (6520); Redi-Mix Concrete, L.P. (4765); Redi-Mix GP, LLC (N/A); Redi-Mix, LLC (6751); Riverside Materials, LLC (3588); San Diego Precast Concrete, Inc. (6282); Sierra Precast, Inc. (4227); Smith Pre-Cast, Inc. (0673); Superior Concrete Materials, Inc. (6503); Titan Concrete Industries, Inc. (6374); U.S. Concrete On-Site, Inc. (0662); USC Atlantic, Inc. (6002); USC Management Co., LLC (6749); USC Payroll, Inc. (0665); and USC Technologies, Inc. (6055). The location of the debtors' corporate headquarters and the debtors' service address is: 2925 Briarpark, Suite 1050, Houston, Texas 77042.

Agreement (as defined below), (iv) modifying the automatic stay under section 362 of the Bankruptcy Code, and (v) prescribing the form and manner of notice and setting the time for the final hearing on the Motion. In support of the Motion, the Debtors respectfully state as follows.[2]

## Jurisdiction

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Case Overview

4.      The Debtors commenced these chapter 11 cases to effectuate a pre-negotiated and fully consensual balance-sheet restructuring. The Debtors have filed a chapter 11 plan (the "Plan") that provides for the full equitization of approximately $285 million in principal amount and accrued interest. Holders of a significant majority of the bond debt have signed lock-up agreements in support of the Plan. Other than these bondholders, no creditors are impaired under the Plan. With the support of the bondholders, the Debtors have filed a motion for authority to pay all prepetition unsecured claims in the ordinary course of business. The bondholders have

---

[2]    The facts and circumstances supporting this Motion are set forth in the Declaration of Robert D. Hardy, Executive Vice President and Chief Financial Officer of U.S. Concrete, Inc., in Support of First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

agreed to convert all $285 million of their debt into equity in the reorganized Debtors and, to facilitate a consensual transaction, have agreed to grant the Debtors' existing shareholders warrants to acquire 7.5% of the equity in the reorganized Debtors struck at a price where the equity of the reorganized Debtors is worth $285 million and warrants to acquire an additional 7.5% of the equity in the reorganized Debtors struck at a price where the equity value of the reorganized Debtors is worth $335 million.

### Introduction

5.      Prior to the Petition Date (as defined herein), the Debtors needed to amend the terms of their prepetition secured credit facility, as governed by the Amended and Restated Credit Agreement, dated as of June 30, 2006 (as amended, supplemented or otherwise modified, the "Prepetition Secured Credit Agreement"), between Debtor U.S. Concrete, Inc., the lenders party thereto from time to time (the "Prepetition Secured Lenders"), JPMorgan Chase Bank, N.A. ("JPMorgan"), as administrative agent to the Prepetition Secured Lenders (JPMorgan, in such capacity, the "Prepetition Secured Agent"), in order to waive certain defaults and to buy additional time and liquidity to complete the debt-for-equity restructuring negotiations with the bondholders. The Debtors and their advisors conducted a thorough marketing process that solicited proposals for refinancing the prepetition secured debt. Recognizing that the bondholder debt-to-equity restructuring might have to be implemented through an in-court process, the Debtors also solicited proposals for debtor-in-possession financing commitments.

6.      The Debtors, in consultation with advisors to an informal committee of bondholders, evaluated numerous proposals and ultimately selected a refinancing proposal from JP Morgan that included a favorable DIP financing commitment. Beginning in late March, the Debtors and JPMorgan negotiated the terms of a DIP credit agreement (the "DIP Credit Agreement"), the Interim Order, and related documents. Part of the proceeds of the DIP Facility

3

will be used to repay in full all of the obligations under the Prepetition Secured Credit Agreement (the "Prepetition Secured Credit Agreement Obligations"). The population of Prepetition Secured Lenders does not overlap entirely with the proposed DIP lenders, so the proposed DIP lenders agreed to provide a takeout facility to obviate the need to negotiate complex intercreditor priming and adequate protection issues with the Prepetition Secured Lenders.

7.    The Debtors need financing to ensure that the Plan remains on course and to ensure that the Debtors' operations are not negatively affected. Accordingly, the Debtors move on an expedited basis, seeking authorization to obtain DIP financing in light of the immediate and irreparable harm that the Debtors' estates likely will suffer if the relief requested is not granted. Specifically, the Debtors have an urgent need to obtain DIP financing for, among other things, continuing the operation of their businesses in an orderly manner, maintaining business relationships with vendors, suppliers, and customers, paying employees, and satisfying other working capital and operational needs—all of which are necessary to minimize disruption to the Debtors' business operations and ensure that the Debtors can consummate their balance-sheet restructuring.[3]    Moreover, the Debtors seek to use the proceeds of the proposed postpetition financing to repay in full the Prepetition Secured Credit Agreement Obligations, as required by the DIP Facility as a condition precedent to closing.

---

[3]    A copy of the Debtors' DIP budget is attached hereto as **Exhibit B**.

4

<u>**Summary of Relief Requested**</u>

8.    In accordance with Bankruptcy Rule 4001(c), below is a summary of the terms of

the proposed DIP Orders and DIP Facility, as applicable:[4]

| | |
|---|---|
| **Interest Rate** | If a CBFR loan, CB Floating Rate plus 4.25% if a term loan or 2.50% if a revolving loan. If a Eurodollar loan, an adjusted LIBOR (subject to a LIBOR floor of 2% in the case of a term loan) plus 5.25% if a term loan or 3.50% if a revolving loan. *See* DIP Credit Agreement, § 2.9. |
| **Maturity** | On or about April 30, 2011, subject to a three month extension to July 30, 2011 by the Debtors provided certain conditions precedent are satisfied. *See* DIP Credit Agreement, § 2.23 and Def. of "Scheduled Termination Date." |
| **Events of Default** | Usual and customary Events of Default for financing of this kind. *See* DIP Credit Agreement, Art. IX. |
| **Liens** | Substantially all property and interests in property or the proceeds thereof now owned or hereafter acquired by any Loan Party, but excluding Avoidance Actions (but, subject to entry of the Final Order, not the proceeds thereof) or any assets upon which security may not be lawfully granted, 34% of stock of any new or existing Excluded Foreign Subsidiary, Stock in the Excluded JV Equity, the Excluded JV Assets, and other property and assets excluded pursuant to the terms of the Pledge and Security Agreement. *See* DIP Credit Agreement, Defs. of "Collateral," "Excluded Collateral," and "Excluded Stock." |
| **Borrowing Limits** | $80 million in the aggregate, consisting of a $45 million Term Loan and a $35 million asset-based Revolving Loan. *See* DIP Credit Agreement, § 2.1. |
| **Borrowing Conditions** | Usual and customary borrowing conditions for financing of this kind. *See* DIP Credit Agreement, Art. III. |
| **364(c) Liens** | The DIP Credit Agreement provides for the following benefits under section 364(c) of the Bankruptcy Code: (i) an allowed administrative expense entitled to superiority over any and all other administrative expenses, pursuant to section 364(c)(1); (ii) a perfected first priority (subject to permitted exceptions) lien on all present and after-acquired property not subject to an existing valid, perfected, and non-avoidable |

---

[4]    Capitalized terms used in the following summary chart and not otherwise defined shall have the meanings ascribed to such terms in the DIP Credit Agreement.

