**EXHIBIT C**

**DIP Credit Agreement**

$80,000,000

REVOLVING CREDIT, TERM LOAN AND GUARANTEE AGREEMENT

Dated as of [April __], 2010

among

U.S. CONCRETE, INC.,
a Debtor and Debtor-in-Possession, as Borrower

and

THE OTHER GUARANTORS NAMED HEREIN,
each either a Debtor and Debtor-in-Possession or a Specified Non-Filer

THE LENDERS AND ISSUERS PARTY HERETO

AND

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent
* * *

J.P. MORGAN SECURITIES INC.,
as Sole Lead Arranger and Sole Bookrunner

ARTICLE I Definitions, Interpretation and Accounting Terms.................................................. 2

    Section 1.1    Defined Terms................................................................................. 2

    Section 1.2    Computation of Time Periods ........................................................ 32

    Section 1.3    Accounting Terms and Principles .................................................. 32

    Section 1.4    Certain Terms................................................................................. 33

ARTICLE II The Facilities....................................................................................................... 34

    Section 2.1    The Commitments .......................................................................... 34

    Section 2.2    Borrowing Procedures.................................................................... 34

    Section 2.3    Letters of Credit ............................................................................. 35

    Section 2.4    Reduction and Termination of the Commitments .......................... 38

    Section 2.5    Repayment of Loans....................................................................... 39

    Section 2.6    Evidence of Debt............................................................................ 39

    Section 2.7    Optional Prepayments .................................................................... 39

    Section 2.8    Mandatory Prepayments................................................................. 39

    Section 2.9    Interest............................................................................................ 40

    Section 2.10    Conversion/Continuation Option ................................................... 41

    Section 2.11    Fees................................................................................................. 41

    Section 2.12    Payments and Computations .......................................................... 42

    Section 2.13    Alternate Rate of Interest. .............................................................. 45

    Section 2.14    Special Provisions Governing Eurodollar Rate Loans ...................... 45

    Section 2.15    Capital Adequacy ........................................................................... 47

    Section 2.16    Taxes .............................................................................................. 47

    Section 2.17    Substitution of Lenders .................................................................. 50

    Section 2.18    Defaulting Lenders. ........................................................................ 51

    Section 2.19    Priority and Liens. .......................................................................... 51

    Section 2.20    Payment of Obligations. ................................................................. 52

    Section 2.21    No Discharge; Survival of Claims.................................................. 52

    Section 2.22    Conflicts. ........................................................................................ 53

    Section 2.23    Fifteen Month Facility Extension Option........................................ 53

ARTICLE III Conditions to Loans and Letters of Credit........................................................ 53

    Section 3.1    Conditions to the Initial Extension of Credit.................................. 54

    Section 3.2    Conditions to the Final Extension of Credit ................................... 58

    Section 3.3    Conditions Precedent to Each Loan and Letter of Credit................... 59

i

# TABLE OF CONTENTS
## (continued)

| | | |
|---|---|---|
| Section 3.4 | Determinations of Borrowing Conditions | 60 |
| ARTICLE IV | Representations and Warranties | 60 |
| Section 4.1 | Corporate Existence; Compliance with Law | 61 |
| Section 4.2 | Corporate Power; Authorization; Enforceable Obligations | 61 |
| Section 4.3 | Ownership of Borrower; Subsidiaries | 62 |
| Section 4.4 | Financial Statements | 62 |
| Section 4.5 | Material Adverse Change | 63 |
| Section 4.6 | Litigation | 63 |
| Section 4.7 | Taxes | 63 |
| Section 4.8 | Full Disclosure | 64 |
| Section 4.9 | Margin Regulations | 64 |
| Section 4.10 | No Burdensome Restrictions; No Defaults | 64 |
| Section 4.11 | Investment Company Act | 65 |
| Section 4.12 | Use of Proceeds | 65 |
| Section 4.13 | Insurance | 65 |
| Section 4.14 | Labor Matters | 65 |
| Section 4.15 | ERISA | 65 |
| Section 4.16 | Environmental Matters | 66 |
| Section 4.17 | Intellectual Property | 67 |
| Section 4.18 | Title; Real Property | 67 |
| Section 4.19 | Collateral. | 67 |
| Section 4.20 | The Orders. | 68 |
| ARTICLE V | Financial Covenants | 68 |
| Section 5.1 | Minimum EBITDAR | 68 |
| Section 5.2 | Maximum Capital Expenditures | 69 |
| ARTICLE VI | Reporting Covenants | 69 |
| Section 6.1 | Financial Statements | 69 |
| Section 6.2 | Default Notices | 72 |
| Section 6.3 | Litigation | 72 |
| Section 6.4 | Asset Sales | 72 |
| Section 6.5 | SEC Filings; Press Releases | 72 |

Section 6.6    Labor Relations ................................................................ 73

Section 6.7    Tax Returns ..................................................................... 73

Section 6.8    Insurance ........................................................................ 73

Section 6.9    ERISA Matters ................................................................ 73

Section 6.10   Environmental Matters .................................................... 74

Section 6.11   Borrowing Base Deliverables and Determination ............ 75

Section 6.12   Other Information ............................................................ 77

ARTICLE VII Affirmative Covenants ................................................................. 77

Section 7.1    Preservation of Corporate Existence, Etc. ...................... 77

Section 7.2    Compliance with Laws, Etc. ........................................... 77

Section 7.3    Conduct of Business ........................................................ 77

Section 7.4    Payment of Taxes, Etc. ................................................... 77

Section 7.5    Maintenance of Insurance ............................................... 78

Section 7.6    Access ............................................................................. 78

Section 7.7    Update Calls. ................................................................... 78

Section 7.8    Keeping of Books ............................................................ 79

Section 7.9    Maintenance of Properties, Etc. ...................................... 79

Section 7.10   Application of Proceeds .................................................. 79

Section 7.11   Environmental ................................................................. 79

Section 7.12   Additional Collateral and Guaranties .............................. 79

Section 7.13   Control Accounts; Approved Deposit Accounts .............. 81

Section 7.14   Real Property .................................................................. 83

Section 7.15   Payment of Obligations. ................................................. 83

Section 7.16   Post-Closing Items ......................................................... 83

ARTICLE VIII Negative Covenants ................................................................... 84

Section 8.1    Indebtedness ................................................................... 84

Section 8.2    Liens, Etc. ....................................................................... 85

Section 8.3    Investments ..................................................................... 86

Section 8.4    Sale of Assets .................................................................. 87

Section 8.5    Restricted Payments ....................................................... 88

Section 8.6    Prepayment and Cancellation of Indebtedness ................ 89

Section 8.7    Restriction on Fundamental Changes ................................................................. 89

Section 8.8    Change in Nature of Business ........................................................................... 89

Section 8.9    Transactions with Affiliates ............................................................................. 89

Section 8.10   Limitations on Restrictions on Subsidiary Distributions; No New
               Negative Pledge ................................................................................................ 90

Section 8.11   Modification of Constituent Documents ........................................................... 90

Section 8.12   Modification of Debt Agreements .................................................................... 91

Section 8.13   Accounting Changes; Fiscal Year ................................................................... 91

Section 8.14   Margin Regulations .......................................................................................... 91

Section 8.15   Operating Leases; Sale/Leasebacks .................................................................. 91

Section 8.16   No Speculative Transactions ............................................................................ 91

Section 8.17   Compliance with ERISA ................................................................................. 91

Section 8.18   Chapter 11 Claims. ........................................................................................... 92

Section 8.19   Available Credit ............................................................................................... 92

ARTICLE IX Events of Default ................................................................................................... 92

Section 9.1    Events of Default .............................................................................................. 92

Section 9.2    Remedies ........................................................................................................... 95

Section 9.3    Actions in Respect of Letters of Credit ............................................................ 96

ARTICLE X The Administrative Agent ....................................................................................... 96

ARTICLE XI    99

**Guarantee**    99

Section 11.1   Guarantee .......................................................................................................... 99

Section 11.2   Right of Contribution ....................................................................................... 99

Section 11.3   No Subrogation. ............................................................................................... 99

Section 11.4   Amendments, etc. with Respect to the Obligations. ....................................... 100

Section 11.5   Guarantee Absolute and Unconditional. ......................................................... 100

Section 11.6   Reinstatement .................................................................................................. 101

Section 11.7   Payments. ........................................................................................................ 101

ARTICLE XII   101

Remedies; Application of Proceeds ............................................................................................. 101

Section 12.1   Remedies; Obtaining the Collateral Upon Default .......................................... 101

Section 12.2   Remedies; Disposition of the Collateral. ......................................................... 102

iv

Section 12.3    Application of DIP Proceeds. .......................................................................... 103

Section 12.4    WAIVER OF CLAIMS. ................................................................................... 103

Section 12.5    Remedies Cumulative. .................................................................................... 104

Section 12.6    Discontinuance of Proceeding. ....................................................................... 104

ARTICLE XIII **Miscellaneous** ............................................................................................. 104

Section 13.1    Amendments, Waivers, Etc. ............................................................................ 104

Section 13.2    Expenses; Indemnity; Damage Waiver ........................................................... 106

Section 13.3    Successors and Assigns ................................................................................... 108

Section 13.4    Limitation of Liability ..................................................................................... 110

Section 13.5    Right of Set-off. ............................................................................................... 110

Section 13.6    Sharing of Payments, Etc. ............................................................................... 110

Section 13.7    Notices, Etc. .................................................................................................... 111

Section 13.8    No Waiver; Remedies ...................................................................................... 113

Section 13.9    Governing Law ................................................................................................ 113

Section 13.10   Submission to Jurisdiction; Service of Process ............................................. 113

Section 13.11   Waiver of Jury Trial ........................................................................................ 114

Section 13.12   Bankruptcy Court Pleadings ........................................................................... 114

Section 13.13   Marshaling; Payments Set Aside .................................................................... 114

Section 13.14   Section Titles ................................................................................................... 114

Section 13.15   Execution in Counterparts .............................................................................. 114

Section 13.16   Entire Agreement ............................................................................................ 115

Section 13.17   Confidentiality ................................................................................................. 115

Section 13.18   Patriot Act Notice ........................................................................................... 115

## SCHEDULES

| | | |
|---|---|---|
| Schedule I(A) | – | Term Commitments |
| Schedule I(B) | – | Revolving Commitments |
| Schedule II | – | Concentration and Disbursement Accounts |
| Schedule III | – | Non-Specified Real Property |
| Schedule IV | – | Specified Real Property |
| Schedule 2.3 | – | Existing Letters of Credit |
| Schedule 4.2 | – | Consents |
| Schedule 4.3 | – | Capitalization |
| Schedule 4.7 | | Taxes |
| Schedule 4.14 | – | Labor Matters |
| Schedule 4.16 | – | Environmental Matters |
| Schedule 4.18 | – | Real Property |
| Schedule 7.16 | | Expired Mortgages |
| Schedule 8.1 | – | Existing Indebtedness |
| Schedule 8.2 | – | Existing Liens |
| Schedule 8.3 | – | Existing Investments |
| Schedule 8.9 | – | Excluded Joint Venture Agreements |
| Schedule 8.10 | | Restrictions on Subsidiary Distributions and Negative Pledges |

## EXHIBITS

| | | |
|---|---|---|
| Exhibit A | – | Form of Assignment and Acceptance |
| Exhibit B | – | Form of Notice of Borrowing |
| Exhibit C | – | Form of Interim Order |
| Exhibit D | – | Form of Pledge and Security Agreement |
| Exhibit E | – | Form of Borrowing Base Certificate |
| Exhibit F | – | Form of Exemption Certificate |
| Exhibit G | | Form of Monthly Financial Statements |
| Exhibit H-1 | | Form of Term Note |
| Exhibit H-2 | | Form of Revolving Note |

**REVOLVING CREDIT, TERM LOAN AND GUARANTEE AGREEMENT** (this "*Agreement*"), dated as of [April __], 2010, among U.S. CONCRETE, INC., a Delaware corporation (the "*Borrower*"), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, each of the other direct and indirect Domestic Subsidiaries of the Borrower signatory hereto (such Subsidiaries, the "*Guarantors*" and, collectively with the Borrower, but excluding the Specified Non-Filers (as defined below), the "*Debtors*" and each a "*Debtor*"), each of which Debtors is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Debtors, each a "*Case*" and, collectively, the "*Cases*"), JPMORGAN CHASE BANK, N.A., as Administrative Agent, and each lender from time to time party hereto (collectively, the "*Lenders*" and each a "*Lender*").