Lien, pursuant to section 364(c)(2); and (iii) a perfected junior lien on all present and after-acquired property that is otherwise subject to a valid, perfected, and non-avoidable Lien, pursuant to section 364(c)(3). *See* DIP Credit Agreement, Preliminary Statement.

| | |
|---|---|
| **Waiver of Automatic Stay** | The DIP Credit Agreement contemplates that the Interim Order will, among other things, provide for the modification of the automatic stay to permit the creation and perfection of the Superpriority Liens on the Collateral and to permit the DIP Lenders to exercise remedies upon certain conditions if an Event of Default occurs. *See* DIP Credit Agreement, § 3.1(c); Interim Order, ¶ 8. |
| **Repayment of the Prepetition Secured Credit Agreement Obligations** | The Interim Order shall authorize the Debtors to repay in full the Prepetition Secured Credit Agreement Obligations, as required as a condition precedent to closing under the DIP Credit Agreement. *See* DIP Credit Agreement, § 3.1(j); Interim Order, ¶ 8(a). |
| **Letters of Credit** | The Orders shall authorize that all letters of credit issued by the Prepetition Secured Agent be deemed letters of credit under the DIP Facility. *See* Interim Order, ¶ 4(b). |
| **Section 506(c) Waiver** | The Final Order shall contain a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code. *See* DIP Credit Agreement, § 3.2(a); Interim Order, ¶ 9. |
| **Lien on Proceeds of Avoidance Action** | The Final Order shall provide the DIP Lenders with a lien on the proceeds of claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. *See* Interim Order, ¶ 7. |

9.     A more complete summary of the material terms of the DIP Credit Agreement is contained herein beginning on page 12.

### Background

10.     On the date hereof (the "Petition Date"), U.S. Concrete, Inc. and 43 of its affiliates each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

6

11. The Debtors are a major producer of ready-mixed concrete, precast concrete products, and concrete-related products in select markets in the United States. The Debtors are a public company that employs approximately 2,100 people throughout their more than 140 locations in the United States. They operate principally in Texas, California, New Jersey/ New York, and Michigan, with those operations representing approximately 35%, 30%, 15%, and 9%, respectively, of the Debtors' 2009 consolidated revenue.

12. As of the Petition Date, the Debtors owed approximately $40 million under a prepetition secured credit facility. The Prepetition Secured Credit Agreement provides for up to $60 million of revolving credit, the availability of which is determined by a formula based on the Debtors' current accounts receivable, inventory and equipment. In addition to the amount of revolving loans drawn on the Prepetition Secured Credit Agreement, as of the Petition Date the Debtors had also issued approximately $17.9 million in undrawn letters of credit under the Prepetition Secured Credit Agreement. The Debtors also owe approximately $285 million in unsecured notes, including principal and accrued interest. The Debtors' unsecured notes were issued pursuant to an indenture dated March 31, 2004 and a supplemental indenture dated July 5, 2006 (collectively, the "Note Indenture"). Under the Note Indenture, U.S. Concrete, Inc. issued a total of approximately $285 million in 8.325% notes due 2014 (the "Notes").

13. As is well-documented, the capital markets collapsed in September 2008. The resulting economic crisis and the related downturn in the real estate industry had a substantial negative impact on the United States concrete industry. The Debtors experienced a dramatic drop in production by volume from a high of 7.3 million cubic yards of concrete in 2006 and 7.6 million cubic yards in 2007 to 6.5 million cubic yards in 2008 and 4.6 million cubic yards in 2009, leading to a decline in revenues from $728.5 million in 2006 and $803.8 million in 2007 to

7

$754.2 million in 2008 and $534.5 million in 2009, and a corresponding decline in EBITDA from $75.6 million in 2006 and $68.2 million in 2007 to $40.6 million in 2008 and $22.4 million in 2009.

14. In response to the protracted, declining sales volumes, the Debtors implemented extensive cost reduction efforts in an effort to restore profitability. From 2007 through 2009, the Debtors implemented workforce reductions, plant idling, equipment dispositions, and divestitures of nonperforming business units to reduce structural costs. In 2010, the Debtors implemented further cost-cutting measures, including wage freezes, elimination of their 401(k) company match program, and other reductions in other employee benefits, and a significant scaling back of capital investment in their plants and equipment.

15. Nonetheless, the continued weakening economic conditions, including ongoing softness in residential construction, further softening of demand in the commercial sector, and delays in public works projects in many of the Debtors' markets, have placed significant stress on the Debtors' liquidity position. The Debtors expect this trend will continue through at least the duration of 2010. Given the decline in production volumes and the sharp drop off in revenue and EBITDA, the Debtors were no longer able to continue to service the interest on the Notes and recognized the need to de-lever their balance sheet.

16. Prior to the Petition Date, the Debtors negotiated extensively with an ad hoc committee (the "Informal Noteholders Committee") representing holders of more than 80% of the Notes. The Debtors commenced these chapter 11 cases to implement a consensual balance sheet restructuring. Concurrently herewith, the Debtors have filed the Plan that provides for the full equitization of the Notes. Shortly before the Petition Date, holders of a substantial majority of the Notes executed a lock-up agreement in support of the Plan. The Plan provides that the

8

Notes will be converted into 100% of the equity in the reorganized debtors and that existing shareholders will receive warrants to acquire up to 15% of the reorganized equity, with exercise prices to be set forth based upon achievement of certain valuation hurdles for the reorganized Debtors. These equity allocations are subject to dilution, as set forth in more detail in the Plan.

17.     Other than the Notes, no other creditors are impaired under the Plan. The Debtors have filed a motion seeking authority to continue to pay all unsecured claims (other than the Notes) in their discretion in the ordinary course of business.

18.     The Debtors anticipate funding these chapter 11 cases through the DIP Facility. Upon approval of the DIP Facility by the Court, proceeds thereof will be used to, among other things, repay in full the obligations under the Prepetition Secured Credit Agreement and to fund the ongoing operating expenses of the Debtors' businesses and the costs of these chapter 11 cases.

19.     The Debtors are extremely pleased with the highly consensual nature of the Plan and hope to exit chapter 11 as quickly as possible. The Debtors look forward to emerging from chapter 11 with a strong balance sheet and with a much-improved ability to compete, to invest in their business, and to gain market share going forward.

## The Debtors' Marketing Process for Postpetition Financing

20.     On December 1, 2009, the Debtors retained Lazard as their financial advisor. Shortly thereafter, the Debtors determined that, given their financial position, it was appropriate to begin exploring strategic options, including, among other things, seeking to borrow additional funds to be secured by unencumbered assets, seeking amendments to the existing Prepetition Secured Credit Agreement and/or the Note Indenture to provide additional liquidity to the Debtors, or refinancing Prepetition Secured Facility.

9

21.     Beginning February 22, 2010, Lazard contacted approximately 16 financing sources—including banks and hedge funds, including certain of the existing Prepetition Secured Lenders—to gauge their interest in the proposed refinancing in connection with a potential out-of-court standalone restructuring of the Debtors.     Eleven of the parties executed non-disclosure agreements, each of which obtained access to a dataroom established by the Debtors in connection with the contemplated refinancing.  Ultimately, Lazard's efforts bore six proposals for refinancing the Prepetition Secured Facility.