PRELIMINARY STATEMENTS

On April [ ], 2010 (the "*Petition Date*"), the Debtors filed voluntary petitions with the Bankruptcy Court (such term and other capitalized terms used in the introductory paragraph and in these preliminary statements being used with the meanings given to such terms in Section 1.1) initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108.

Pursuant to this Agreement and the Orders, the Lenders are making available to the Borrower an $80,000,000 debtor-in-possession loan facility consisting of (i) a term loan facility in an aggregate principal amount not to exceed $45,000,000 and (ii) a revolving facility in an aggregate principal amount not to exceed $35,000,000.

The proceeds of the Loans will be used (i) for operating expenses, working capital and other general corporate purposes of the Borrower, the other Loan Parties and their respective Subsidiaries (including without limitation, for the payment of fees and expenses incurred in connection with entering into this Agreement, the Cases and the transactions contemplated hereby) and (ii) on the Closing Date to repay in full the obligations outstanding under the Prepetition Credit Agreement, in each case subject to the terms of this Agreement and the Orders.

To provide guarantees for the repayment of the Loans and the payment of the other Obligations of the Loan Parties hereunder and under the other Loan Documents, each Cash Management Document and each Hedging Contract, the Loan Parties are providing to the Administrative Agent and the Lenders, pursuant to this Agreement, the other Loan Documents and the Orders, the following (each as more fully described herein) and subject to the Carve Out (except for *clause (a)* below):

(a)     a guarantee from each of the Guarantors of the due and punctual payment and performance of the Obligations of the Borrower hereunder;

(b)     an allowed administrative expense claim entitled to the benefits of Bankruptcy Code Section 364(c)(1) in each of the Cases, having a superpriority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) or 507(b);

(c)     pursuant to Bankruptcy Code Section 364(c)(2) a perfected first priority (subject to permitted exceptions) Lien on all present and after-acquired property of the Debtors not subject to a valid, perfected and non-avoidable Lien on the Petition Date, excluding, in all cases, with respect to the obligations of the Loan Parties under any Loan Document, (x) 34% of the issued and outstanding Stock of any new or existing Excluded Foreign Subsidiary (and, for the avoidance of doubt, 100% of the issued and outstanding Stock of any new or existing Foreign Subsidiary not owned directly by a Debtor), (y) the Excluded JV Equity (any Stock so excluded, together with any Stock excluded pursuant to clause (x) above, the "Excluded Stock") and (z) other Excluded Collateral; and

(d)     pursuant to Bankruptcy Code Section 364(c)(3) a perfected junior Lien on all present and after-acquired property of the Debtors that is otherwise subject to a valid, perfected and non-avoidable Lien on the Petition Date or a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under Section 546(b) of the Bankruptcy Code, excluding, in all cases, any Excluded Stock and other Excluded Collateral.

Accordingly, the parties hereto hereby agree as follows:

## ARTICLE I
## Definitions, Interpretation and Accounting Terms

### Section 1.1     Defined Terms

As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Account*" has the meaning given to such term in the UCC.

"*Account Debtor*" has the meaning given to such term in the UCC.

"*Additional Guarantor*" means any Person who becomes a Guarantor after the Closing Date.

"*Additional Notes*" means up to $85 million in aggregate principal amount of additional notes issued under the terms of the Notes Indenture, having the same terms and conditions as the Notes issued under the Notes Indenture.

"*Adjusted LIBO Rate*" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"*Adjusted One Month LIBOR Rate*" means, an interest rate per annum equal to the sum of (i) 1.0% per annum plus (ii) the Adjusted LIBO Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day); provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page) at approximately 11:00 a.m. London time on such day (without any rounding).

"*Administrative Agent*" has the meaning specified in the preamble to this Agreement.

"*Affected Lender*" has the meaning specified in Section 2.17.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling or that is controlled by or is under common control with such Person, each officer, director, general partner or joint-venturer of such Person, and each Person that is the beneficial owner of 15% or more of any class of Voting Stock of such Person. For the purposes of this definition, "*control*" means the possession of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Aggregate Exposure*" means with respect to any Lender at any time, an amount equal to (a) until the Closing Date, the aggregate amount of such Lender's Commitments at such time and (b)

thereafter, the sum of (i) the aggregate amount of such Lender's Commitments then in effect and (ii) the aggregate principal amount of such Lender's Loans then outstanding.

"*Aggregate Exposure Percentage*" means with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"*Agreement*" has the meaning specified in the preamble to this Agreement.

"*Applicable Amount*" means $3,000,000.

"*Applicable Margin*" means for each type of Loan, the rate per annum set forth under the relevant column heading below:

|  | CBFR Loans | Eurodollar Rate Loans |
|---|---|---|
| Term Loans | 4.25% | 5.25% |
| Revolving Loans | 2.50% | 3.50% |

"*Applicable Unused Commitment Fee Rate*" means 0.75% per annum.

"*Appraisal*" means each appraisal that is conducted after the Closing Date pursuant to Section 6.11(b) for purpose of determining the Borrowing Base, in form and substance reasonably satisfactory to the Administrative Agent and performed by an appraiser that is reasonably satisfactory to the Administrative Agent.

"*Approved Deposit Account*" means a Deposit Account (other than an Excluded Deposit Account) that is the subject of an effective Deposit Account Control Agreement and that is maintained by any Loan Party with a Deposit Account Bank. "*Approved Deposit Account*" includes all monies on deposit in a Deposit Account and all certificates and instruments, if any, representing or evidencing such Deposit Account.

"*Approved Fund*" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"*Approved Securities Intermediary*" means (i) a Securities Intermediary or Commodity Intermediary selected or approved by the Administrative Agent, such approval not to be unreasonably withheld, delayed or conditioned, and (ii) Merrill Lynch.

"*Arranger*" means J.P. Morgan Securities Inc. in its capacity as sole lead arranger and sole bookrunner.

"*Asset Sale*" has the meaning specified in Section 8.4.

"*Assignment and Acceptance*" means an assignment and acceptance entered into by a Lender and an Eligible Assignee (except upon the occurrence and during the continuance of an Event of Default, when an Assignment and Acceptance may be entered into by any assignee), and accepted by the Administrative Agent, in substantially the form of *Exhibit A*.

"*Availability Period*" means the period from and including the Closing Date to but

excluding the earlier of the Revolving Termination Date and the date of termination of the Revolving Commitments.

"*Availability Reserve*" means, effective (a) immediately, if a Default or Event of Default has occurred and is continuing or (b) otherwise as of one Business Day after the date of written notice of any determination thereof to the Borrower by the Administrative Agent (which such notice shall provide reasonable detail for the basis of the implementation of such reserve), such amounts (without duplication) as the Administrative Agent may from time to time establish against the Revolving Facility, in the Administrative Agent's sole discretion, exercised reasonably and in good faith, deems appropriate in order to, preserve and protect (i) the value of the Borrowing Base Collateral or any other material portion of the Collateral, (ii) the ability of the Administrative Agent and the Lenders to realize such value, (iii) the Lien of the Administrative Agent therein or (iv) the priority of the obligations owing under the Loan Documents relative to any other liability of the Borrower or its Subsidiaries (including, if applicable, liabilities in respect of Cash Management Obligations and liabilities with respect to net mark-to-market losses incurred under Hedging Contracts entered into with Hedging Creditors).

"*Available Credit*" means, at any time, the result of (a) the lesser of (i) the then effective Revolving Commitments and (ii) the Borrowing Base at such time *minus* (b) the sum of (i) the aggregate Revolving Outstandings at such time and (ii) without duplication, any Availability Reserve in effect at such time.

"*Bankruptcy Code*" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Cases from time to time.

"*Board*" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"*Borrower*" has the meaning specified in the preamble to this Agreement.

"*Borrower's Accountants*" means PricewaterhouseCoopers LLP or other independent nationally-recognized accountants acceptable to the Administrative Agent.

"*Borrowing*" means either a Revolving Borrowing or a Term Borrowing.

"*Borrowing Base*" means, at any time, (a) the sum of (i) the product of 85% and the face amount of all Eligible Receivables of the Borrowing Base Contributors (calculated net, without duplication, of all finance charges, late fees and other fees that are unearned, unpaid sales, excise or similar taxes, and credits or allowances granted at such time), (ii) the product of (x) the product of 85% *multiplied by* the Orderly Liquidation Value Inventory Rate *multiplied by* (y) the value of the Eligible Inventory of the Borrowing Base Contributors (valued, in each case, at the lower of cost or market on a first-in, first-out basis) at such time and (iii) the lesser of (x) $20,000,000 and (y) the product of 85% of the Orderly Liquidation Value Of Eligible Trucks of the Borrowing Base Contributors at such time, *minus* (b) any Eligibility Reserve then in effect and applicable to the Borrowing Base Collateral. It being understood, for the avoidance of doubt, that the Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate theretofore delivered to the Administrative (subject to any Availability Reserve taken by the Administrative Agent in its sole discretion at any time in accordance with the terms hereunder).

4

"*Borrowing Base Certificate*" means a certificate of the Borrowing Base Contributors substantially in the form of *Exhibit E,* or otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"*Borrowing Base Collateral*" means the Accounts, Inventory and Trucks of the Borrowing Base Contributors other than Excluded Collateral.

"*Borrowing Base Contributors*" means (a) the Borrower and (b) each Debtor as of the Closing Date.

"*Budget*" means the consolidated forecasts of the consolidated income statement, balance sheet and cash flows of the Borrower and its Subsidiaries through the date that is one year after the Closing Date (on a monthly basis), including the material assumptions on which such forecasts were based, and setting forth the anticipated disbursements and uses of the Commitments, prepared by the Borrower's management assuming that the Notes and the Additional Notes are outstanding during such periods up to the Effective Date.

"*Business Day*" means a day of the year on which banks are not required or authorized to close in New York City and, if the applicable Business Day relates to notices, determinations, fundings and payments in connection with the Adjusted LIBO Rate or any Eurodollar Rate Loans, a day on which dealings in Dollar deposits are also carried on in the London interbank market.

"*Capital Expenditures*" means, for any Person for any period, the aggregate of amounts that would be reflected as additions to property, plant or equipment on a Consolidated statement of cash flow of such Person and its Subsidiaries, excluding costs and interest capitalized during construction; *provided* that such term shall not include (i) amounts expended during such period to replace or repair assets, equipment or other property lost, destroyed, damaged or condemned or otherwise to acquire, maintain, develop, construct, improve, upgrade or repair assets in replacement of assets, equipment or other property lost, destroyed, damaged or condemned, in each case, solely (except for any applicable customary deductible retainage, co-payment or similar deduction or reduction in reimbursement) to the extent of the amount of reimbursement (whether pursuant to insurance or indemnity claims) that such Person has actually received in respect of such lost, destroyed, damaged or condemned assets and (ii) expenditures that are accounted for as capital expenditures of such Person and that are actually paid for or actually reimbursed by a Person that is not Borrower or any of its Subsidiaries (it being understood that to the extent the Borrower or any Subsidiary makes any expenditures to the Excluded Joint Venture for which such Borrower or Subsidiary is actually reimbursed, such amount shall not constitute Capital Expenditures).

"*Capital Lease*" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, property by such Person as lessee that would be accounted for as a capital lease on a balance sheet of such Person prepared in conformity with GAAP.

"*Capital Lease Obligations*" means, with respect to any Person, the capitalized amount of all Consolidated obligations of such Person or any of its Subsidiaries under Capital Leases.

"*Carve Out*" has the meaning specified in Section 2.19.

"*Carve Out Cap*" has the meaning specified in Section 2.19.

"*Cases*" has the meaning specified in the preamble to this Agreement.