22.     The Debtors, with the assistance of Lazard and their other professionals, reviewed each of the six proposals.  Ultimately, the Debtors concluded that an out-of-court restructuring would not be feasible and that a proposal from JPMorgan was the best alternative because such proposal also included a DIP financing commitment.  In late March, 2010, the Debtors entered into a material amendment to the Prepetition Secured Credit Agreement.  Over the ensuing weeks the Debtors and JPMorgan negotiated the terms of the proposed DIP Facility, Interim Order, and related documents, all of which are based on the original JPMorgan DIP commitment.

### Summary of Principal Terms of DIP Facility

23.     The Debtors have negotiated and reached agreement to enter into, subject to approval of the Court pursuant to the DIP Orders, the DIP Credit Agreement[5] dated on or about April 30, 2010, by and among U.S. Concrete, Inc., as borrower, certain Debtor and non-Debtor guarantors (collectively, the "DIP Guarantors," and together with U.S. Concrete, Inc., the "DIP

---

[5]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.  This summary of the DIP Credit Agreement is provided for the benefit of the Court and other parties in interest.  The DIP Credit Agreement proposed to be executed by the parties will be substantially in the form attached hereto as **Exhibit C** and incorporated herein by reference.  To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Moreover, to the extent there are any conflicts between this summary and the DIP Orders, the terms of the DIP Orders shall govern.

Obligors"),[6] JPMorgan, as administrative agent (in such capacity, the "DIP Agent"), and the

other financial institutions named therein (the DIP Agent, together with the other banks, financial

institutions, and lenders party thereto, collectively, the "DIP Lenders").[7]

24.     The DIP Facility consists of (i) a term loan facility in an aggregate principal

amount not to exceed $45 million (the "DIP Term Facility") and (ii) a revolving facility in an

aggregate principal amount not to exceed $35 million (the "DIP Revolving Facility"). The

Debtors' obligations under the DIP Facility (the "DIP Obligations") are secured by:

(a)     a guarantee from each of the DIP Guarantors of due and punctual payment
        and performance of the Obligations of the Borrower;

(b)     an allowed administrative expense claim entitled to the benefits of
        section 364(c)(1) of the Bankruptcy Code, having superpriority over any
        and all administrative expenses of the kind specified in sections 503(b) or
        507(b) of the Bankruptcy Code, but subject to the Carve Out;

(c)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first
        priority (subject to permitted exceptions) Lien on all present and
        after-acquired property of the Debtors not subject to a valid, perfected, and
        non-avoidable Lien on the Petition Date, but subject to the Carve Out; and

(d)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior
        Lien (subject to permitted exceptions) on all present and after-acquired
        property of the Debtors that is otherwise subject to a valid, perfected, and
        non-avoidable Lien on the Petition Date or a valid Lien perfected (but not
        granted) after the Petition Date to the extent such postpetition perfection in
        respect of a pre-Petition Date claim is expressly permitted under the
        Bankruptcy Code.

25.     Upon receiving interim approval of the DIP Facility, the Debtors plan to use the

proceeds from the DIP Facility to, among other things, fund the Debtors' ongoing business

---

[6]   "DIP Guarantors" means each Debtor, with the exception of Debtor U.S. Concrete, Inc., along with the
      following non-Debtor entities: Builders' Redi-Mix, LLC; BWB, Inc. of Michigan; Kurtz Gravel Company;
      Superior Holdings, Inc.; and USC Michigan, Inc.

[7]   The collective term "DIP Facility Lenders" may mean the DIP Agent, one or more other banks, financing
      institutions, or other lender parties to the DIP Credit Agreement or all such parties, depending on the context.

operations and the costs of these chapter 11 cases and to repay in full the Prepetition Secured Credit Agreement Obligations.

26. The significant terms of the proposed DIP Credit Agreement are summarized as follows:

| | |
|---|---|
| Borrower: | U.S. Concrete, Inc. |
| Guarantors: | Alberta Investments, Inc.; Alliance Haulers, Inc.; American Concrete Products, Inc.; Atlas Redi-Mix, LLC; Atlas-Tuck Concrete, Inc.; Beall Concrete Enterprises, LLC; Beall Industries, Inc.; Beall Investment Corporation, Inc.; Beall Management, Inc.; Breckenridge Ready Mix, Inc.; Builders' Redi-Mix, LLC; B.W.B., Inc. of Michigan; Central Concrete Supply Co., Inc.; Central Precast Concrete, Inc.; Concrete Acquisition III, LLC; Concrete Acquisition IV, LLC; Concrete Acquisition V, LLC; Concrete Acquisition VI, LLC; Concrete XXXIII Acquisition, Inc.; Concrete XXXIV Acquisition, Inc.; Concrete XXXV Acquisition, Inc.; Concrete XXXVI Acquisition, Inc.; Eastern Concrete Materials, Inc.; Hamburg Quarry Limited Liability Company; Ingram Concrete, LLC; Kurtz Gravel Company; Local Concrete Supply & Equipment, LLC; Master Mix Concrete, LLC; Master Mix, LLC; MG, LLC; NYC Concrete Materials, LLC; Pebble Lane Associates, LLC; Redi-Mix Concrete, L.P.; Redi-Mix GP, LLC; Redi-Mix, LLC; Riverside Materials, LLC; San Diego Precast Concrete, Inc.; Sierra Precast, Inc.; Smith Pre-Cast, Inc.; Superior Concrete Materials, Inc.; Superior Holdings, Inc.; Titan Concrete Industries, Inc.; U.S. Concrete On-Site, Inc.; USC Atlantic, Inc.; USC Management Co., LLC; USC Michigan, Inc.; USC Payroll, Inc.; USC Technologies, Inc. |
| Administrative Agent: | JPMorgan Chase Bank, N.A. |
| Type, Amount, and Availability of Funds: | Type and Amount of Facilities:<br>• DIP Term Facility: $45 million.<br>• DIP Revolving Facility: $35 million, subject to Borrowing Base availability.<br><br>Availability: Upon entry of the Interim Order by the Bankruptcy Court up to $30 million under the DIP Revolving Facility and an amount equal to $45 million under the DIP Term Facility may be drawn under the DIP Facility on the Closing Date. |
| Maturity Date: | On or about April 30, 2011, subject to a three month extension by the Debtors provided certain conditions precedent are satisfied. |