"*Cash Collateral Account*" means any Deposit Account or Securities Account that is (a) established by the Administrative Agent from time to time in its sole discretion to receive cash and Cash Equivalents (or purchase cash or Cash Equivalents with funds received) from the Loan Parties or Persons acting on their behalf pursuant to the Loan Documents, (b) with such depositaries and securities intermediaries as the Administrative Agent may determine in its sole discretion, (c) in the name of the Administrative Agent (although such account may also have words referring to the Borrower and the account's purpose), (d) under the sole dominion and control of the Administrative Agent and (e) in the case of a Securities Account, with respect to which the Administrative Agent shall be the Entitlement Holder and the only Person authorized to give Entitlement Orders with respect thereto.

"*Cash Equivalents*" means (a) securities issued or fully guaranteed or insured by the United States federal government or any agency thereof, (b) certificates of deposit, eurodollar time deposits, overnight bank deposits and bankers' acceptances of any commercial bank organized under the laws of the United States, any state thereof, the District of Columbia, any foreign bank, or its branches or agencies (fully protected against currency fluctuations) that, at the time of acquisition, are rated at least "*A-2*" by S&P or "*P-2*" by Moody's, (c) commercial paper of an issuer rated at least "*A-2*" by S&P or "*P-2*" by Moody's, (d) shares of any money market fund that (i) has at least 95% of its assets invested continuously in the types of investments referred to in *clauses (a), (b)* and *(c)* above or *clauses (e), (f), (g)* and *(h)* below, (ii) has net assets exceeding $500,000,000 and (iii) is rated at least "*A-2*" by S&P or "*P-2*" by Moody's, (e) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of *clause (b)* above, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government, (f) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A-2 by Moody's, (g) securities with maturities of 270 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of *clause (b)* above, (h) (i) commercial paper and variable and fixed rate notes issued by any Lender or other bank or financial institution (or by the parent company of any such Person), in each case, with a short-term commercial paper rating of at least A-2 by S&P or at least P-2 by Moody's and (ii) commercial paper, auction rate notes and variable rate notes issued by, or guaranteed by, any industrial or financial company with a short-term commercial paper rating of at least A-2 by S&P or at least P-2 by Moody's or at least F-2 or the equivalent thereof by Fitch, and in each case maturing within nine months after the date of acquisition thereof and (i) money market funds that (i) are rated AAA by S&P and Aaa by Moody's and (ii) have portfolio assets of at least $5,000,000,000; *provided, however,* that the maturities of all obligations of the type specified in *clauses (a), (b)* and *(c)* above shall not exceed 180 days.

"*Cash Flow Forecast*" has the meaning specified in Section 6.1(i).

"*Cash Management Document*" means any certificate, agreement or other document executed by any Loan Party in respect of the Cash Management Obligations of any Loan Party.

"*Cash Management Obligation*" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person in respect of cash management services (including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements) *provided* after the Closing Date (regardless of whether these or similar services were provided prior to the Closing Date by the Administrative Agent, any Lender or any Affiliate of any of them) by the Administrative Agent, any Lender or any Affiliate of any of them, in each case, so long as the applicable Lender is a Lender hereunder, including obligations for the payment of reasonable fees, interest, charges, expenses, attorneys' fees and disbursements in connection therewith, if any.

"*CB Floating Rate*" means the Prime Rate, *provided* that the CB Floating Rate shall never be less than the Adjusted One Month LIBOR Rate for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day). Any change in the CB Floating Rate due to a change in the Prime Rate or the Adjusted One Month LIBOR Rate shall be effective from and including the effective date of such change in the Prime Rate or the Adjusted One Month LIBOR Rate, respectively.

"*CBFR Borrowing*" means a borrowing consisting of CBFR Loans.

"*CBFR Loan*" means any Loan during any period in which it bears interest based on the CB Floating Rate.

"*Change of Control*" means the occurrence of any of the following: (a) any person or group of persons (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*")) shall have acquired beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Exchange Act) of 35% or more of the issued and outstanding voting securities within the meaning of Rule 13d-5(b) of the Exchange Act of the Borrower or (b) during any period of twelve consecutive calendar months commencing from and after the Closing Date, individuals who, at the beginning of such period, constituted the board of directors of the Borrower (together with any new directors whose election by the board of directors of the Borrower or whose nomination for election by the stockholders of the Borrower was approved by a vote of at least a majority of the directors then still in office who either were directors at the beginning of such period or whose elections or nomination for election was previously so approved) cease for any reason other than death or disability to constitute a majority of the directors then in office.

"*Closing Date*" means [April __], 2010.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Collateral*" means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a Lien is granted under this Agreement, the Orders or any Collateral Document, but in any event, excluding the Excluded Collateral, and subject to the provisions of Section 2.19.

"*Collateral Access Agreement*" means individually and collectively, each "Collateral Access Agreement" referred to in the Pledge and Security Agreement.

"*Collateral Documents*" means the Pledge and Security Agreement, the Deposit Account Control Agreements, the Securities Account Control Agreements, the Mortgages and any other document executed and delivered by a Loan Party granting a Lien on any of its property to secure payment of the Obligations.

"*Committee*" has the meaning specified in Section 2.19.

"*Commitments*" means the collective reference to the Revolving Commitments and the Term Commitments.

"*Commodity Account*" has the meaning given to such term in the UCC.

"*Commodity Intermediary*" has the meaning given to such term in the UCC.

"*Compliance Certificate*" has the meaning specified in Section 6.1(d).

"*Concentration and Disbursement Accounts*" shall mean, collectively, the deposit accounts of Borrower identified on *Schedule II* and such other accounts as may be established after the date hereof in accordance with the terms hereof that are used as concentration or disbursement accounts.

"*Confirmation Order*" means an order of the Bankruptcy Court confirming a plan of reorganization.

"*Consolidated*" means, with respect to any Person, the consolidation of accounts of such Person and its Subsidiaries in accordance with GAAP.

"*Consolidated Net Income*" means, for any Person for any period, the Consolidated net income (or loss) of such Person and its Subsidiaries for such period; *provided, however,* that (a) the net income of any other Person in which such Person or one of its Subsidiaries has a joint interest with a third party (which interest does not cause the net income of such other Person to be Consolidated into the net income of such Person) shall be included only to the extent of the amount of dividends or distributions paid in cash to such Person or Subsidiary, (b) the net income of any Subsidiary of such Person that is subject to any restriction or limitation on the payment of dividends or the making of other distributions shall be excluded to the extent of such restriction or limitation and (c) extraordinary gains and losses and any one-time increase or decrease to net income that is required to be recorded because of the adoption of new accounting policies, practices or standards required by GAAP shall be excluded.

"*Constituent Documents*" means, with respect to any Person, (a) the articles of incorporation, certificate of incorporation, constitution or certificate of formation (or the equivalent organizational documents) of such Person, (b) the by laws or operating agreement (or the equivalent governing documents) of such Person and (c) any document setting forth the manner of election and duties of the directors or managing members (or any equivalent managers) of such Person (if any) and the designation, amount or relative rights, limitations and preferences of any class or series of such Person's Stock.

"*Contaminant*" means any material, substance or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including any petroleum or petroleum derived substance or waste, asbestos and polychlorinated biphenyls and any other substance, material or waste that would be reasonably be expected to result in liability under any Environmental Law.

"*Contractual Obligation*" of any Person means any obligation, agreement, undertaking or similar provision of any Security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (excluding a Loan Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"*Control Account*" means a Securities Account or Commodity Account that is the subject of an effective Securities Account Control Agreement and that is maintained by any Loan Party with an Approved Securities Intermediary. "*Control Account*" includes all Financial Assets held in a Securities Account or a Commodity Account and all certificates and instruments, if any, representing or evidencing the Financial Assets contained therein.

"*Corporate Chart*" means a corporate organizational chart, list or other similar document and setting forth for each Person that is a Loan Party that is subject to Section 7.12 or that is a Subsidiary of any of them, (a) the full legal name of such Person (and any trade name, fictitious name or other name such Person may have had or operated under), (b) the jurisdiction of organization, the organizational number (if any) and the tax identification number (if any) of such Person, (c) the location of such Person's chief executive office (or sole place of business) and (d) the number of shares of each class of

such Person's Stock authorized (if applicable), the number outstanding as of the date of delivery and the number and percentage of such outstanding shares for each such class owned (directly or indirectly) by any Loan Party or any Subsidiary of any of them.

"*Credit Impairment Event*" means (i) the release of a material portion of the Collateral, (ii) the release of any Guarantor from its obligations under Article XI, (iii) the payment of adequate protection, (iv) any creditor obtaining relief from stay to foreclose on assets of the Loan Parties in an amount in excess of $100,000, (v) any amendment or waiver of any Specified Financial Covenants or the underlying definitions used in the Specified Financial Covenants, (vi) the amendment or waiver of Section 2.8 that materially adversely affects either, but not both in substantially the same manner, of the Revolving Lenders or the Term Lenders, (vii) the waiver of any Default or Event of Default resulting from a breach by any Debtor of the Interim Order or the Final Order or (viii) any modification of either the Interim Order or the Final Order in a manner adverse to the Lenders, *provided*, that notwithstanding anything herein to the contrary, no action or event shall be a Credit Impairment Event if such action or event is permitted pursuant to the terms hereof.

"*Customary Permitted Liens*" means, with respect to any Person, any of the following Liens:

(a)     Liens with respect to the payment of taxes, assessments or governmental charges in each case (i) that are not yet due or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP, (ii) in respect of which the aggregate liability of such Person does not exceed $1,000,000 at any time or (iii) that are otherwise stayed pursuant to the Cases;

(b)     Liens of landlords arising by statute and liens of suppliers, mechanics, carriers, materialmen, warehousemen or workmen and other liens imposed by law created in the ordinary course of business (i) for amounts not yet due or that are being contested in good faith by appropriate proceedings and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP, (ii) in respect of which the aggregate liability of such Person does not exceed $1,000,000 at any time or (iii) that are otherwise stayed pursuant to the Cases;

(c)     deposits and pledges of cash, Cash Equivalents and Deposit Accounts made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security benefits or other ordinary course statutory obligations or to secure the performance of bids, tenders, sales, contracts (other than for the repayment of borrowed money) and surety, appeal, customs, bid or performance bonds;

(d)     encumbrances arising by reason of zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions and other similar encumbrances on the use of real property not materially detracting from the value of such real property or not materially interfering with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(e)     encumbrances arising under leases or subleases of real property that do not, in the aggregate, materially detract from the value of such real property or interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(f)         financing statements with respect to a lessor's rights in and to personal property leased to such Person in the ordinary course of such Person's business other than through a Capital Lease;

(g)         solely with respect to Real Property, such other Liens, defects and encumbrances as may be approved by the Administrative Agent in its sole discretion;

(h)         Liens securing judgments which do not constitute an Event of Default; and

(i)         Liens in favor of a banking institution arising as a matter of law or otherwise encumbering deposits (including the right of set off) and which are within the general parameters customary in the banking industry.

*"Debt Issuance"* means the incurrence of Indebtedness (a) of the type specified in *clause (a)* or *(b)* of the definition of *"Indebtedness"* by the Borrower or any of its Subsidiaries and (b) incurred pursuant to Section 8.1(k).

*"Debtors"* has the meaning specified in the preamble to this Agreement.

*"Default"* means any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

*"Defaulting Lender"* means any Lender that (a) has failed to fund any portion of its Loans or participations in Letters of Credit required to be funded by it hereunder within 2 Business Days of the date required to be funded by it hereunder, (b) has notified the Administrative Agent, any Issuer, any Lender and/or the Borrower in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement, (c) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within 3 Business Days of the date when due, unless the subject of a good faith dispute, or (d) becomes (or is) the subject of any action or proceeding of a type described in Section 9.1(f) (or any comparable proceeding initiated by a regulatory authority having jurisdiction over such Lender).

*"Deposit Account"* has the meaning given to such term in the UCC.

*"Deposit Account Bank"* means a financial institution selected or approved by the Administrative Agent, such approval not to be unreasonably withheld, delayed or conditioned. The following financial institutions are approved: Bank of America, N.A. and JPMorgan.

*"Deposit Account Control Agreement"* has the meaning specified in the Pledge and Security Agreement.

*"Designated Real Property"* means the following Real Property: (i) Prosper Plant, 706 S. Dallas Parkway, Collin County, Texas; (ii) Alliance Plant, 9.431 Acres, Denton County 13624 FM 1171, Roanoke, Texas and part of the Alliance Plant property consisting of 10.438 acres in Denton County, Roanoke, Texas and (iii) Plant #260, Frisco Batch Plant, 14800 SH-121, Frisco, Texas.