12

| | |
|---|---|
| Interest Rate: | • If a CBFR Loan or such other Obligation, at a rate per annum equal to the sum of (A) the CB Floating Rate as in effect from time to time and (B) the Applicable Margin; and |
| | • If a Eurodollar Rate Loan, at a rate per annum equal to the sum of (A) the Adjusted LIBO Rate (subject to a LIBOR floor of 2% in the case of term loans) determined for the applicable Interest Period and (B) the Applicable Margin in effect from time to time during such Interest Period. |
| | • The Applicable Margin for each type of Loan is as follows: Term Loans: CBFR Loans (4.25%) and Eurodollar Rate Loans (5.25%) Revolving Loans: CBFR Loans (2.50%) and Eurodollar Rate Loans (3.50%). |
| Interest Payments: | Interest shall be payable in arrears on each Interest Payment Date, *provided* that upon an Event of Default interest shall be payable from time to time on demand. |
| Default Interest: | Upon the occurrence of an Event of Default and for as long thereafter as such Event of Default shall be continuing, the principal balance of all Loans and the amount of all other Obligations then due and payable shall bear interest at a rate that is 2.0% percent per annum in excess of the rate of interest applicable to such Loans or other Obligations from time to time. Such interest shall be payable on written demand. |
| Fees: | The Borrower has agreed to the following: |
| | • Commitment Fee: equal to 0.75% *per annum* on the unused amount of the DIP Revolving Facility, payable in arrears on the first Business Day of each calendar month; |
| | • Letter of Credit Fees: equal to the Applicable Margin then in effect with respect to Eurodollar Rate Loans under the DIP Revolving Facility plus a fronting fee to the Issuer of any Letter of Credit Obligation, which shall accrue at the rate of 0.20% per annum on the average daily amount of Letter of Credit Undrawn Amounts plus the Issuers' standard fees with respect to the issuance and administration of such letters of credit;[8] |

---

[8] Provided that, the Specified Letter of Credit Fee shall be on the terms and conditions to be mutually agreed by the Debtors and the DIP Agent.

DOCS_DE:159489.1

- Underwriting Fee: as set forth in a separate fee letter among the Borrower and the DIP Agent and one or more of the DIP Agent's affiliates;[9] and

- Administration Fee: as set forth in a separate fee letter among the Borrower and the DIP Agent and one or more of the DIP Agent's affiliates.[10]

Carve-Out:

Under the Interim Order, the Carve-Out means:

(a) in the event of the occurrence and during the continuance of an Event of Default, the payment of Professional Fees incurred at any time after the first business day following delivery of the Trigger Notice from the Administrative Agent to the U.S. Trustee and each of the lead counsel for the Debtors and any Committee of the occurrence of an Event of Default (to the extent allowed by the Bankruptcy Court at any time) by the Loan Parties and any Committee in an aggregate amount not in excess of $1,500,000,

(b) all unpaid Professional Fees incurred by the Loan Parties and any Committee at any time on or prior to the first business day following delivery of the Trigger Notice to the extent allowed by the Bankruptcy Court at any time, and the payment of fees pursuant to 28 U.S.C. §1930 and

(c) fees and expenses up to $250,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (a) or (b) above).

The Carve Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the Prepetition Secured Lenders or the Prepetition Secured Agent.

Priority:

Subject to the Carve Out, the DIP Obligations (i) shall constitute at all times an allowed superpriority administrative expense, (ii) are secured by a first priority lien on all property and interests in property or the proceeds thereof not already subject to valid perfected liens on the Petition Date now owned or hereafter acquired by any Loan Party, but excluding Avoidance Actions (but, subject to entry of the Final Order, not the proceeds thereof) or any

---

[9] The Debtors have provided a copy of the fee letter to the United States Trustee on a confidential basis.

[10] The Debtors have provided a copy of the fee letter to the United States Trustee on a confidential basis.

assets upon which security may not be lawfully granted, 34% of stock of any new or existing Excluded Foreign Subsidiary, Stock in the Excluded JV Equity, the Excluded JV Assets, and other property and assets excluded pursuant to the terms of the Pledge and Security Agreement, and (iii) are secured by a junior lien on all of the Debtors' assets already subject to validly perfected liens on the Petition Date and such junior liens shall be subject to the same exclusions set forth in clause (ii) above.

Events of Default:    The DIP Credit Agreement contains such Events of Default (and in some cases, grace periods) as are usual and customary for financings of this kind, including without limitation:

- failure to pay any principal, interest, or fees when due;

- any material misrepresentation or warranty by any Loan Party in any Loan Document or by any Loan Party in connection with any Loan Document;

- breach of any term, covenant, or agreement contained in the DIP Credit Agreement or any other Loan Document (subject to a grace period in some instances);

- a payment default on certain material Indebtedness or the occurrence of any other event that permits the acceleration of certain material Indebtedness (after giving effect to grace periods, waivers, and amendments);

- any creditor of a Non-Filer shall exercise any remedy against any Non-Filer unless such Non-Filer seeks bankruptcy protection within a specified time period;

- failure by any Non-Filer to pay its debts as such debts come due, admit in writing its inability to pay its debts, or any insolvency or other related proceeding is initiated against a Non-Filer (subject to a 30 day grace period for involuntary insolvency proceedings);

- dismissal or conversion of any of these chapter 11 cases to a case under chapter 7 or the appointment of a chapter 11 trustee;

- an order by the Bankruptcy Court is entered granting another Superpriority Claim or Lien (other than the Carve Out) *pari passu* with or senior to that granted to the Lenders and the Administrative Agent without the consent of the Administrative Agent and the Requisite Lenders;

- an order is entered reversing, staying for a period in

15

excess of five days, vacating or otherwise amending, supplementing or modifying the Interim Order or Final Order, as applicable, in a manner adverse to the Lenders without the written consent of the Administrative Agent and the Requisite Lenders;

- an order is entered under section 1106(b) of the Bankruptcy Code in any of these chapter 11 cases appointing an examiner having enlarged powers relating to the operation of the business of the Loan Parties;

- a Final Order is not entered within 45 days of the date of the entry of the Interim Order (or such date as may be agreed to by the Administrative Agent);

- a plan is confirmed that does not provide for termination of the Commitments and payment in full in cash of the Obligations on the Effective Date;

- the grant by the Bankruptcy Court of any claim or lien with equal or greater priority than the claims or liens of the Administrative Agent and the DIP Lenders and certain other bankruptcy-related events;

- any Debtor shall make any payments related to Indebtedness incurred and outstanding prior to the Petition Date (unless permitted by the DIP Orders, authorized by the Court, or as otherwise permitted by the DIP Credit Agreement);

- an order is entered allowing a secured creditor to foreclose, or similar relief, on any assets of the Debtors with a total value in excess of $1 million or could reasonably be expected to result in a Material Adverse Effect;

- a change of control;

- the entry of an order that (i) reverses, stays for more than 3 days, vacates or rescinds the Interim Order or the Final Order or (ii) amends, modifies or supplements the Interim Order or the Final Order in a manner adverse to the Lenders without the prior written consent of the Administrative Agent;

- any judgment or decree enforced against the Debtors in excess of $1 million (to the extent not paid or fully covered by the Debtors' insurance) for any postpetition obligation, and all such judgments or decrees have not been vacated, discharged, stayed, or bonded pending appeal within 30 days from the entry thereof;

- the occurrence of certain ERISA-related and environment-related defaults;

- any nonmonetary judgment with respect to a postpetition event which causes or could reasonably be expected to have a Material Adverse Effect;

- any proceeding is commenced by any Loan Party seeking, or otherwise consenting to (i) the invalidation, subordination, or challenging of the Superpriority Claims and Liens or (ii) any relief with respect to the Collateral is granted under section 506(c) of the Bankruptcy Code;

- any provision of any Loan Document or any Collateral Document (including the DIP Orders) shall for any reason fail or cease to be valid and binding, or enforceable against any Loan Party;