*"Disqualified Stock"* means with respect to any Person, any Stock that, by its terms (or by the terms of any Security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is exchangeable for Indebtedness of such Person or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the Scheduled Termination Date.

"*Dollars*" and the sign "*$*" each mean the lawful money of the United States of America.

"*Domestic Person*" means any "*United States person*" under and as defined in Section 7701(a)(30) of the Code.

"*Domestic Subsidiary*" means any Subsidiary of the Borrower organized under the laws of any state of the United States of America or the District of Columbia.

"*EBITDAR*" means, with respect to any Person for any period, (a) Consolidated Net Income of such Person for such period *plus* (b) the sum of, in each case to the extent included in the calculation of such Consolidated Net Income but without duplication, (i) any provision for federal, state and local income and franchise taxes, (ii) Interest Expense, (iii) loss or charges from extraordinary items, (iv) depreciation, depletion and amortization expenses, (v) all other non-cash charges, non-cash impairment charges and non-cash charges, expenses and losses for such period, *provided* that each of the foregoing is a non-recurring charge, expense or loss and (vi) the amount of any non-cash (x) compensation deduction as the result of any grant of Stock or Stock Equivalents to employees, officers, directors or consultants and (y) incentive compensation charges *plus* (c) reorganization and restructuring costs, charges and expenses (including fees, costs and expenses incurred in connection with this Agreement, the restructuring or repayment of the Prepetition Credit Agreement, or the transactions contemplated hereby or thereby) in an aggregate amount during the term of this Agreement not to exceed (w) $7,500,000 in the aggregate as of June 30, 2010, (x) $18,500,000 in the aggregate as of September 30, 2010, (y) $24,000,000 in the aggregate as of December 31, 2010 and (z) $26,000,000 in the aggregate throughout the term of this Agreement *minus* (d) the sum of, in each case to the extent included in the calculation of such Consolidated Net Income but without duplication, (i) any credit for any federal, state and local income and franchise tax, (ii) gains from extraordinary items for such period and (iii) any other non-cash gains or other items which have been added in determining Consolidated Net Income, including any reversal of a change referred to in *clause (b)(vi)* above by reason of a decrease in the value of any Stock or Stock Equivalent. In no event shall the calculation of "EBITDAR" include any gain or loss from the early extinguishment or repurchase of Indebtedness.

"*Effective Date*" means the effective date of a plan of reorganization in the Cases.

"*Eligibility Reserves*" means, effective (a) immediately, if any Default or Event of Default has occurred and is continuing or (b) otherwise, as of one Business Day after the date of written notice of any determination thereof to the Borrower by the Administrative Agent (which such notice shall provide reasonable detail for the basis of the implementation of such reserve) immediately, such amounts as the Administrative Agent, in its sole discretion, exercised reasonably and in good faith, may from time to time establish against the gross amounts of Eligible Receivables, Eligible Inventory and/or Eligible Trucks to reflect risks or contingencies existing on or arising after the Closing Date that are reasonably expected to affect any one or more classes of such items and that have not already been taken into account in the calculation of the Borrowing Base or any Availability Reserve (including, without limitation, reserves for excess dilution of Accounts of the Borrowing Base Contributors).

"*Eligible Assignee*" means (a) a Lender or an Affiliate or Approved Fund of any Lender, (b) a commercial bank having total assets exceeding $5,000,000,000, (c) a finance company, insurance company or any other financial institution or Fund, in each case reasonably acceptable to the Administrative Agent and regularly engaged in making, purchasing or investing in loans and having a net worth, determined in accordance with GAAP, exceeding $250,000,000 (or, to the extent net worth is less than such amount, a finance company, insurance company, other financial institution or Fund, reasonably acceptable to the Administrative Agent and the Borrower) or (d) a savings and loan association or savings bank organized under the laws of the United States or any State thereof having a net worth, determined in accordance with GAAP, exceeding $250,000,000.

"*Eligible Inventory*" means the Inventory of each of the Borrowing Base Contributors (other than any Inventory that has been consigned by any such Borrowing Base Contributor) including raw materials, goods subject to an agreement providing for a bill and hold arrangement (but only to the extent any Account relating thereto is not otherwise eligible for inclusion as an Eligible Receivable), finished goods, truck parts and supplies (a) that is owned solely by such Borrowing Base Contributor or (without duplication) jointly with other Borrowing Base Contributors, (b) with respect to which the Administrative Agent has a valid, perfected and enforceable first-priority Lien, subject only to Customary Permitted Liens so long as such Customary Permitted Liens (other than Customary Permitted Liens of the type described in *clause (a)* of the definition thereof) do not have priority over the Lien in favor of the Administrative Agent, (c) with respect to which no representation or warranty contained in any Loan Document has been breached, (d) that is not, in the Administrative Agent's sole discretion, exercised reasonably and in good faith, obsolete or unmerchantable, (e) with respect to which (in respect of any Inventory labeled with a brand name or trademark and sold by such Borrowing Base Contributor pursuant to a trademark owned by such Borrowing Base Contributor or a license granted to such Borrowing Base Contributor) the Administrative Agent would have rights under such trademark or license pursuant to the Pledge and Security Agreement, the Orders or other agreement reasonably satisfactory to the Administrative Agent to sell such Inventory in connection with a liquidation thereof and (f) that the Administrative Agent deems to be Eligible Inventory based on such credit and collateral considerations as the Administrative Agent may, in its sole discretion, exercised reasonably and in good faith, deem appropriate. No Inventory of any Borrowing Base Contributor shall be Eligible Inventory if such Inventory consists of or constitutes (i) goods returned or rejected by customers other than goods that are undamaged or are resalable in the normal course of business, (ii) goods to be returned to suppliers, (iii) goods in transit (it being understood, for the avoidance of doubt, that this *clause (iii)* shall not exclude from Eligible Inventory any goods that are in transit from a Borrowing Base Contributor to a customer of such Borrowing Base Contributor), (iv) "*fuel*" or "*gasoline*" for operational use by such Borrowing Base Contributor, (vi) goods which constitute forms or casting patterns used in the production of pre-cast concrete Inventory, (vii) goods which constitute personal computers (and equipment and supplies related thereto), (viii) goods which are classified as "*Other*" in the most recent Appraisal delivered to the Administrative Agent, (ix) spare parts used in maintenance of the Trucks and which are identified in the most recent Appraisal delivered to the Administrative Agent as parts "*without supporting detail*" or similar notation, (x) goods for which a reserve has been taken on the balance sheet of such Borrowing Base Contributor or (xi) goods located, stored, used or held at the premises of a third party unless (A)(1) the Administrative Agent shall have received a Collateral Access Agreement or (2) in the case of Inventory located at a leased premises, and without duplication of any "occupancy costs" reflected in the most recent Appraisal delivered to the Administrative Agent, an Eligibility Reserve of up to three months' rent (as determined by the Administrative Agent in its sole discretion, exercised reasonably and in good faith) shall have been established with respect thereto and (B) an appropriate UCC 1 financing statement shall have been properly filed. For the avoidance of doubt, eligible "*raw materials*" means the Eligible Inventory of each Borrowing Base Contributor that is classified, consistent with past practice, on such Borrowing Base Contributor's account system as "raw materials".

"*Eligible Receivable*" means the gross outstanding balance of each Account of each Borrowing Base Contributor arising out of the sale of merchandise, goods or services in the ordinary course of business, that is made by such Borrowing Base Contributor to a Person that is not an Affiliate of such Borrowing Base Contributor and that constitutes Collateral in which the Administrative Agent has a fully perfected first priority Lien other than Customary Permitted Liens so long as such Customary Permitted Liens (other than Customary Permitted Liens of the type described in *clause (a)* of the definition thereof) do not have priority over the Lien in favor of the Administrative Agent; *provided, however,* that an Account shall not be an "*Eligible Receivable*" if any of the following shall be true:

(a)     such Account is (i) more than 90 days past due according to the original terms of sale or (ii) 120 days or more past the original invoice date thereof; or

(b)     any warranty contained in this Agreement or any other Loan Document with respect to such specific Account is not true and correct with respect to such Account; or

(c)     the Account Debtor on such Account has disputed liability or made any claim with respect to any other Account due from such Account Debtor to such Borrowing Base Contributor but only to the extent of such dispute or claim; or

(d)     the Account Debtor on such Account has (i) filed a petition for bankruptcy or any other relief under the Bankruptcy Code or any other law relating to bankruptcy, insolvency, reorganization or relief of debtors, (ii) made a general assignment for the benefit of creditors, (iii) had filed against it any petition or other application for relief under the Bankruptcy Code or any such other law, (iv) has failed, suspended business operations, become insolvent, called a meeting of its creditors generally for the purpose of obtaining any financial concession or accommodation or (v) had or suffered a receiver or a trustee to be appointed for all or a significant portion of its assets or affairs unless such Accounts arose on a post-petition basis and (A) the Account Debtor on such Account is a debtor-in-possession in a Chapter 11 case under the Bankruptcy Code and has available debtor-in-possession financing from sources and under terms reasonably acceptable to the Administrative Agent and (B) the Administrative Agent, acting in its sole discretion, determines that such Account shall be an Eligible Receivable; *provided, however,* that the aggregate amount of all Eligible Receivables under this *clause (d)* shall not, at any time, exceed 5% of the Eligible Receivables of the Borrowing Base Contributors; or

(e)     the Account Debtor on such Account or any of its Affiliates is also a supplier to or creditor of the Borrower or any of its Subsidiaries, but only to the extent of the amount owing by the Borrower or any of its Subsidiaries to such supplier or creditor, unless such supplier or creditor has executed a no-offset letter reasonably satisfactory to the Administrative Agent, in its sole discretion, in which case the full amount of such account shall be eligible pursuant to this *clause (e)*; or

(f)     the sale represented by such Account is to an Account Debtor located outside the United States, unless the sale is on letter of credit or acceptance terms reasonably acceptable to the Administrative Agent, in its sole discretion, exercised reasonably and in good faith, and (i) such letter of credit names the Administrative Agent as beneficiary for the benefit of the Secured Parties or (ii) the issuer of such letter of credit has consented to the assignment of the proceeds thereof to the Administrative Agent; or

(g)     the sale to such Account Debtor on such Account is on a bill-and-hold, guaranteed sale, cash-on-delivery, sale-and-return, sale-on-approval or consignment basis or other terms by reason of which the payment by such Account Debtor is or may be conditional, *provided* that with respect to any Accounts which are bill-and-hold, if the relevant Account Debtor has delivered to the relevant Borrowing Base Contributor a letter (or other agreement) pursuant to which such Account Debtor accepts title and risk of loss with respect to the goods or services which are the subject of such Accounts (and such Borrowing Base Contributor has delivered a true and complete copy of such letter to the Administrative Agent) prior to the delivery of such goods or services by such Borrowing Base Contributor to such Account Debtor, then the bill-and-hold Accounts of such Account Debtor shall not be deemed ineligible pursuant to this *clause (g)*; or

(h)     such Account is (i) a bonded Account or (ii) subject to a Lien in favor of any Person other than the Administrative Agent for the benefit of the Secured Parties other than

Customary Permitted Liens so long as such Customary Permitted Liens (other than Customary Permitted Liens of the type described in *clause (a)* of the definition thereof) do not have priority over the Lien in favor of the Administrative Agent; or

(i)     such Account is subject to any deduction, offset, counterclaim, return privilege or other conditions other than volume sales discounts given in the ordinary course of such Borrowing Base Contributor's business; *provided, however,* that such Account shall be ineligible pursuant to this *clause (i)* only to the extent of such deduction, offset, counterclaim, return privilege or other condition; or

(j)     the Account Debtor on such Account is located in any State of the United States requiring the holder of such Account, as a precondition to commencing or maintaining any action in the courts of such State either to (i) receive a certificate of authorization to do business in such State or be in good standing in such State or (ii) file a Notice of Business Activities Report with the appropriate office or agency of such State, in each case unless the holder of such Account has received such a certificate of authority to do business, is in good standing or, as the case may be, has duly filed such a notice in such State; or