- any Collateral Document (including the DIP Orders) shall for any reason fail or cease to create a valid and enforceable Lien on any Collateral;

- the guarantees contained in the DIP Orders or in the DIP Credit Agreement shall cease, for any reason, to be in full force and effect or any Loan Party shall so assert in writing;

- the filing of any pleading by any Loan Party seeking, or otherwise consenting to (i) the conversion or dismissal of the Chapter 11 Cases, the (ii) incurrence of senior or *pari passu* indebtedness, the payment of prepetition Indebtedness (other than as permitted by the Interim Order or the DIP Documents), or (iii) the entry of an order granting relief from the automatic stay to allow a third party to proceed against property with a value in excess of $1,000,000 or could reasonably be expected to result in a Material Adverse Effect;

- Section 3 of the Notes Forbearance Agreement shall for any reason fail or cease to be valid and binding on, or enforceable against, any party thereto, or any party thereto shall so state in writing;

- the Borrower or any Subsidiary thereof shall fail to comply with the DIP Orders; and

- the failure to meet specific filing milestones in the Chapter 11 Cases, including failure to file a plan and disclosure statement within 90 days after the Petition Date, approval of the disclosure statement with 120 days

17

after the Petition Date, confirming a plan within 165 days after the Petition Date, and emerging from chapter 11 within 180 days after the Petition Date.

Remedies:                During the continuance of any Event of Default, the Administrative Agent:

- may and, at the request of the Majority Facility Lenders for the Revolving Facility, shall, by notice to the Borrower declare that all or any portion of the Revolving Commitments be terminated, whereupon the obligation of each Revolving Lender to make any Revolving Loan and each Issuer to Issue any Letter of Credit shall immediately terminate;

- may and, at the request of the Majority Facility Lenders for the Term Facility, shall, by notice to the Borrower declare that all or any portion of the Term Commitments be terminated, whereupon the obligation of each Term Lender to make any Term Loan shall immediately terminate;

- may, and, at the request of the Majority Facility Lenders for the Revolving Facility, shall, by notice to the Borrower, declare the Revolving Loans, all accrued but unpaid interest thereon to be forthwith due and payable, whereupon the Revolving Loans, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind;

- may, and, at the request of the Majority Facility Lenders for the Term Facility, shall, by notice to the Borrower, declare the Term Loans, all accrued but unpaid interest thereon to be forthwith due and payable, without presentment, demand, protest or further notice of any kind;

- may, and, at the request of the Requisite Lenders, shall, by notice to the Borrower, declare all other Obligations payable under the Credit Agreement to be forthwith due and payable, whereupon such Obligations shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind; and

- may, and, at the request of the Majority Facility lenders for either the Revolving Facility or the Term Facility, shall be, subject to the terms of the Orders, may exercise remedies provided for by the Collateral Documents in accordance with the terms thereof or any other remedies

18

provided by applicable law (subject to 5 Business Days' prior written notice prior to any action with respect to the enforcement of Liens or other remedies with respect to the Collateral.

<u>Covenants:</u>

The DIP Credit Agreement contains such financial, reporting, affirmative, and negative covenants as are usual and customary for financings of this kind—in each case subject to carve outs thresholds, and materiality qualifiers as set forth in the Credit Agreement—including, without limitation:

- minimum EBITDAR requirements and limits on capital expenditures;

- furnish financial statements, including, without limitation, monthly reports (on or prior the last day of the following fiscal month), quarterly reports (within 45 days of the end of each of the first three fiscal quarters), and annual reports (within 90 days after the end of each fiscal year), compliance certificates in connection with each of the above reports, corporate chart and other collateral certifications in connection with each quarterly and annual report, business plans (not later than 45 days after the end of each fiscal year), management letters within 10 business days of receipt thereof, cash flow forecasts and variance reports (no later than Thursday on a bi-weekly basis), as well as bankruptcy documents upon the filing of the same;

- notify the Administrative Agent with 5 Business Days after actual knowledge of any Default, Event of Default, or other event having had a Material Adverse Effort or having any reasonable likelihood of causing or resulting in a Material Adverse Change;

- notify the Administrative Agent upon commencement of any action, suit, or proceeding affecting the Debtors or Non-Filers that (i) seeks injunctive or similar relief or (ii) may expose the Debtors or Non-Filers to liability that would have a Material Adverse Effect;

- provide notice to the Administrative Agent prior to consummating any Asset Sales;

- provide the Administrative Agent with reports sent to security holders, all SEC filings upon such filing thereof, and statements concerning material changes or developments made available to the public or any other

creditor;

- provide written notice to the Administrative Agent upon becoming aware of (i) any labor dispute that could reasonably be expected to have a Material Adverse Effect and (ii) any Worker Adjustment and Retraining Notification Act or related liability incurred in connection with the closing of any plant or other facility;

- Provide, upon reasonable request by the Administrative Agent, copies of (i) all federal and material state and local tax returns and reports and (ii) written notices or other information reasonably requested by the Administrative Agent;

- furnish to the Administrative Agent within 90 days of each fiscal year (i) a report outlining all material insurance coverage maintained as of that date and (ii) an insurance broker's statement that all premiums then due and payable have been paid and confirming the Administrative Agent has been named as a loss payee or additional insured, as applicable;

- notify the Administrative Agent of (i) the occurrence of any ERISA Event (within 30 days any Debtor or Non-Filer knows or has reason to know of such event); (ii) a minimum funding waiver under Section 412 of the Bankruptcy Code being filed (within 10 days any Debtor or Non-Filer knows or has reason to know); (iii) the filing of a notice of intent to terminate any Title IV Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA (simultaneously upon filing); and (iv) receipt of any documents described in Sections 101(k) or 101(l) of ERISA (promptly following receipt thereof);

- notify the Administrative Agent within 10 days of, among other things, obtaining knowledge of any potential violation under any Environmental Law, receipt of notice that property may be subject to an Environmental Lien, or upon commencement of any judicial or administrative proceeding that could reasonably be expected to result in Environmental Liability Costs that exceed $1,000,000;

- deliver weekly Borrowing Base Certificates and documents supporting such calculations; conduct or cause to be conducted upon reasonable request of the

Administrative Agent (no more than twice in a twelve month period) third-party appraisals and investigations and reviews (reasonably satisfactory to the Administrative Agent) of the Borrowing Base; deliver notices to the Administrative Agent with respect to the Borrowing Base Collateral in certain circumstances; grant access to the Administrative Agent to make test verifications of the Accounts and physical verifications of the Inventory; permit the Administrative Agent or any of its Affiliates (or one of their representatives) to conduct field examinations of the Borrowing Base Collateral;

- deliver within 10 business days of the end of each calendar month: (i) a detailed aging report of the Borrower Base Contributors' Accounts; (ii) a schedule detailing the Borrowing Base Contributors' Inventory by unit; (iii) a worksheet of calculations prepared by the Borrowing Base Contributors to determine Eligible Receivables and Eligible Inventory; (iv) a reconciliation of the Borrowing Base Contributors' Accoutns and Inventory between such amounts on the general ledger and financial statements; (v) a reconciliation of the loan balance per the Borrowing Base Contributors' general ledger to the loan balance under the DIP Credit Agreement; (vi) a schedule and aging of the Borrowing Base Contributors' accounts payable;