(k)     the Account Debtor on such Account is a Governmental Authority, unless such Borrowing Base Contributor has assigned its rights to payment of such Account to the Administrative Agent pursuant to the Assignment of Claims Act of 1940, as amended, in the case of a federal Governmental Authority, and pursuant to applicable law, if any, in the case of any other Governmental Authority, and such assignment has been accepted and acknowledged by the appropriate government officers; or

(l)     such Account or any portion thereof represents late charges or finance charges; *provided* that with respect to any Account for which late charges or finance charges constitute only a portion of such Account, such Account shall be ineligible pursuant to this *clause (l)* only to the extent of such late charges or finance charges; or

(m)     such Account represents a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to such Borrowing Base Contributor's completion of further performance under such contract; *provided* that with respect to any such Account for which all of the goods sold or used or services rendered have been delivered or performed, as the case may be, and a final invoice upon completion of all performance under such contract has been sent to the Account Debtor, such Account shall not be deemed to be ineligible pursuant to this *clause (m)*; or

(n)     such Account was previously the subject of a charge-back, debit memo or other transaction pursuant to which the liability of the Account Debtor thereunder was at one time extinguished or settled but has subsequently been reinstated and re-aged; or

(o)     50% or more of the outstanding Accounts of the Account Debtor have become, or have been determined by the Administrative Agent, in accordance with the provisions hereof, to be, ineligible pursuant to *clause (a)* above; or

(p)     the sale represented by such Account is denominated in a currency other than Dollars; or

(q)     such Account is not evidenced by an invoice or other writing or electronic record in form acceptable to the Administrative Agent, in its sole discretion, exercised reasonably and in good faith; or

(r) such Borrowing Base Contributor, in order to be entitled to collect such Account, is required to perform any additional service for, or perform or incur any additional obligation to, the Person to whom or to which it was made; or

(s) the total Accounts of such Account Debtor to such Borrowing Base Contributor represent more than 15% of the Eligible Receivables of all Borrowing Base Contributors at such time, but only to the extent of such excess; or

(t) the Administrative Agent, in accordance with its customary criteria, determines, in its sole discretion, exercised reasonably and in good faith, that such Account might not be paid or is otherwise ineligible.

Notwithstanding the foregoing, any Account which is secured by a letter of credit issued by an Eligible Assignee pertaining to the contract under which such Account arose and as to which either (i) such letter of credit names the Administrative Agent as beneficiary for the benefit of the Secured Parties or (ii) the issuer of such letter of credit has consented to the assignment of the proceeds thereof to the Administrative Agent, shall constitute an Eligible Receivable.

"*Eligible Trucks*" means the Trucks of each of the Borrowing Base Contributors (a) that are owned solely by such Borrowing Base Contributor, (b) with respect to which the Administrative Agent has a valid, perfected and enforceable first-priority Lien, subject only to Customary Permitted Liens, (c) with respect to which no representation or warranty contained in any Loan Document has been breached, (d) that are not, in the Administrative Agent's sole discretion, exercised reasonably and in good faith, obsolete or unmerchantable and (e) that the Administrative Agent deems to be Eligible Trucks, based on such credit and collateral considerations as the Administrative Agent may, in its sole discretion, exercised reasonably and in good faith, deem appropriate. Trucks which would otherwise be eligible pursuant to the foregoing criteria but which were not owned by a Borrowing Base Contributor on the date of the most recent Appraisal delivered to the Administrative Agent shall only become "*Eligible Trucks*" on the last day of any fiscal month during which (or after) such Truck is (or was) acquired by such Borrowing Base Contributor.

"*Entitlement Holder*" has the meaning given to such term in the UCC.

"*Entitlement Order*" has the meaning given to such term in the UCC.

"*Environmental Laws*" means all applicable Requirements of Law now or hereafter in effect and as amended or supplemented from time to time, relating to pollution or the regulation and protection of human or animal health, safety, the environment or natural resources, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 *et seq.*); the Hazardous Material Transportation Act, as amended (49 U.S.C. § 5101 *et seq.*); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. § 136 *et seq.*); the Resource Conservation and Recovery Act, as amended (42 U.S.C. § 6901 *et seq.*); the Toxic Substance Control Act, as amended (15 U.S.C. § 2601 *et seq.*); the Clean Air Act, as amended (42 U.S.C. § 7401 *et seq.*); the Federal Water Pollution Control Act, as amended (33 U.S.C. § 1251 *et seq.*); the Occupational Safety and Health Act, as amended (29 U.S.C. § 651 *et seq.*); the Safe Drinking Water Act, as amended (42 U.S.C. § 300f *et seq.*); and each of their state and local counterparts or equivalents and any transfer of ownership notification or approval statute, including the Industrial Site Recovery Act (N.J. Stat. Ann. § 13:1K-6 *et seq.*); and including such applicable Requirements of Law requiring the reclamation of mining sites.

"*Environmental Liabilities and Costs*" means, with respect to any Person, all liabilities, obligations, responsibilities, Remedial Actions, losses, damages, punitive damages, consequential

damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions and interest (a) incurred as a result of any claim or demand by any other Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute and arising under or relating to any Environmental Law, including all those (i) relating to any Permit, order or agreement with any Governmental Authority or other Person, (ii) relating to any environmental, health or safety condition or to any Release or threatened Release or (iii) resulting from the past, present or future operations of, or ownership of property by, such Person or any of its Subsidiaries or (b) otherwise relating to Environmental Laws.

"*Environmental Lien*" means any Lien in favor of any Governmental Authority for Environmental Liabilities and Costs.

"*Equipment*" has the meaning given to such term in the UCC.

"*Equity Issuance*" means the issuance or sale of any Stock by the Borrower or any Subsidiary of the Borrower of Stock of the Borrower or any Subsidiary of the Borrower, as applicable, to any Person other than the Borrower or any Subsidiary of the Borrower.

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) under common control or treated as a single employer with the Borrower or any of its Subsidiaries within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*ERISA Event*" means (a) a Reportable Event with respect to a Title IV Plan or a Multiemployer Plan, (b) the withdrawal of the Borrower, any of its Subsidiaries or any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA, (c) the complete or partial withdrawal of the Borrower, any of its Subsidiaries or any ERISA Affiliate from any Multiemployer Plan, (d) notice that a Multiemployer Plan is Insolvent, in Reorganization, or in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), (e) the filing of a notice of intent to terminate a Title IV Plan or the treatment of a plan amendment as a termination under Section 4041 of ERISA, (f) the institution of proceedings to terminate a Title IV Plan or Multiemployer Plan by the PBGC, (g) any failure by any Title IV Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Title IV Plan, whether or not waived, (h) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Title IV Plan, (i) the failure of Borrower, any of its Subsidiaries or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any required contribution to a Multiemployer Plan, (j) a determination that any Title IV Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA), (k) the imposition of a lien under Section 412 of the Code or Sections 302 or 4068 of ERISA on the Borrower or any of its Subsidiaries or any ERISA Affiliate or (l) any other event or condition that might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA.

"*Eurodollar Borrowing*" means a borrowing consisting of Eurodollar Rate Loans.

"*Eurodollar Rate Loan*" means any Loan the rate of interest applicable to which is based upon the Adjusted LIBO Rate.

"*Event of Default*" has the meaning specified in Section 9.1.

"*Excluded Collateral*" means (a) the Stock of the Excluded Joint Venture (the "*Excluded JV Equity*"), (b) the assets owned by the Excluded Joint Venture (the "*Excluded JV Assets*") and (c) property and assets excluded pursuant to the terms of the Pledge and Security Agreement.

"*Excluded Deposit Account*" means any Deposit Account maintained by the Borrower or its Subsidiaries as to which the criteria in the provisos to *clause (z)* of Section 7.13(a) shall be satisfied.

"*Excluded Foreign Subsidiary*" means any Subsidiary that is not a Domestic Subsidiary in respect of which either (a) the pledge of all of the Stock of such Subsidiary as Collateral to secure payment of the Obligations or (b) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of the Borrower based on an analysis reasonably satisfactory to the Administrative Agent, result in adverse tax consequences to the Loan Parties and their Subsidiaries, taken as a whole.

"*Excluded Joint Venture*" means Superior Materials Holdings LLC and its direct and indirect Subsidiaries.

"*Excluded JV Assets*" has the meaning set forth in *clause (b)* of the definition of "*Excluded Collateral*".

"*Excluded JV Equity*" has the meaning set forth in *clause (a)* of the definition of "*Excluded Collateral*".

"*Excluded Stock*" has the meaning specified in the preamble to this Agreement.

"*Facility*" means each of (a) the Term Commitments and the Term Loans made thereunder (the "*Term Facility*") and (b) the Revolving Commitments and the Revolving Loans made thereunder (the "*Revolving Facility*").

"*Fair Market Value*" means (a) with respect to any asset or group of assets (other than a marketable Security) at any date, the value of the consideration obtainable in a sale of such asset at such date assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Board of Directors of the Borrower or, if such asset shall have been the subject of a relatively contemporaneous appraisal by an independent third party appraiser, the basic material assumptions underlying which have not materially changed since its date, the value set forth in such appraisal, *provided* that the Board of Directors shall be permitted to consider the circumstances existing at such time (including, without limitation, any relevant legal compulsion, judicial proceeding or administrative order or the possibility thereof) in determining such Fair Market Value in connection with such transaction and (b) with respect to any marketable Security at any date, the closing sale price of such Security on the Business Day next preceding such date, as appearing in any published list of any national securities exchange or the NASDAQ Stock Market or, if there is no such closing sale price of such Security, the final price for the purchase of such Security at face value quoted on such Business Day by a financial institution of recognized standing regularly dealing in Securities of such type and selected by the Administrative Agent.

"*Federal Funds Effective Rate*" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%)

of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"*Federal Reserve Board*" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"*Fifteen Month Facility Extension Option*" has the meaning given to such term in Section 2.23.

"*Final Closing Date*" means the first date following the Final Order Entry Date that the conditions precedent set forth in Section 3.1, Section 3.2 and Section 3.3 shall have been satisfied or waived.

"*Final Order*" means an order of the Bankruptcy Court entered in the Cases, in substantially the form of the Interim Order, with such modifications thereto as are reasonably satisfactory to the Administrative Agent and the Requisite Lenders.

"*Final Order Entry Date*" means the date the Final Order is entered on the Bankruptcy Court's docket in the Cases.

"*Financial Asset*" has the meaning given to such term in the UCC.

"*Financial Statements*" means the financial statements of the Borrower and its Subsidiaries delivered in accordance with Section 4.4 and Section 6.1.

"*Fiscal Quarter*" means each of the three month periods ending on March 31, June 30, September 30 and December 31.

"*Fiscal Year*" means the twelve month period ending on December 31.

"*Flood Hazard Property*" means each Mortgaged Property which is located in an area designated by the Federal Emergency Management Agency (or any successor agency) as having special flood or mudslide hazards.

"*Fund*" means any Person (other than a natural Person) that is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"*GAAP*" means generally accepted accounting principles in the United States of America, consistently applied, as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements and pronouncements of such other entity as may be in general use by significant segments of the accounting profession, that are applicable to the circumstances as of the date of determination.

"*General Intangible*" has the meaning given to such term in the UCC.

"*Governmental Authority*" means any nation, sovereign or government, any state or other political subdivision thereof and any entity or authority exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including any central bank or stock exchange.

"*Guarantor*" means each Subsidiary of the Borrower, that is not an Excluded Foreign Subsidiary, that guarantees any of the Obligations under Article XI.