- deliver upon request by the Administrative Agent, a list of all customer addresses;

- deliver upon request of the Administrative Agent: (i) copies of invoices issued by the Borrowing Base Contributors in connection with any Accounts, credit memos, shipping and delivery documents, and other information; (ii) copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and (iii) a schedule detailing the balance of all intercompany accounts of the Loan Parties;

- do all things necessary to preserve, renew and maintain its corporate existence;

- comply with all applicable Requirements of Law, certain Contractual Obligations, and Permits;

- conduct business in the ordinary course and consistent with past practice and use reasonable efforts to preserve

21

business and goodwill;

- pay all postpetition taxes and other postpetition obligations as and when due except where contested in good faith and by appropriate proceedings (provided the Debtors shall have set aside on their books adequate reserves therefor) or to extent liability does not exceed $1 million;

- maintain insurance on all its property in a manner which is customary in the industry with financially sound and responsible insurance companies;

- provide access to the Administrative Agent and the Lenders from time to time to examine books and records, visit properties, discuss financial affairs, communicate directly with the Debtors' and Non-Filers' certified public accountants, and conduct meetings with management;

- host update calls with the Administrative Agent and member of senior management to discuss business, strategic alternatives, and other issues;

- maintain proper books and records in conformity with GAAP;

- maintain and preserve all properties in good working order and all rights, permits, licenses, approvals, privileges, and intellectual property;

- use the entire amount of the proceeds of the Loans as provided for in the DIP Credit Agreement;

- comply with all Environmental Laws and take steps to ensure such compliance, such as conduct or pay for consultants to conduct, test, or assess environmental conditions;

- execute and deliver joinder agreements, amendments to collateral documents, mortgages, and other real property deliverables in connection with the DIP Credit Agreement and Pledge and Security Agreement and any other Collateral Documents in connection with any Debtor and Non-Filer and any after-acquired property;

- deposit all cash into an Approved Deposit Account (subject to certain exceptions);

- comply with all Lease obligations, not terminate, modify, cancel, extend, or otherwise change in any manner a condition of any Lease, not assign or sublet

22

any Lease, provide the Administrative Agent with a copy of any notice of default under a Lease within 3 Business Days' receipt thereof, and notify the Administrative Agent at least 5 days prior to the Borrower or any Subsidiary taking possession of, or entering into a new Lease;

- pay, discharge, or otherwise satisfy at or before maturity or before postpetition material obligations become such obligations become delinquent;

- transfer within 60 days following the Closing Date and maintain with the Administrative Agent each Concentration and Disbursement Account;

- prior to consummation of any Asset Sale which would trigger mandatory prepayment under Section 2.8 of the DIP Credit Agreement, Borrower shall use commercially reasonable efforts to send the Administrative Agent a notice (i) describing such Asset Sale, (ii) stating the estimated Net Cash Proceeds and (iii) describing any reinvestment in connection with Section 2.8(a) of the DIP Credit Agreement;

- on or prior to the date that is 45 days following the Closing Date (or such later date as the Administrative Agent may approve in its reasonable discretion), transfer to and maintain with the Administrative Agent (or any of its Affiliates) each Concentration and Disbursement Account;

- on or prior to the date that is 30 days following the Closing Date, deliver to the Administrative Agent: (i) specified documents for each Designated Real Property; and (ii) evidence that all real estate insurance premiums, recording fees and stamp, documentary, intangible or mortgage taxes, if any, have been paid or delivered to the title company to pay; and

- on or prior to the date that is 30 days following the Closing Date, deliver to the Administrative Agent evidence reasonably satisfactory to the Administrative Agent that each of the mortgages set forth in Schedule 7.16(i) has been terminated and released of record.

Except as allowed under the DIP Credit Agreement, the Debtors—in each case, subject to carve outs, thresholds, and materiality qualifiers as wet forth in the Credit Agreement—shall not (and none of them shall apply to the Court for authority to):

23

- create, incur, assume, or otherwise remain directly or indirectly liable with respect to any Indebtedness (including guarantees of such Indebtedness);

- create or permit to exist any liens or encumbrances on any assets;

- make or maintain any Investment;

- sell, convey, transfer, lease, or otherwise dispose of any interest through an Asset Sale;

- declare, order, pay, or set apart any sum for any Restricted Payment;

- cancel any claim or Indebtedness owed or prepay, redeem, purchase, defease, or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of any Subordinated Indebtedness;

- merge or consolidate with any other Person;

- make any material change in the nature or conduct of the business or modify its Constituent Documents;

- directly or indirectly enter into or permit to exist any material transaction between any Debtor and with any of its non-Debtor Affiliates, except, among other things, for transactions that are entered into in the ordinary course of the Debtors' business in good faith and upon commercially reasonable terms, and that are no less favorable to the applicable Debtor than would be obtained in an arm's-length transaction with a non-Affiliate;

- modify or otherwise amend the terms of any Subordinated Debt;

- change its (i) accounting treatment or tax reporting treatment (except as required by law or by GAAP and disclosed to the Lenders and the Administrative Agent) or (ii) Fiscal Year;

- use proceeds of any credit extended to purchase or carry margin stock;

- become liable, or permit any of its Subsidiaries from

24

becoming liable, after the Closing Date as lessee or guarantor or other surety with respect to an operating lease entered into outside of the ordinary course of business (unless the aggregate amount of all rents paid or accrued thereunder does not exceed $100,000 in the aggregate);

- engage in any speculative transaction or any transaction involving Hedging Contracts (unless in the ordinary course of business or consistent with industry practice);

- cause to permit to occur any event that could reasonably be expected to result in ERISA-related liability;

- incur create, assume, suffer to exist or permit any other Superiority Claim or Lien on any Collateral with is *pari passu* with or senior to the claims of the Administrative Agent and the Lenders granted pursuant to the Credit Agreement;

- shall permit agree or shall permit any of its Subsidiaries to (a) agree to (enter into or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of such Subsidiary to (i) pay dividends or make any other distribution, (ii) transfer funds or assets to the Borrower or any Subsidiary of the Borrower or (iii) make loans or advances to or other Investments in, or pay any Indebtedness owed to, the Borrower or any other Subsidiary of the Borrower or (b) enter into or suffer to exist or become effective any agreement prohibiting or limiting the ability of the Borrower or any Subsidiary of the Borrower to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, to secure the Obligations, except as specifically permitted under Section 8.10 of the DIP Credit Agreement; and

- permit the Available Credit to be less than $3,000.000 at any time.