"*Guaranty Obligation*" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of such Person (the "*guaranteeing person*") with respect to any Indebtedness of another Person, if the purpose or intent of the guaranteeing person is to provide assurance to the obligee of such Indebtedness that such Indebtedness will be paid or discharged, that any agreement relating thereto will be complied with, or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof, including (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co making, discounting with recourse or sale with recourse by such Person of Indebtedness of another Person and (b) any liability of such Person for Indebtedness of another Person through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such Indebtedness or any security therefor or to provide funds for the payment or discharge of such Indebtedness (whether in the form of a loan, advance, stock purchase, capital contribution or otherwise), (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another Person, (iii) to make take or pay or similar payments, if required, regardless of non performance by any other party or parties to an agreement, (iv) to purchase, sell or lease (as lessor or lessee) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss or (v) to supply funds to, or in any other manner invest in, such other Person (including to pay for property or services irrespective of whether such property is received or such services are rendered), if in the case of any agreement described under *clause (b)(i), (ii), (iii), (iv)* or *(v)* above the primary purpose or intent thereof is to provide assurance that Indebtedness of another Person will be paid or discharged, that any agreement relating thereto will be complied with or that any holder of such Indebtedness will be protected (in whole or in part) against loss in respect thereof. The amount of any Guaranty Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guaranty Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guaranty Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guaranty Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"*Hedging Contracts*" means all Interest Rate Contracts, foreign exchange contracts, credit derivatives, currency swap or option agreements, forward contracts, commodity swap, purchase or option agreements, other commodity price hedging arrangements and all other similar agreements or arrangements designed to alter the risks of any Person arising from fluctuations in interest rates, currency values or commodity prices.

"*Hedging Creditor*" means the Administrative Agent, any Lender or any Affiliate of any of them from time to time party to one or more Hedging Contracts (regardless of whether these or similar services were provided prior to the Closing Date by the Administrative Agent, any Lender or any Affiliate of any of them, but only so long as such Lender is a Lender hereunder) permitted hereunder with a Loan Party.

"*Indebtedness*" of any Person means without duplication (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments or that bear interest, (c) all reimbursement and all obligations with respect to letters of credit, bankers' acceptances, surety bonds and performance bonds, whether or not matured, (d) all indebtedness for the deferred purchase price of property or services, other than trade payables incurred in the ordinary course of business, prepaid expenses or amounts owed by such Person to employees or

officers of such Person in the ordinary course of business as compensation for services rendered, (e) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (f) all Capital Lease Obligations of such Person and the present value of future rental payments under all synthetic leases, (g) all Guaranty Obligations of such Person, (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any Stock or Stock Equivalents (other than for other Stock or Stock Equivalents that do not constitute Disqualified Stock) of such Person prior to the Scheduled Termination Date, valued, in the case of redeemable preferred stock, at the greater of its voluntary liquidation preference and its involuntary liquidation preference plus accrued and unpaid dividends, (i) all net payments that such Person would have to make in the event of an early termination on the date Indebtedness of such Person is being determined in respect of Hedging Contracts of such Person and (j) all Indebtedness of the type referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including Accounts and General Intangibles) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"*Indemnitee*" has the meaning specified in Section 13.2(b).

"*Initial Cash Flow Forecast*" has the meaning specified in Section 3.1(o).

"*Insolvent*" means, with respect to a Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"*Instrument*" has the meaning given to such term in the UCC.

"*Interest Expense*" means, for any Person for any period, Consolidated total interest expense of such Person and its Subsidiaries for such period and including, in any event, net costs under Interest Rate Contracts for such period.

"*Interest Payment Date*" means as to any CBFR Loan or Eurodollar Rate Loan, the first Business Day of each calendar month and the Revolving Termination Date for Revolving Loans and the Term Termination Date for Term Loans.

"*Interest Period*" means as to any Eurodollar Rate Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Rate Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its Notice of Borrowing or notice of conversion, as the case may be, given with respect thereto and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Rate Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; *provided* that all of the foregoing provisions relating to Interest Periods in respect of Eurodollar Rate Loans are subject to the following:

      (i)     if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day;

      (ii)    the Borrower may not select an Interest Period under a particular Facility that would extend beyond the Revolving Termination Date or Term Termination Date;

(iii)    any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period;

(iv)    the Borrower may not select any Interest Period in respect of Loans having an aggregate principal amount of less than $1,000,000; and

(v)    there shall be outstanding at any one time no more than four (4) Interest Periods in the aggregate.

"*Interest Rate Contracts*" means all interest rate swap agreements, interest rate cap agreements, interest rate collar agreements and interest rate insurance.

"*Interim Order*" means an order of the Bankruptcy Court entered in the Cases granting interim approval of the transactions involving the Debtors contemplated by this Agreement and the other Loan Documents and granting the Liens on the Collateral and the Superpriority Claims described herein in favor of the Administrative Agent and the Lenders, substantially in the form of *Exhibit C* hereto, and otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Requisite Lenders.

"*Inventory*" has the meaning given to such term in the UCC.

"*Investment*" means, with respect to any Person, (a) any purchase or other acquisition by such Person of (i) any Security issued by, (ii) a beneficial interest in any Security issued by, or (iii) any other equity ownership interest in, any other Person, (b) any purchase by such Person of all or a significant part of the assets of a business conducted by any other Person, or all or substantially all of the assets constituting the business of a division, branch or other unit operation of any other Person, (c) any loan, advance (other than deposits with financial institutions available for withdrawal on demand, prepaid expenses, accounts receivable and similar items made or incurred in the ordinary course of business) or capital contribution by such Person to any other Person, including all Indebtedness of any other Person to such Person arising from a sale of property by such Person other than in the ordinary course of its business and (d) any Guaranty Obligation incurred by such Person.

"*IRS*" means the Internal Revenue Service of the United States or any successor thereto.

"*Issue*" means, with respect to any Letter of Credit, to issue, extend the expiry of, renew or increase the maximum face amount (including by deleting or reducing any scheduled decrease in such maximum face amount) of, such Letter of Credit. The terms "*Issued*" and "*Issuance*" shall have a corresponding meaning.

"*Issuer*" means each Lender or Affiliate of a Lender that is listed on the signature pages hereof as an "*Issuer*" or (b) hereafter becomes an Issuer pursuant to the terms of Section 2.3(i).

"*JPMorgan*" means JPMorgan Chase Bank, N.A.

"*Land*" of any Person means all of those plots, pieces or parcels of land now owned, leased or hereafter acquired or leased or purported to be owned, leased or hereafter acquired or leased (including, in respect of the Loan Parties, as reflected in the most recent Financial Statements) by such Person, including, without limitation, any quarries.

"*Leases*" means, with respect to any Person, all of those leasehold estates in real property of such Person, as lessee, as such may be amended, supplemented or otherwise modified from time to time.

"*Lender*" has the meaning specified in the preamble to this Agreement.

"*Letter of Credit*" means any letter of credit Issued pursuant to Section 2.3.

"*Letter of Credit Disbursement*" means a payment made by the Issuer pursuant to a Letter of Credit.

"*Letter of Credit Obligations*" means, at any time, the aggregate of all liabilities at such time of the Borrower to all Issuers with respect to Letters of Credit, whether or not any such liability is contingent, including, without duplication, the sum of (a) the Reimbursement Obligations at such time and (b) the Letter of Credit Undrawn Amounts at such time.

"*Letter of Credit Sublimit*" means $30,000,000.

"*Letter of Credit Undrawn Amounts*" means, at any time, the aggregate undrawn face amount of all Letters of Credit outstanding at such time.

"*LIBO Rate*" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period. Notwithstanding the foregoing, with respect to the Term Loans only, in no event shall the LIBO Rate be less than 2.0% per annum.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or the performance of any other obligation, including any conditional sale or other title retention agreement, the interest of a lessor under a Capital Lease and any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable law of any jurisdiction naming the owner of the asset to which such Lien relates as debtor.

"*Loan*" means the Term Loans and the Revolving Loans.

"*Loan Documents*" means, collectively, this Agreement, the Orders, the Promissory Notes (if any), the Collateral Documents and each certificate, agreement or document executed by a Responsible Officer of a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing.

"*Loan Party*" means each of the Borrower, each Guarantor and each other Subsidiary of the Borrower that executes and delivers a Loan Document.

"*Majority Facility Lenders*" means with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans or the Revolving Outstandings, as the case may be, outstanding under such Facility (or, in the case of the Revolving Facility, prior to any termination of the Revolving Commitments, the holders of more than 50% of the Revolving Commitments).

"*Material Adverse Change*" means a material adverse change in any of (a) the condition (financial or otherwise), business, performance, prospects, operations or properties of the Borrower and its Subsidiaries, taken as a whole (other than (i) any events leading up to the filing of the Cases disclosed to the Lenders and (ii) those events which customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and other events ancillary thereto), (b) the ability of the Borrower and the Guarantors, taken as a whole, to perform their respective obligations under the Loan Documents or (c) the rights and remedies of the Administrative Agent, the Lenders or the Issuers to enforce the Loan Documents.

"*Material Adverse Effect*" means an effect that results in or causes, or could reasonably be expected to result in or cause, a Material Adverse Change.

"*Maximum Credit*" means, at any time, the lesser of (a) (i) the Revolving Commitments in effect at such time and (ii) the Borrowing Base at such time *minus* (b) the aggregate amount of any Availability Reserve in effect at such time.

"*Merrill Lynch Account*" has the meaning specified in Section 7.13(f).

"*Moody's*" means Moody's Investors Services, Inc.

"*Mortgagee's Title Insurance Policy*" has the meaning specified in Section 3.1(s).

"*Mortgaged Property*" means each parcel of Real Property subject to the Lien of a Mortgage pursuant to the terms of this Agreement.

"*Mortgages*" means each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders, in a form reasonably acceptable to the Administrative Agent.

"*Multiemployer Plan*" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which the Borrower, any of its Subsidiaries or any ERISA Affiliate has any obligation or liability, contingent or otherwise.

"*Net Cash Proceeds*" means proceeds received by the Borrower or any of its Subsidiaries after the Closing Date in cash or Cash Equivalents from any (a) Asset Sale (other than an Asset Sale permitted under Section 8.4(a), Section 8.4(b), Section 8.4(c), Section 8.4(d), Section 8.4(e), Section 8.4(f), Section 8.4(h), Section 8.4(i) or Section 8.4(j)) net of (i) the reasonable cash costs and expenses of sale, assignment or other disposition (including a reasonable reserve for liabilities retained by the Borrower or such Subsidiary in connection with such Asset Sale; it being understood that "*Net Cash Proceeds*" shall include, without limitation, any reversal of a reserve described in this clause (i) or if such liabilities have not been satisfied in cash and such reserve not reversed within the longer of (x) 365 days after such Asset Sale and (y) the applicable contractual limitations period, the amount of such reserve), (ii) taxes paid or reasonably estimated to be payable as a result thereof and (iii) any amount required to be

paid or prepaid on Indebtedness (other than the Obligations) secured by the assets subject to such Asset Sale; *provided, however*, that evidence of *clauses (i), (ii)* and *(iii)* above is provided to the Administrative Agent in form and substance reasonably satisfactory to it, (b) Property Loss Event or (c)(i) Equity Issuance (other than any such issuance of Stock (other than Disqualified Stock) of the Borrower occurring in the ordinary course of business to any director, member of the management or employee of the Borrower or its Subsidiaries) or (ii) any Debt Issuance, in each case net of brokers' and advisors' fees and other costs incurred in connection with such transaction; *provided, however*, that in the case of this *clause (c)*, evidence of such costs is provided to the Administrative Agent in form and substance reasonably satisfactory to it.

"*Non-Consenting Lender*" has the meaning specified in Section 13.1(c).

"*Non-Filer*" means any Affiliate of the Borrower that is not a Debtor.

"*Non-Funding Lender*" has the meaning specified in Section 2.2(e).

"*Non-Specified Real Property*" shall mean the Real Property owned by the Loan Parties with a net book value less than $100,000, as listed on *Schedule III*.

"*Non-U.S. Lender*" means each Lender or Issuer (or the Administrative Agent) that is a Non-U.S. Person.

"*Non-U.S. Person*" means any Person that is not a Domestic Person.

"*Notes*" means those 8-3/8% Senior Subordinated Notes due 2014 issued pursuant to the Notes Indenture.

"*Notes Forbearance Agreement*" means that certain Restructuring and Lock-Up Agreement dated as of April [ ], 2010 whereby the holders of each of the Notes and the Additional Notes that are party to such Restructuring and Lock-Up Agreement agree to forbear from taking any action in respect of the guarantees provided by the Specified Non-Filers.

"*Notes Indenture*" means that certain Indenture dated as of March 31, 2004 by and between the Borrower, as issuer, and Wells Fargo Bank, National Association, as trustee, governing the Notes and the Additional Notes (or any notes which are freely transferable issued in exchange for the Notes or Additional Notes but having substantially the same terms and conditions).