DOCS_DE:159489.1

## Relief Requested

27.     The Debtors seek entry of the DIP Orders granting the following relief, without limitation:[11]

     a.    authorizing the Debtors to obtain $45 million under the DIP Term Facility and up to $35 million under the DIP Revolving Facility pursuant to the DIP Credit Agreement (subject to the limitations set forth in the DIP Credit Agreement);

     b.    authorization for the Debtors to execute and deliver the DIP Credit Agreement and other related documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

     c.    the granting in favor of the DIP Lenders of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of the DIP Obligations, subject to the Carve Out;

     d.    as security for the DIP Obligations, the granting in favor of the DIP Lenders of perfected, valid, enforceable, and non-avoidable first-priority liens upon and security interests in all of the assets of the DIP Obligors (to the extent unsecured at filing) pursuant to section 364(c)(2) of the Bankruptcy Code, subject to the Carve Out and excluding (i) Avoidance Actions (but, subject to entry of the Final Order, not the proceeds thereof) or any assets upon which security may not be lawfully granted, (ii) 34% of stock of any new or existing Excluded Foreign Subsidiary, (iii) Stock in the Excluded JV Equity, (iv) the Excluded JV Assets, and (vi) other property and assets excluded pursuant to the terms of the Pledge and Security Agreement;

---

[11]  In accordance with Local Rule 4001-2(a)(i), the Debtors have provided separate justification in the "Basis for Relief" section of the Motion for those DIP Credit Agreement provisions enumerated in Local Rule 4001 and, additionally, identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement.

e.  as further security for the DIP Obligations, the granting in favor of the DIP Lenders of perfected, valid, enforceable, and non-avoidable second-priority liens upon and security interests in all of the assets of the Debtors subject to valid and perfected liens in existence on the Petition Date, pursuant to section 364(c)(3) of the Bankruptcy Code;

f.  repayment of the Prepetition Secured Credit Agreement Obligations;

g.  deeming letters of credit from the Prepetition Secured Credit Agreement as issued under the DIP Credit Agreement;

h.  subject to entry of the Final Order, the waiver by the Debtors of any right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code;

i.  the scheduling of the final hearing on the Motion to consider entry of the Final Order authorizing and granting the relief requested in the Motion; and

j.  granting related relief and such other and further relief as this Court deems just and proper.

## Basis for Relief

**I.  The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Sections 364(c) of the Bankruptcy Code.**

28.  As set forth above, the Debtors' ability to continue operating their business in the ordinary course and complete their financial restructuring hinges upon their being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis. For the reasons discussed below, the Debtors must be able to access postpetition financing on a secured basis pursuant to section 364(c) of the Bankruptcy Code.

29.  Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to

27

superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c).

30.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

31.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames*, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

32.     As above-described, the DIP Facility resulted from an extensive prepetition marketing process conducted by Lazard.  The Debtors were unable to obtain more favorable postpetition financing in the form of unsecured credit, an administrative expense, or credit secured solely by junior liens on the Debtors' assets.  Moreover, because the DIP Facility provides for the immediate satisfaction of the Prepetition Secured Credit Agreement Obligations, the Debtors will be able to avoid the accrual of postpetition interest thereon, potentially, at the default interest rate.  Finally, the Informal Noteholders Committee, who represents a substantial portion of the only class of creditors impaired under the Plan, has consented to the DIP Credit Agreement, the Motion, and the relief requested herein as reflected by the Restructuring and Lock-Up Agreement.  Accordingly, the Debtors respectfully submit that their efforts to obtain postpetition financing satisfies the standard required under section 364(c) of the Bankruptcy Code.

## II.     Provisions To Be Highlighted Pursuant to Local Bankruptcy Rule 4001-2.

33.     Local Bankruptcy Rule 4001-2 requires the Debtors to highlight certain provisions included in the DIP Credit Agreement and the DIP Orders.  The only such provisions under Local Bankruptcy Rule 4001-2 included in the DIP Orders and DIP Documents are as follows:

a.     **Subject to entry of the Final Order, a grant to the DIP Lenders of a secured first priority lien on the proceeds of the Debtors' avoidance actions arising under sections 544, 545, 547, 548, and 549, as set forth in paragraph 7 of the Interim Order;**

b.     **subject to entry of the Final Order, the waiver of the Debtors' right to surcharge the collateral under section 506 of the Bankruptcy Code, as set forth in paragraph 9 of the Interim Order;**

c.     **the use of proceeds of the DIP Facility to pay the entire amount of the Prepetition Secured Credit Agreement of the DIP Lenders, as set forth in paragraph 11 of the Interim Order;**

29

> d.   authorization to deem all letters of credit issued by the Prepetition Secured Agent to be letters of credit under the DIP Facility, as set forth in paragraph 4(b) of the Interim Order; and
>
> e.   a carve-out for the benefit of professionals retained by the Debtors and any official committee appointed in the Chapter 11 Cases as set forth in paragraph 6(b) of the Interim Order.

34.     These provisions are typically found in debtor-in-possession financing agreements of this nature, and the DIP Facility Lenders would not have agreed to provide financing to the Debtors absent such provisions.

35.     <u>Lien on Avoidance Action Proceeds</u>. The proposed Final Order will provide that the DIP Lenders will be granted a lien on the proceeds of chapter 5 avoidance actions (the "<u>Avoidance Actions</u>"), but not the actual Avoidance Actions. The Debtors submit this is appropriate because the Debtors do not anticipate bringing any Avoidance Actions and because all unsecured creditors other than holders of Note Claims will be unimpaired under the Plan.

36.     Moreover, courts in this district and elsewhere have supported the granting of liens on avoidance action proceeds. *See In re Source Interlink Cos.*, No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Ritz Camera Centers, Inc.*, No. 09-10617 (MFW) (Bankr. D. Del. Mar. 27, 2009) (same); *In re Tropicana Entm't, LLC*, Case No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (same); *In re Silver Cinemas Int'l, Inc.*, No. 00-1978 (Bankr. D. Del. Aug. 11, 2000) (same); *In re Trans World Airlines*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving the granting of liens on avoidance actions to postpetition lenders); *In re Movie Gallery, Inc.*, No. 07-33849 (Bankr. E.D. Va. Nov. 16, 2007) (secured lenders' collateral includes proceeds and property that is the subject of successful avoidance actions); *In re NTELOS Inc.*, No. 03-32094 (DOT) (Bankr. E.D. Va. Mar. 24, 2003) (same); *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. July 2,

30

2002) (granting secured lenders liens on avoidance action proceeds); *In re AMF Bowling Worldwide, Inc.*, No. 01-61119 (Bankr. E.D. Va. Aug. 8, 2001) (secured lenders' collateral includes avoidance actions and proceeds); *In re Ellingsen MacLean Oil Co.*, 98 B.R. 284, 291-92 (Bankr. W.D. Mich. 1989). Accordingly, the Debtors believe that granting liens on the proceeds of the Avoidance Actions, subject to entry of the Final Order, is appropriate.[12]

37.     506(c) Waiver. The Interim Order provides that subject to entry of the Final Order, the Debtors shall waive their rights under section 506(c) of the Bankruptcy Code.