"*Notice of Borrowing*" has the meaning specified in Section 2.2(a).

"*Obligations*" means the Loans, the Letter of Credit Obligations and all other amounts, obligations, covenants and duties owing by the Borrower or any Guarantor to the Administrative Agent, any Lender, any Issuer, any Affiliate of any of them or any Indemnitee, of every type and description (whether by reason of an extension of credit, opening or amendment of a letter of credit or payment of any draft drawn or other payment thereunder, loan, guaranty, indemnification, foreign exchange or currency swap transaction, interest rate hedging transaction or otherwise), present or future, arising under this Agreement, any other Loan Document, any Cash Management Document and any Hedging Contract, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, including all letter of credit, cash management and other fees, interest, charges, expenses, attorneys' fees and disbursements, Cash Management Obligations and other sums chargeable to the Borrower or any Guarantor under this Agreement, any other Loan Document, any Cash Management Document, any Hedging Contract and all

obligations of the Borrower under any Loan Document to provide cash collateral for any Letter of Credit Obligation and, with respect to any Obligations of a Non-Filer, interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to such Non-Filer.

"*Orderly Liquidation Value Inventory Rate*" shall mean the orderly liquidation value (net of reasonable costs and expenses incurred in connection with liquidation) of the Borrowing Base Contributors' Eligible Inventory as a percentage of the value of such Eligible Inventory, which percentage shall be determined by the most recent Appraisal of such Inventory received by the Administrative Agent.

"*Orderly Liquidation Value Of Eligible Trucks*" means, as of any date of determination, the result of the following formula:

(a) - (b)

where

(a) represents the sum of $\{(x) + (y) - (z)\}$;

(b) represents the product of (i) the number represented by *clause (a)* above and (ii) a percentage representing the reasonable costs and expenses expected to be incurred in connection with a liquidation of the Eligible Trucks (such percentage to be determined by reference to the most recent Appraisal referred to in *clause (x)* below);

(x) represents, with respect to the Eligible Trucks of the Borrowing Base Contributors which have been appraised pursuant to an Appraisal and are then owned by the Borrowing Base Contributors, the orderly liquidation value of such Eligible Trucks as determined by the most recent Appraisal of such Trucks received by the Administrative Agent;

(y) represents, with respect to Eligible Trucks which have been acquired by the Borrowing Base Contributors during any fiscal month occurring after the most recent Appraisal referred to in *clause (x)* above (but only until such time as the next Appraisal occurs) and are then owned by the Borrowing Base Contributors, the cost of such Trucks (without deduction for depreciation, which shall be governed by *clause (z)* below); and

(z) represents the cumulative book depreciation (determined in accordance with the depreciation methods used by the Borrowing Base Contributors with respect to Trucks on the Closing Date) attributable to all Eligible Trucks of the Borrowing Base Contributors (it being understood that such depreciation shall be an estimated amount as of the first two months of each Fiscal Quarter and shall be adjusted to an actual number as of the end of each Fiscal Quarter).

"*Orders*" means the collective reference to the Interim Order and the Final Order.

"*Participant*" has the meaning specified in Section 13.3(f).

"*Patriot Act*" means the USA Patriot Act of 2001 (31 U.S.C. §5318 et. seq.).

"*PBGC*" means the Pension Benefit Guaranty Corporation or any successor thereto.

"*Permit*" means any permit, approval, authorization, license, variance or permission required from a Governmental Authority under an applicable Requirement of Law.

"*Permitted Utility Deposit Account*" means any Deposit Accounts held by the Company or any of its Subsidiaries that is funded in connection with a deposit provided to any utility company as a result of the Cases, provided that the aggregate balance on deposit in all Permitted Utility Deposit Accounts shall not at any time exceed $500,000.

"*Person*" means an individual, partnership, corporation (including a business trust), joint stock company, estate, trust, limited liability company, unincorporated association, joint venture or other entity or a Governmental Authority.

"*Petition Date*" has the meaning specified in the preamble to this Agreement.

"*Pledge and Security Agreement*" means an agreement, in substantially the form of *Exhibit D*, executed by the Borrower and each Guarantor.

"*Pledged Debt Instruments*" has the meaning specified in the Pledge and Security Agreement.

"*Pledged Stock*" has the meaning specified in the Pledge and Security Agreement.

"*Prepetition Credit Agreement*" means the Amended and Restated Credit Agreement, dated as of June 30, 2006, among the US Borrower, the lenders party thereto and the agents party thereto, as amended, supplemented or otherwise modified.

"*Prime Rate*" means the rate of interest per annum publicly announced from time to time by JPMorgan as its prime rate at its offices at 270 Park Avenue in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"*Proceeds*" has the meaning given to such term in the UCC.

"*Professional Fees*" has the meaning specified in Section 2.19.

"*Promissory Note*" means the collective reference to any promissory note evidencing Loans.

"*Property Loss Event*" means (a) any loss of or damage to property of the Borrower or any of its Subsidiaries that results in the receipt by such Person of Net Cash Proceeds of insurance in an amount in excess of $500,000 (individually or in the aggregate) or (b) any taking of property of the Borrower or any of its Subsidiaries that results in the receipt by such Person of Net Cash Proceeds in an amount in excess of $500,000 (individually or in the aggregate).

"*Protective Advances*" means all expenses, disbursements and advances incurred by the Administrative Agent pursuant to the Loan Documents that the Administrative Agent, in its sole discretion, exercised reasonably and in good faith, deems necessary or desirable to preserve or protect the Collateral or any portion thereof or to enhance the likelihood, or maximize the amount, of repayment of the Obligations, *provided* that in no event shall the aggregate amount of Protective Advances outstanding at any time be greater than 5% of the lesser of (a) the Revolving Commitment and (b) the Borrowing Base.

"*Purchasing Lender*" has the meaning specified in Section 13.6(b).

"*Real Property*" of any Person means the Land of such Person, together with the right, title and interest of such Person, if any, in and to the streets, the Land lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to the Land and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting the Land and all royalties and rights appertaining to the use and enjoyment of the Land, including all alley, vault, drainage, mineral, water, oil and gas rights, together with all of the buildings and other improvements now or hereafter erected on the Land and any fixtures appurtenant thereto.

"*Register*" has the meaning specified in Section 13.3(d).

"*Reimbursement Obligations*" means, as and when matured, the obligation of the Borrower to pay, on the date payment is made or scheduled to be made to the beneficiary under each such Letter of Credit and in the currency drawn, all amounts of each drafts and other requests for payments drawn under Letters of Credit, and all other matured reimbursement or repayment obligations of the Borrower to any Issuer with respect to amounts drawn under Letters of Credit.

"*Related Documents*" means the Notes Indenture and each other document and instrument executed with respect thereto.

"*Related Parties*" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"*Release*" means, with respect to any Person, any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration, in each case, of any Contaminant into the indoor or outdoor environment or into or out of any property owned, leased or operated by such Person, including the movement of Contaminants through or in the air, soil, surface water, ground water or property.

"*Remedial Action*" means all actions required to (a) clean up, remove, treat or in any other way address any Contaminant in the indoor or outdoor environment, (b) prevent the Release or threat of Release or minimize the further Release so that a Contaminant does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment and (c) perform pre remedial studies and investigations and post remedial monitoring and care.

"*Reorganization*" means, with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"*Reportable Event*" means any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043 of ERISA has been waived.

"*Report*" means (a) reports prepared by the Administrative Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the Borrower's assets from information furnished by or on behalf of the Borrower, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, (b) Compliance Certificates, (c) each financial report delivered to the Administrative Agent pursuant to Section 6.1 and (d) the Borrowing Base Certificates, in each case, which Reports may be distributed to the Lenders by the Administrative Agent.

"*Requirement of Law*" means, with respect to any Person, the common law and all federal, state, local and foreign laws, treaties, rules and regulations, orders, judgments, decrees and other

determinations of, concessions, grants, franchises, licenses and other Contractual Obligations with, any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Requisite Lenders*" at any time, (a) the holders of more than 50% of the Aggregate Exposure of all Lenders and (b) the Administrative Agent.

"*Responsible Officer*" means, with respect to any Person, any of the principal executive officers, managing members or general partners of such Person but, in any event, with respect to financial matters, the chief financial officer, treasurer or controller of such Person.

"*Restricted Payment*" means (a) any dividend, distribution or any other payment whether direct or indirect, on account of any Stock or Stock Equivalent of the Borrower or any of its Subsidiaries now or hereafter outstanding and (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Stock or Stock Equivalent of the Borrower or any of its Subsidiaries now or hereafter outstanding other than for Stock or Stock Equivalents which do not constitute Disqualified Stock.

"*Revolving Borrowing*" means a borrowing consisting of Revolving Loans made on the same day by the Revolving Lenders ratably according to their respective Revolving Percentage.

"*Revolving Commitment*" means, with respect to each Revolving Lender, the commitment of such Revolving Lender to make Revolving Loans and acquire interests in other Revolving Outstandings in the aggregate principal amount outstanding not to exceed the amount set forth opposite such Revolving Lender's name on *Schedule I(B)* under the caption "*Revolving Commitment*" and as such amount may be reduced pursuant to this Agreement. The initial aggregate amount of the Revolving Commitments is $35,000,000.

"*Revolving Facility*" has the meaning specified in the definition of "Facility".

"*Revolving Interim Availability Amount*" has the meaning given to such term in Section 3.1(c).

"*Revolving Lender*" means each Lender that has a Revolving Commitment or that holds a Revolving Loan.

"*Revolving Loan*" has the meaning specified in Section 2.1(a).

"*Revolving Outstandings*" means, at any particular time, the sum of (a) the principal amount of the Revolving Loans outstanding at such time and (b) the Letter of Credit Obligations outstanding at such time.

"*Revolving Percentage*" means, with respect to any Revolving Lender, the percentage obtained by dividing (a) the Revolving Commitment of such Revolving Lender by (b) the aggregate Revolving Commitments of all Revolving Lenders (or, at any time on or after the Revolving Termination Date, the percentage obtained by dividing the aggregate outstanding principal balance of the Revolving Outstandings owing to such Revolving Lender by the aggregate outstanding principal balance of the Revolving Outstandings owing to all Revolving Lenders).

"*Revolving Termination Date*" shall mean the earliest of (a) the Scheduled Termination Date, (b) the date of termination of all of the Revolving Commitments pursuant to Section 2.4, (c) 45 days (or such later date as the Requisite Lenders may agree) after entry of the Interim Order if the Final Order

has not been entered prior thereto, (d) the date any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (e) the Effective Date and (f) the date on which the Obligations become due and payable pursuant to Section 9.2.

"*Revolving Unused Commitment Fee*" has the meaning specified in Section 2.11(a).

"*S&P*" means Standard & Poor's Rating Services.

"*Sale and Leaseback Transaction*" means any arrangement entered into by the Borrower or any Subsidiary of the Borrower with any Person providing for the leasing to the Borrower or such Subsidiary of any capital asset which has been or is to be sold or transferred by the Borrower or such Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such capital asset or rental obligations of the Borrower or such Subsidiary.

"*Sarbanes-Oxley Act*" means the United States Sarbanes-Oxley Act of 2002.

"*Scheduled Termination Date*" means [April __], 2011, *provided*, that upon the effectiveness of the Fifteen Month Facility Extension Option, the Scheduled Termination Date shall be [July __], 2011.

"*Secured Parties*" means the Lenders, the Issuers, the Administrative Agent and any other holder of any Obligation.

"*Securities Account*" has the meaning given to such term in the UCC.

"*Securities Account Control Agreement*" has the meaning specified in the Pledge and Security Agreement.

"*Securities Intermediary*" has the meaning given to such term in the UCC.

"*Security*" means any Stock, Stock Equivalent, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether secured, unsecured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing, but shall not include any evidence of the Obligations.

"*Selling Lender*" has the meaning specified in Section 13.6(b).

"*Specified Financial Covenants*" means collectively the covenants set forth in Section 5.1 and Section 5.2.

"*Specified Letter of Credit*" means that certain Letter of Credit originally issued on April 6, 2010, by JPMorgan, in its capacity as Issuer under the Prepetition Credit Agreement, to Bank of America, N.A., as beneficiary, in the face amount of $3,500,000.