38.     Section 506(c) of the Bankruptcy Code allows the estate to surcharge the collateral of a secured creditor to pay the reasonable and necessary costs and expenses of preserving or disposing of such creditor's collateral to the extent of any benefit received. *See* 11 U.S.C. § 506(c). In connection with the provision of debtor-in-possession financing, lenders commonly request a waiver of a debtor's ability to surcharge such lender's collateral. Here, the DIP Lenders are lending new money to these estates, thereby benefiting the Debtors' estates as a whole. Further, this Court has authorized similar section 506(c) waivers in other instances. *See, e.g., In re Lazy Days' R.V. Inc.*, No. 09-13911 (KG) (Bankr. D. Del. Nov. 6, 2009) (approving 506(c) waiver as part of the debtor in possession financing); *In re Source Interlink Cos.*, No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009) (same); *In re Ritz Camera Centers, Inc.*, No. 09-10617 (MFW) (Bankr. D. Del. Mar. 27, 2009) (same); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. June 5, 2008) (same); *In re CMC (formerly Cone Mills Corp., et al.)*, No. 03-12944 (MFW) (Bankr. D. Del. Oct. 27, 2003) (approving 506(c) waiver as part of debtor in possession financing where debtor was selling all

---

[12] Due to the voluminous nature of the orders referenced herein and in paragraphs 38 and 47, such orders are not attached to the Motion. Copies of the orders may be obtained upon request to the Debtors' counsel.

or substantially all of its assets under section 363); *In re Pillowtex Corp.*, No. 03-12339 (PJW) (Bankr. D. Del. Sept. 25, 2003) (same).

39. <u>Take-Out Transaction</u>. As also discussed in detail above, a subset of the Prepetition Secured Lenders were willing to extend postpetition financing to the Debtors on such favorable terms provided that the proceeds of the DIP Facility be used to repay in full the Prepetition Secured Credit Agreement Obligations.

40. Eliminating the Prepetition Secured Credit Agreement Obligations will, among other things, obviate the need to segregate and separately account for post-closing collections, avoid intercreditor issues and an unnecessary priming fight, as well as the accrual of interest payments under the Prepetition Secured Credit Agreement (potentially, at default rates) pursuant to section 506(b) of the Bankruptcy Code, and eliminate the need for separate counsel for the Prepetition Secured Lenders. In any event, as the Prepetition Secured Credit Agreement is fully and validly secured, the Debtors submit that such refinancing will not prejudice the Debtors' estates as the Prepetition Secured Credit Agreement Obligations would be repaid in full upon consummation of the Plan, and the Interim Order provides for an appropriate investigative period. Finally, the Informal Noteholders Committee, the only impaired voting class of creditors, has committed to vote to accept the Plan—which provides for a full recovery to the prepetition secured lenders—pursuant to the Restructuring and Lock-Up Agreement. Thus, satisfying the Prepetition Secured Credit Agreement Obligations with the proceeds of the DIP Facility only expedites the treatment and distribution that would otherwise be made at a later date, and therefore, does not prejudice any party in interest. To the extent any constituent with standing wishes to raise any issues with respect to the perfection, validity, or amount of the Prepetition Secured Credit Agreement liens or the waiver of claims against any lender

32

thereunder, the Interim Order provides that such constituents shall have the earlier of (a) 75 days from entry of the Interim Order and (b) 60 days following the date of formation of a Committee of unsecured creditors to investigate such matters.

41.    Existing Letters of Credit.  The Interim Order provides that outstanding letters of credit issued by the Prepetition Secured Agent under the Prepetition Secured Credit Agreement shall be deemed to be letters of credit issued pursuant to the DIP Facility.  Upon the closing of the DIP Facility, the commitments of the lenders under the Prepetition Secured Credit Agreement will be completely terminated.  Approximately $18 million in unfunded letters of credit have been issued under the Prepetition Secured Credit Agreement.  To ensure a seamless transition, the DIP Lenders need to assume responsibility for honoring those letters of credit. Deeming prepetition outstanding letters of credit issued under the Prepetition Secured Credit Agreement as being issued pursuant to the DIP Facility will allow the Debtors to satisfy in full the Prepetition Secured Credit Agreement Obligations—as required under the DIP Facility—and, importantly, will avoid intercreditor adequate protection and priming issues that otherwise would arise.

42.    Carve-Out.  Further, with the inclusion of provisions for the payment of the Carve-Out Expenses, neither the Interim Order nor Final Order directly or indirectly deprives the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in -interest are sorely prejudiced").  Generally, the proposed DIP Orders subject the security interests and administrative expense claims of the DIP Lenders

33

to payment of the Carve-Out Expenses, as described above. In *Ames*, the court found such "carve-outs" for professional fees to be not only reasonable, but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *See id.* at 41.

## III. Modification of the Automatic Stay is Warranted.

43.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various actions without further order of or application to the Court. However, the DIP Agent must provide the Debtors and various other parties, including the United States Trustee, with five (5) business days written notice prior to exercising any enforcement rights or remedies in respect of the Collateral or upon a shorter period of time after notice and a hearing.

44.     Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Credit Agreement and the proposed DIP Orders.

## IV. Interim Approval of $45 Million Under the DIP Term Facility and up to $30 Million Under the DIP Revolving Facility Should be Approved.

45.     It is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a successful reorganization. Accordingly, the Debtors are seeking interim approval to access $45 million of the DIP Term Facility and up to $30 million of the DIP Revolving Facility to meet their working capital needs, including, without limitation, making payments to employees, suppliers, and various governmental taxing and

34

licensing authorities, as well as to repay in full the Prepetition Secured Credit Agreement Obligations.

46.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than [15] days after service of the motion. If the motion so requests, the court may conduct a hearing before such [15] day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

47.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449. Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g., In re ACG Holdings, Inc.,* Case No. 08-11467 (CSS) (Bankr. D. Del. Jul. 16, 2008); *In re Hilex Poly Holding Co. LLC,* Case No. 08-10890 (KJC) (Bankr. D. Del. May 7, 2008) (approving a $150 million postpetition facility and granting first day authorization to refinance a $100 million prepetition facility); *In re Holley Performance Prods. Inc.,* Case No. 08-10256 (PJW) (Bankr. D. Del. Feb. 12, 2008) (approving a $45 million postpetition facility and granting first day authorization to refinance a $40.3 million prepetition facility); *In re Remy Worldwide Holdings, Inc.,* Case No. 07-11481 (KJC) (Bankr. D. Del. Oct. 10, 2007) (approving a $160 million postpetition facility and granting first day authorization to refinance a $158 million prepetition facility); *In re Foamex Int'l Inc.,* Case No. 05-12685 (PJW) (Bankr. D. Del. Sept. 20, 2005) (approving a $325 million postpetition facility and granting first day authorization to refinance all amounts owed under a prepetition facility).

35

## Request for Final Hearing

48.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, but in no event later than 25 days following the entry of the Interim Order, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

49.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

50.     The Debtors have provided notice of the hearing on this Motion to, and, upon entry of each DIP Order, will serve the Interim Order or Final Order, as applicable, on: (a) the Office of the United States Trustee for the District of Delaware; (b) the agent for the Debtors' prepetition and proposed postpetition secured lenders; and (c) the Informal Noteholders Committee. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

51.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, and Final Order granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated: April 29, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Mark M. Billion (Bar No. 5263)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:    ljones@pszjlaw.com
           joneill@pszjlaw.com
           mbillion@pszjlaw.com

and

**KIRKLAND & ELLIS LLP**
James H.M. Sprayregen (*pro hac vice* pending)
Patrick Nash (*pro hac vice* pending)
Ross Kwastenient (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-Mail:    james.sprayregen@kirkland.com
           patrick.nash@kirkland.com
           ross.kwastenient@kirkland.com