"*Specified Non-Filers*" means individually and collectively, each of Kurtz Gravel Company, BWB, Inc. of Michigan, USC Michigan, Inc., Superior Holdings, Inc. and Builders' Redi-Mix, LLC.

"*Specified Real Property*" shall mean the Real Property owned by the Loan Parties with a net book value equal to or great than $100,000, as listed on *Schedule IV*.

"*Statutory Reserve Rate*" means a fraction (expressed as a decimal), the numerator of

which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"*Stock*" means shares of capital stock (whether denominated as common stock or preferred stock), beneficial, partnership or membership interests, participations or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity, whether voting or nonvoting.

"*Stock Equivalents*" means all securities convertible into or exchangeable for Stock and all warrants, options or other rights to purchase or subscribe for any Stock, whether or not presently convertible, exchangeable or exercisable.

"*Subordinated Indebtedness*" means unsecured Indebtedness of the Borrower or any Subsidiary owing to any Person that is not a Debtor that is subordinated to the payment in full of the Obligations on subordination terms reasonably satisfactory to the Administrative Agent.

"*Subsidiary*" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which an aggregate of 50% or more of the outstanding Voting Stock is, at the time, directly or indirectly, owned or controlled by such Person or one or more Subsidiaries of such Person; *provided,* that the Excluded Joint Venture shall not be a "*Subsidiary*", with respect to any Person.

"*Substitute Institution*" has the meaning specified in Section 2.17.

"*Substitution Notice*" has the meaning specified in Section 2.17.

"*Supermajority Lenders*" means at any time, (a) the holders of more than 75% of the Aggregate Exposure of all Lenders and (b) the Administrative Agent.

"*Superpriority Claim*" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"*Tax Affiliate*" means, with respect to any Person, (a) any Subsidiary of such Person and (b) any Affiliate of such Person with which such Person files or is eligible to file consolidated, combined or unitary tax returns.

"*Tax Return*" has the meaning specified in Section 4.7(a).

"*Taxes*" has the meaning specified in Section 2.16(a).

"*Term Borrowing*" means a borrowing consisting of Term Loans made on the same day by the Term Lenders ratably according to their respective Term Percentage.

"*Term Commitments*" means, with respect to each Term Lender, the commitment of such Term Lender to make Term Loans in the aggregate principal amount outstanding not to exceed the amount set forth opposite such Term Lender's name on *Schedule I(A)* under the caption "*Term Commitment*" and as such amount may be reduced pursuant to this Agreement. The initial aggregate amount of the Term Commitments is $45,000,000.

"*Term Facility*" has the meaning specified in the definition of "Facility".

"*Term Lender*" means each Lender that has a Term Commitment or that holds a Term Loan.

"*Term Loans*" has the meaning specified in Section 2.1(b).

"*Term Percentage*" as to any Term Lender at any time, the percentage which such Lender's Term Commitment then constitutes of the aggregate Term Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term Loans then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding).

"*Term Termination Date*" shall mean the earliest of (a) the Scheduled Termination Date, (b) the date of termination of all of the Term Commitments pursuant to Section 2.4, (c) 45 days (or such later date as the Requisite Lenders may agree) after entry of the Interim Order if the Final Order has not been entered prior thereto, (d) the date any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (e) the Effective Date and (f) the date on which the Obligations become due and payable pursuant to Section 9.2.

"*Termination Date*" means the later to occur of (i) the Revolving Termination Date and (ii) the Term Termination Date.

"*Test Period*" means on any date, the period beginning on [May 1], 2010 and ending on such date (taken as one accounting period).

"*Title IV Plan*" means an employee pension benefit (as defined in Section 3(2) of ERISA) plan (other than a Multiemployer Plan) covered by Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and to which the Borrower any of its Subsidiaries or any ERISA Affiliate has any obligation or liability, contingent or otherwise.

"*Trigger Notice*" has the meaning specified in Section 2.19.

"*Trucks*" means, with respect to each Borrowing Base Contributor, the ready-mix concrete trucks and the mixing drums affixed thereto owned by such Borrowing Base Contributor.

"*UCC*" has the meaning specified in the Pledge and Security Agreement.

"*Unfunded Pension Liability*" means, with respect to the Borrower or any of its Subsidiaries at any time, the sum of (a) the amount, if any, by which the present value of all accrued benefits under each Title IV Plan (other than any Title IV Plan subject to Section 4063 of ERISA) exceeds the fair market value of all assets of such Title IV Plan allocable to such benefits in accordance with Title IV of ERISA, as determined as of the most recent valuation date for such Title IV Plan using the actuarial assumptions in effect under such Title IV Plan, (b) the aggregate amount of Withdrawal Liability that could be assessed under Section 4063 with respect to each Title IV Plan subject to such section, separately calculated for each such Title IV Plan as of its most recent valuation date and (c) for a

period of five years following a transaction reasonably likely to be covered by Section 4069 of ERISA, the liabilities (whether or not accrued) that could be avoided by the Borrower, any of its Subsidiaries or any ERISA Affiliate as a result of such transaction.

"*U.S. Lender*" means each Lender or Issuer (or the Administrative Agent) that is a Domestic Person.

"*Voting Stock*" means Stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons, of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency).

"*Wholly-Owned Subsidiary*" of any Person means any Subsidiary of such Person, all of the Stock of which (other than director's qualifying shares, local residents or other holders, in each case, as may be required by law) is owned by such Person, either directly or indirectly through one or more Wholly-Owned Subsidiaries of such Person.

"*Withdrawal Liability*" means, with respect to the Borrower or any of its Subsidiaries at any time, the aggregate liability incurred (whether or not assessed) with respect to all Multiemployer Plans pursuant to Section 4201 of ERISA or for increases in contributions required to be made pursuant to Section 4243 of ERISA.

### Section 1.2    Computation of Time Periods

In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "*from and including*" and the words "*to*" and "*until*" each mean "*to but excluding*" and the word "*through*" means "*to and including.*"

### Section 1.3    Accounting Terms and Principles

(a)    Except as set forth below, all accounting terms not specifically defined herein shall be construed in conformity with GAAP and all accounting determinations required to be made pursuant hereto (including for purpose of measuring compliance with Article V shall, unless expressly otherwise provided herein, be made in conformity with GAAP. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein.

(b)    If any change in the accounting principles used in the preparation of the most recent Financial Statements referred to in Section 6.1 is hereafter required or permitted by the rules, regulations, pronouncements and opinions of the Financial Accounting Standards Board or the American Institute of Certified Public Accountants (or any successors thereto) and such change is adopted by the Borrower with the agreement of the Borrower's Accountants and results in a change in any of the calculations required by Article V that would not have resulted had such accounting change not occurred, the parties hereto agree to enter into negotiations in order to amend such provisions so as to equitably reflect such change such that the criteria for evaluating compliance with such covenants by the Borrower shall be the same after such change as if such change had not been made; *provided, however,* that no change in GAAP that would affect a

calculation that measures compliance with any provision of the Loan Documents shall be given effect until such provisions are amended to reflect such changes in GAAP.

(c)     For purposes of making all financial calculations to determine compliance with Article V, all components of such calculations shall be adjusted to include or exclude, as the case may be, without duplication, such components of such calculations attributable to any business or assets with a Fair Market Value in excess of $200,000 that have been acquired or disposed of by the Borrower or any of its Subsidiaries after the first day of the applicable period of determination and prior to the end of such period, as determined in good faith by the Borrower on a pro forma basis.

### Section 1.4     *Certain Terms*

(a)     The terms *"herein," "hereof", "hereto"* and *"hereunder"* and similar terms refer to this Agreement as a whole and not to any particular Article, Section, subsection or clause in, this Agreement.

(b)     Unless otherwise expressly indicated herein, (i) references in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement and (ii) the words *"above"* and *"below"*, when following a reference to a clause or a sub-clause of any Loan Document, refer to a clause or sub-clause within, respectively, the same Section or clause.

(c)     Each agreement defined in this Article I shall include all appendices, exhibits and schedules thereto.  Unless the prior written consent of the Requisite Lenders is required hereunder for an amendment, restatement, supplement, modification, extension, renewal or replacement to any such agreement and such consent is not obtained, references in this Agreement to such agreement shall be to such agreement as so amended, restated, supplemented or modified, extended, renewed or replaced.

(d)     References in this Agreement to any statute shall be to such statute as amended or modified from time to time and to any successor legislation thereto, in each case as in effect at the time any such reference is operative.

(e)     The term *"including"* when used in any Loan Document means *"including without limitation"* except when used in the computation of time periods.

(f)     The terms *"Lender," "Issuer"* and *"Administrative Agent"* include, without limitation, their respective successors.

(g)     All references to "knowledge" of any Loan Party means the actual knowledge of a Responsible Officer.

(h)     The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, without limitation, cash, securities, accounts and contract rights.

(i)     Any reference herein to any Person shall be construed to include such Person's permitted successors and assigns.

**ARTICLE II**
**The Facilities**

### Section 2.1     *The Commitments*

(a)     On the terms and subject to the conditions contained in this Agreement and the Orders, each Revolving Lender severally agrees to make loans in Dollars (each a "*Revolving Loan*") to the Borrower from time to time on any Business Day during the period from the Closing Date until the Revolving Termination Date in an aggregate principal amount at any time outstanding for all such loans by such Revolving Lender not to exceed such Revolving Lender's Revolving Commitment; *provided, however,* that at no time shall any Revolving Lender be obligated to make a Revolving Loan in excess of such Revolving Lender's Revolving Percentage of the Available Credit, *provided, further*, that (i) during the period from the Closing Date until the Final Closing Date, the aggregate principal amount of Revolving Loans shall at no time exceed the Revolving Interim Availability Amount and (ii) at any time following the Final Closing Date, the aggregate principal amount of Revolving Loans shall at no time exceed that aggregate principal amount of Revolving Loans permitted to be made to the Borrower pursuant to the Orders. Within the limits of the Revolving Commitment of each Revolving Lender, amounts of Revolving Loans repaid may be reborrowed under this Section 2.1(a).

(b)     On the terms and subject to the conditions contained in this Agreement and the Orders, each Term Lender severally agrees to make a term loan (a "*Term Loan*") in Dollars to the Borrower on the Closing Date in an amount not to exceed such Lender's Term Commitment. Amounts borrowed under this Section 2.1(a) and repaid or prepaid may not be reborrowed.

### Section 2.2     *Borrowing Procedures*

(a)     Each Borrowing shall be made on irrevocable notice given by the Borrower to the Administrative Agent (i) not later than 2:00 p.m. (New York time) the date of the proposed Borrowing, in the case of a Borrowing of CBFR Loans, and (ii) not later than 10:00 a.m. (New York time) 3 Business Days, in the case of a Borrowing of Eurodollar Rate Loans, prior to the date of the proposed Borrowing. Each such notice shall be in substantially the form of *Exhibit B* (a "*Notice of Borrowing*"), specifying (A) the date of such proposed Borrowing, (B) the aggregate amount of such proposed Borrowing, (C) whether any portion of the proposed Borrowing will be of CBFR Loans or Eurodollar Rate Loans, (D) whether the Loan will be a Revolving Loan or a Term Loan, (E) the initial Interest Period or Periods for any such Eurodollar Rate Loans and (F) for Revolving Borrowings, the Available Credit (after giving effect to such proposed Revolving Borrowing). The Loans shall be made as CBFR Loans unless, subject to Section 2.14, the Notice of Borrowing specifies that all or a portion thereof shall be Eurodollar Rate Loans, *provided* that all Borrowings made on the Closing Date and the Final Closing Date shall be made initially as CBFR Borrowings but may be converted into Eurodollar Borrowings in accordance with Section 2.10.

(b)     Each Revolving Lender shall, before 11:00 a.m. (New York time) on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in Section 13.7, in immediately available funds, such Lender's Revolving Percentage of such proposed Borrowing. Upon fulfillment (or due waiver in accordance with Section 13.1) (i) on the Closing Date, of the applicable conditions set forth in Section 3.1, (ii) on the Final Closing Date, of the applicable conditions set forth in Section 3.2 and (iii) at any time (including the Closing Date and Final Closing Date), of the applicable conditions set forth in Section 3.3, as the case may be, and after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower.