(c)     Each Term Lender shall, before 11:00 a.m. (New York time) on the date of the proposed Borrowing, make available to the Administrative Agent at its address referred to in Section 13.7, in immediately available funds, such Lender's Term Percentage of such proposed Borrowing. Upon fulfillment (or due waiver in accordance with Section 13.1) (i) on the Closing Date, of the applicable conditions set forth in Section 3.1 and (ii) on the Final Closing Date, of the applicable conditions set forth in Section 3.2, as the case may be, and after the Administrative Agent's receipt of such funds, the Administrative Agent shall make such funds available to the Borrower.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any proposed Borrowing that such Lender will not make available to the Administrative Agent such Lender's Revolving Percentage or Term Percentage, as applicable, of such Borrowing (or any portion thereof), the Administrative Agent may assume that such Lender has made such Revolving Percentage or Term Percentage, as applicable, available to the Administrative Agent on the date of such Borrowing in accordance with this Section 2.2 and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made such Revolving Percentage or Term Percentage, as applicable, available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on written demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the Federal Funds Effective Rate for the first Business Day and thereafter at the interest rate applicable at the time to the Loans comprising such Borrowing. If such Lender shall repay to the Administrative Agent such corresponding amount, such corresponding amount so repaid shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement. If the Borrower shall repay to the Administrative Agent such corresponding amount, such payment shall not relieve such Lender of any obligation it may have hereunder to the Borrower.

(e)     The failure of any Lender to make on the date specified any Loan or any payment required by it (such Lender being a "*Non-Funding Lender*"), including any payment in respect of its participation in Letter of Credit Obligations, shall not relieve any other Lender of its obligations to make such Loan or payment on such date but no such other Lender shall be responsible for the failure of any Non-Funding Lender to make a Loan or payment required under this Agreement.

### Section 2.3     Letters of Credit

(a)     Subject to the terms and conditions set forth herein, the Borrower may request the Issuance of Letters of Credit for its own account, in a form reasonably acceptable to the Administrative Agent and the Issuer, at any time and from time to time during the Availability Period. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is five Business Days prior to the Revolving Termination Date. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuer relating to any Letter of Credit, the terms and conditions of this Agreement shall control in all respects.

(b)     To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or facsimile (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuer) to the Issuer and the Administrative Agent (prior to 9:00 a.m., New York City time, at least three Business Days prior to the requested date of issuance, amendment, renewal or extension) a notice requesting the Issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of Issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph Section 2.3(c)), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be reasonably necessary to prepare, amend, renew or extend such Letter of Credit. If requested by the Issuer, the Borrower also shall submit a letter of credit application on the Issuer's standard form in connection with any request for a Letter of Credit. A Letter of Credit shall be Issued, amended, renewed or extended only if (and upon Issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the Letter of Credit Obligations would not exceed the Letter of Credit Sublimit or (ii) the aggregate amount of Revolving Outstandings would not exceed the Maximum Credit

(c)     Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date one year after the date of the Issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (ii) the date that is five Business Days prior to the Revolving Termination Date.

(d)     By the Issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuer or the Revolving Lenders, the Issuer hereby grants to each Revolving Lender, and each Revolving Lender hereby acquires from the Issuer, a participation in such Letter of Credit equal to such Lender's Revolving Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuer, such Lender's Revolving Percentage of each Letter of Credit Disbursement made by the Issuer and not reimbursed by the Borrower on the date due as provided in paragraph Section 2.3(e), or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)     If the Issuer shall make any Letter of Credit Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such Letter of Credit Disbursement by paying to the Administrative Agent an amount equal to such Letter of Credit Disbursement not later than 10:00 a.m., New York City time, on the Business Day immediately following the day that the Borrower receives written notice of such payment. If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Revolving Lender of the applicable Letter of Credit Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Revolving Percentage thereof. Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its Revolving Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.2(b) with respect to Revolving Loans made

by such Revolving Lender (and Section 2.2(b) shall apply, mutatis mutandis, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the Issuer the amounts so received by it from the Revolving Lenders. Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuer or, to the extent that Revolving Lenders have made payments pursuant to this paragraph to reimburse the Issuer, then to such Revolving Lenders and the Issuer as their interests may appear. Any payment made by a Revolving Lender pursuant to this paragraph to reimburse the Issuer for any Letter of Credit Disbursement shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such Letter of Credit Disbursement.

(f) The Borrower's obligation to reimburse Letter of Credit Disbursements as provided in Section 2.3(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuer under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.3, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder (other than payment or performance). Neither the Administrative Agent, the Revolving Lenders nor the Issuer, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the Issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuer; *provided* that this assumption is not intended to, and shall not, preclude the Borrower from pursuing such rights and remedies as it may have against the beneficiary at law or under any other agreement, *provided* further that the foregoing shall not be construed to excuse the Issuer from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuer's failure to exercise the standard of care set forth above when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or wilful misconduct on the part of the Issuer (as finally determined by a court of competent jurisdiction), the Issuer shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuer may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g) The Issuer shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuer shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by facsimile) of such demand for payment and whether the Issuer has made or will make a Letter of Credit

Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuer and the Revolving Lenders with respect to any such Letter of Credit Disbursement.

(h)     If the Issuer shall make any Letter of Credit Disbursement, then, unless the Borrower shall reimburse such Letter of Credit Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such Letter of Credit Disbursement is made to but excluding the date that the Borrower reimburses such Letter of Credit Disbursement, at the rate per annum equal to the Applicable Margin then in effect with respect to Eurodollar Rate Loans under the Revolving Facility; *provided* that, if the Borrower fails to reimburse such Letter of Credit Disbursement when due pursuant to Section 2.3(e), then Section 2.9(b) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the Issuer, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to Section 2.3(e) to reimburse the Issuer shall be for the account of such Lender to the extent of such payment.

(i)     The Issuer may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuer and the successor Issuer. The Administrative Agent shall notify the Revolving Lenders of any such replacement of the Issuer. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuer pursuant to Section 2.11(b). From and after the effective date of any such replacement, (i) the successor Issuer shall have all the rights and obligations of the Issuer under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuer" shall be deemed to refer to such successor or to any previous Issuer, or to such successor and all previous Issuers, as the context shall require. After the replacement of an Issuer hereunder, the replaced Issuer shall remain a party hereto and shall continue to have all the rights and obligations of an Issuer under this Agreement solely with respect to Letters of Credit Issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(j)     Notwithstanding anything to the contrary herein, on and after the Closing Date, each letter of credit set forth on *Schedule 2.3* will constitute a Letter of Credit, and the issuer of such letter of credit shall constitute an Issuer, under this Agreement and for purposes hereof will be deemed to have been issued on the Closing Date, *provided* that the Specified Letter of Credit shall not be considered a Letter of Credit Obligation for the purposes of (i) the definition of "Revolving Outstandings" and (ii) Section 2.11(a). The Borrower agrees that it shall pay such other fees in respect of the Specified Letter of Credit as may be mutually agreed to by the Borrower and JPMorgan.

### Section 2.4     *Reduction and Termination of the Commitments*

The Borrower may, upon at least 5 Business Days' prior notice to the Administrative Agent, terminate in whole or reduce in part ratably the unused portions of the respective Revolving Commitments of the Revolving Lenders. All outstanding Revolving Commitments shall terminate on the Scheduled Termination Date. Upon the Revolving Commitments being terminated, the Revolving Loans having been paid and the Borrower providing cash collateral for the Letter of Credit Obligations in the manner set forth in Section 9.3 in an amount equal to 105%, the Borrower may, upon at least 5 Business Days' prior notice to the Administrative Agent, terminate in whole or reduce in part ratably the unused portions of the respective Term Commitments of the Term Lenders.

### Section 2.5    Repayment of Loans

The Borrower promises to repay the entire unpaid principal amount of the Loans on the Termination Date.

### Section 2.6    Evidence of Debt

Any Lender may request that Loans made by it be evidenced by a Promissory Note. In such event, the Borrower shall promptly prepare, execute and deliver to such Lender a Promissory Note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) substantially in the forms attached hereto as Exhibit H-1 and Exhibit H-2, as applicable. Thereafter, the Loans evidenced by such Promissory Note and interest thereon shall at all times (including after assignment pursuant to Section 13.3) be represented by one or more Promissory Notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

### Section 2.7    Optional Prepayments

The Borrower may voluntarily prepay the outstanding principal amount of the Revolving Loans in whole or in part (without premium or penalty, except as set forth herein). Upon the Revolving Commitments being terminated, the Revolving Loans having been paid and full and the Borrower providing cash collateral for the Letter of Credit Obligations in the manner set forth in Section 9.3 in an amount equal to 105%, the Borrower may prepay the outstanding principal amount of the Term Loans in whole or in part. Prepayments under this Section 2.7 may only be made upon notice delivered to the Administrative Agent no later than 11:00 a.m., New York City time, three Business Days prior thereto, in the case of Eurodollar Rate Loans, and no later than 11:00 a.m., New York City time, one Business Day prior thereto, in the case of CBFR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Rate Loans or CBFR Loans. If any prepayment of any Eurodollar Rate Loan is made by the Borrower other than on the last day of an Interest Period for such Loan, the Borrower shall also pay any amount owing pursuant to Section 2.14(d). Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof (or such other amount that is equal to amount required to repay the Revolving Loans or the Term Loans, as applicable, in full).

### Section 2.8    Mandatory Prepayments

(a)    Within one Business Day of receipt by the Borrower or any of its Subsidiaries of Net Cash Proceeds arising (i) from an Asset Sale, Property Loss Event, Debt Issuance or Equity Issuance, the Borrower shall immediately prepay the Loans in an amount equal to 100% of such Net Cash Proceeds, provided that in the case of any Asset Sale or Property Loss Event, if the Borrower shall deliver to the Administrative Agent a certificate of a Responsible Officer to the effect that the Loan Parties intend to apply the Net Cash Proceeds from such event (or a portion thereof specified in such certificate), within 150 days after receipt of such Net Cash Proceeds, to acquire (or replace or rebuild) property (excluding Inventory) used or useful in the business of the Loan Parties, and certifying that no Default or Event of Default has occurred and is continuing, then no prepayment shall be required pursuant to this paragraph in respect of the Net Cash Proceeds specified in such certificate, *provided however* that to the extent any such Net Cash Proceeds therefrom have not been so applied by the end of such 150 day period, at such time a prepayment shall be required in an amount equal to such Net Cash Proceeds that have not been so applied. Any such mandatory prepayment shall be applied in accordance with *clause (b)* below. The Borrower shall also prepay the Loans to the extent required by *clause (c)* below.

(b)     Subject to the provisions of Section 2.12(g), any prepayments made by the Borrower required to be applied in accordance with this *clause (b)* shall be applied as follows: first, to repay the outstanding principal balance of the Revolving Loans until such Revolving Loans shall have been repaid in full; and then, to repay the outstanding principal balance of the Term Loans until such Term Loans shall have been paid in full. Repayments of Revolving Loans required to be made pursuant to this *clause (b)* shall result in a permanent reduction of the Revolving Commitments. Repayments of Term Loans required to be made pursuant to this *clause (b)* may not be reborrowed.

(c)     If at any time, the aggregate principal amount of Revolving Outstandings exceeds the Maximum Credit at such time, the Borrower shall forthwith prepay the Revolving Loans then outstanding in an amount equal to such excess. If any such excess remains after repayment in full of the aggregate outstanding Revolving Loans, the Borrower shall provide cash collateral for the Letter of Credit Obligations in the manner set forth in Section 9.3 in an amount equal to 105% of such excess. If any such excess remains after repayment in full of the aggregate outstanding Revolving Loans and cash collateralization of the Letters of Credit as provided in the preceding sentence, the Borrower shall forthwith prepay the Term Loans then outstanding in an amount equal to such excess.

(d)     The Borrower hereby irrevocably waives the right to direct the application of all funds in the Cash Collateral Account and agrees that the Administrative Agent shall, except as provided in Section 2.12(g) and *clause (b)* above, on each Business Day apply payments in respect of any Obligations and all funds credited to the Cash Collateral Account on such Business Day or the immediately preceding Business Day (at the discretion of the Administrative Agent, whether or not immediately available) as follows: *first*, if such date is an Interest Payment Date, to accrued but unpaid interest on the Revolving Loans, ratably; *second*, to repay the outstanding principal balance of the Revolving Loans until such Revolving Loans shall have been repaid in full (without, for the avoidance of doubt, a permanent reduction in the Revolving Commitments); *third*, to be held as cash collateral for the Letter of Credit Obligations in the manner set forth in Section 9.3 in an amount equal to 105% of the aggregate Letter of Credit Undrawn Amounts; *fourth*, to any other Obligation owing to the Revolving Lenders then due and payable; and then as otherwise directed by the Borrower so long as such direction does not violate the terms of this Agreement. The Administrative Agent agrees so to apply such funds and the Borrower consents to such application. If (i) following such application or (ii) after all Letters of Credit shall have expired or be fully drawn and all Commitments shall have been terminated, there are no Loans outstanding and no other Obligations that are then due and payable, then the Administrative Agent shall cause any remaining funds in the Cash Collateral Account to be paid at the written direction of the Borrower (or, in the absence of such direction, to the Borrower or another Person lawfully entitled thereto).

### Section 2.9    *Interest*

(a)     All Loans and the outstanding amount of all other Obligations (other than pursuant to (i) Hedging Contracts, to the extent such Hedging Contracts provide for the accrual of interest on unpaid obligations and (ii) Cash Management Obligations) shall bear interest, in the case of Loans, on the unpaid principal amount thereof from the date such Loans are made and, in the case of such other Obligations, from the date such other Obligations are due and payable until, in all cases, paid in full, except as otherwise provided in *clause (b)* below, as follows:

(i)      if a CBFR Loan or such other Obligation, at a rate per annum equal to the sum of (A) the CB Floating Rate as in effect from time to time and (B) the Applicable Margin; and

(ii)      if a Eurodollar Rate Loan, at a rate per annum equal to the sum of (A) the Adjusted LIBO Rate determined for the applicable Interest Period and (B) the Applicable Margin in effect from time to time during such Interest Period.

(b)      Notwithstanding the rates of interest specified in *clause (a)* above or elsewhere herein, effective immediately upon the occurrence of an Event of Default and for as long thereafter as such Event of Default shall be continuing, the principal balance of all Loans and the amount of all other Obligations then due and payable shall bear interest at a rate that is 2.0% percent per annum in excess of the rate of interest applicable to such Loans or other Obligations from time to time. Such interest shall be payable on written demand.

(c)      Interest shall be payable in arrears on each Interest Payment Date, *provided* that interest accruing pursuant to paragraph (b) of this Section 2.9 shall be payable from time to time on demand.

### Section 2.10      *Conversion/Continuation Option*

(a)      The Borrower may elect from time to time to convert Eurodollar Rate Loans to CBFR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 a.m., New York City time, on the Business Day preceding the proposed conversion date, *provided* that any such conversion of Eurodollar Rate Loans may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert CBFR Loans to Eurodollar Rate Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), *provided* that no CBFR Loan under a particular Facility may be converted into a Eurodollar Rate Loan when any Event of Default has occurred and is continuing and the Majority Facility Lenders in respect of such Facility have determined in their reasonable discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)      Any Eurodollar Rate Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, *provided* that no Eurodollar Rate Loan under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Majority Facility Lenders in respect of such Facility have determined in their reasonable discretion not to permit such continuations, and *provided, further,* that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to CBFR Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

### Section 2.11      *Fees*

(a)      The Borrower agrees to pay in immediately available Dollars to each Revolving Lender a commitment fee on the actual daily amount by which the Revolving

Commitment of such Revolving Lender exceeds such Revolving Lender's Revolving Percentage of the sum of (i) the aggregate outstanding principal amount of Revolving Loans and (ii) the outstanding amount of the aggregate Letter of Credit Obligations (the "*Revolving Unused Commitment Fee*") from the Closing Date through the Revolving Termination Date at the Applicable Unused Commitment Fee Rate, payable in arrears (x) on the first Business Day of each calendar month, commencing on the first such Business Day following the Closing Date and (y) on the Revolving Termination Date.

(b)     The Borrower agrees to pay (i) to the Administrative Agent for the account of each Revolving Lender a participation fee with respect to its participations in Letters of Credit, at the rate per annum equal to the Applicable Margin then in effect with respect to Eurodollar Rate Loans under the Revolving Facility on the average daily amount of such Lender's Letter of Credit Obligations during the period from and including the Closing Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and the date on which such Revolving Lender ceases to have any Letter of Credit Obligations and (ii) to the Issuer a fronting fee, which shall accrue at the rate of 0.20% per annum on the average daily amount of Letter of Credit Undrawn Amounts during the period from and including the Closing Date to but excluding the later of the date of termination of the Revolving Commitments and the date on which there ceases to be any Letter of Credit Obligations, as well as the Issuer's standard fees with respect to the Issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. Participation fees and fronting fees accrued through and including the last day of each calendar quarter shall be payable on the first Business Day of each January, April, July and October following such last day, commencing on the first such date to occur after the Closing Date, *provided* that all such fees shall be payable on the date on which the Revolving Commitments terminate and any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on written demand. Any other fees payable to the Issuer pursuant to this paragraph shall be payable within 15 days after written demand (including documentation reasonably supporting such request). All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.

### Section 2.12     *Payments and Computations*

(a)     The Borrower shall make each payment hereunder (including fees and expenses) not later than noon (New York time) on the day when due, in the currency specified herein (or, if no such currency is specified, in Dollars) to the Administrative Agent at its address referred to in Section 13.7 in immediately available funds without set-off or counterclaim. The Administrative Agent shall promptly thereafter cause to be distributed immediately available funds relating to the payment of principal, interest or fees to the Lenders, in accordance with the application of payments set forth in *clause (f)* or *(g)* below, as applicable; *provided, however,* that amounts payable pursuant to Section 2.14(b), Section 2.14(c), Section 2.15 or Section 2.16, shall be paid only to the affected Lender or Lenders. Payments received by the Administrative Agent after 11:00 a.m. (New York time) shall be deemed to be received on the next Business Day.

(b)     All interest and fees hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the CB Floating Rate at times when the CB Floating Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed. The applicable CB Floating Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(c)     Each payment by a Borrower of any Loan, Reimbursement Obligation (including interest or fees in respect thereof) and each reimbursement of various costs, expenses or other Obligation shall be made in the currency in which such Loan was made, such Letter of Credit issued or such cost, expense or other Obligation was incurred.

(d)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, the due date for such payment shall be extended to the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be; *provided, however,* that if such extension would cause payment of interest on or principal of any Eurodollar Rate Loan to be made in the next calendar month, such payment shall be made on the immediately preceding Business Day.  All repayments of any Loans shall be applied as follows:  first, to repay such Loans outstanding as CBFR Loans and then, to repay such Loans outstanding as Eurodollar Rate Loans, with those Eurodollar Rate Loans having earlier expiring Eurodollar Interest Periods being repaid prior to those having later expiring Eurodollar Interest Periods.

(e)     Unless the Administrative Agent shall have received notice from the Borrower to the Lenders prior to the date on which any payment is due hereunder that the Borrower will not make such payment in full, the Administrative Agent may assume that the Borrower has made such payment in full to the Administrative Agent on such date and the Administrative Agent may, in reliance upon such assumption, cause to be distributed to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent that the Borrower shall not have made such payment in full to the Administrative Agent, each Lender shall repay to the Administrative Agent forthwith on demand such amount distributed to such Lender together with interest thereon (at the Federal Funds Effective Rate for the first Business Day and thereafter at the rate applicable to CBFR Loans) for each day from the date such amount is distributed to such Lender until the date such Lender repays such amount to the Administrative Agent.

(f)     Except for payments and other amounts received by the Administrative Agent and applied in accordance with the provisions of *clause (g)* below (or required to be applied in accordance with Section 2.8), all payments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied as follows: *first*, to pay principal of, and interest on, any portion of the Loans the Administrative Agent may have advanced pursuant to the express provisions of this Agreement on behalf of any Lender, for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, *second*, to pay all other Obligations then due and payable (without, for the avoidance of doubt, in the case of any repayment of any Revolving Loan, a permanent reduction in the Revolving Commitments) and *third*, as the Borrower so designates.  Payments in respect of Revolving Loans received by the Administrative Agent shall be distributed to each Revolving Lender in accordance with such Revolving Lender's Revolving Percentage; payments in respect of Term Loans received by the Administrative Agent shall be distributed to each Term Lender in accordance with such Term Lender's Term Percentage and all payments of fees and all other payments in respect of any other Obligation shall be allocated among such of the Lenders and Issuers as are entitled thereto and, for such payments allocated to the Lenders, in proportion to their respective Aggregate Exposure Percentage.

(g)     The Borrower hereby irrevocably waives the right to direct the application of any and all payments in respect of the Obligations and any proceeds of Collateral after the occurrence and during the continuance of an Event of Default and agrees that, notwithstanding the provisions of Section 2.8 and *clause (f)* above, the Administrative Agent may, and, upon either (A) the written direction of the Requisite Lenders or (B) the acceleration of the Obligations pursuant to

Section 9.2 shall, apply all payments in respect of any Obligations and all funds on deposit in any Cash Collateral Account and all other proceeds of Collateral in the following order:

      (i)    *first*, to pay interest on and then principal of any portion of the Revolving Loans that the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

      (ii)    *second*, to pay Obligations in respect of any expense reimbursements or indemnities then due to the Administrative Agent;

      (iii)    *third*, to pay Obligations in respect of any expense reimbursements or indemnities then due to the Lenders and the Issuers;

      (iv)    *fourth*, to pay Obligations in respect of any fees then due to the Administrative Agent, the Arranger, the Lenders and the Issuers;

      (v)    *fifth*, to pay interest then due and payable in respect of the Revolving Loans and Reimbursement Obligations (including interest that would have accrued but for a bankruptcy proceeding involving the Borrower);

      (vi)    *sixth*, to pay or prepay principal amounts on the Revolving Loans and Reimbursement Obligations, and to provide cash collateral for outstanding Letter of Credit Undrawn Amounts in the manner described in Section 9.3, ratably to the aggregate principal amount of such Revolving Loans, Reimbursement Obligations and Letter of Credit Undrawn Amounts;

      (vii)    *seventh*, to pay Obligations in respect of Cash Management Obligations and Hedging Contracts in an aggregate amount not to exceed $2,500,000, ratably;

      (viii)    *eighth*, to pay interest then due and payable in respect of the Term Loans (including interest that would have accrued but for a bankruptcy proceeding involving the Borrower);

      (ix)    *ninth*, to pay or prepay principal amounts on the Term Loans;

      (x)    *tenth*, to pay all other Obligations in respect of Cash Management Obligations and Hedging Contracts, ratably;

      (xi)    *eleventh*, to the ratable payment of all other Obligations; and

      (xii)    *twelfth*, to the payment of the surplus, if any, to the Borrower;

*provided, however*, that if sufficient funds are not available to fund all payments to be made in respect of any Obligation described in any of *clauses (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), (ix), (x) and (xi)* above the available funds being applied with respect to any such Obligation (unless otherwise specified in such clause) shall be allocated to the payment of such Obligation ratably, based on the proportion of the Administrative Agent's and each Lender's or Issuer's interest in the aggregate outstanding Obligations described in such clauses; *provided, however*, that payments that would otherwise be allocated to the Revolving Lenders shall be allocated first to repay Protective Advances pro rata until such Protective Advances are repaid in full and then to repay the Revolving Loans or to provide cash collateral for outstanding Letters of Credit. The order of priority set forth in *clauses (i), (ii), (iii), (iv), (v), (vi), (vii), (viii), (ix), (x), (xi) and (xii)* above may at any time and from time to time be changed pursuant to the

terms of Section 13.1 without necessity of notice to or consent of or approval by the Borrower, any Secured Party that is not a Lender or Issuer or by any other Person that is not a Lender or Issuer.

(h)     At the option of the Administrative Agent, (i) upon one Business Day prior written notice to the Borrower, fees, expenses and other sums (other than principal), in each case, then due and payable in respect of the Revolving Loans may be paid from the proceeds of Revolving Loans and (ii) Reimbursement Obligations, interest in respect of the Revolving Loans and Protective Advances may be paid from the proceeds of Revolving Loans. The Borrower hereby authorizes the Revolving Lenders to make such Revolving Loans pursuant to Section 2.2(a) from time to time in the amounts of any and all principal payable with respect to the Reimbursement Obligations, interest, fees, expenses and other sums payable in respect of the Revolving Loans and Protective Advances, and further authorizes the Administrative Agent to give the Lenders notice of any Revolving Borrowing with respect to such Revolving Loans and to distribute the proceeds of such Revolving Loans to pay such amounts. The Borrower agrees that all such Revolving Loans so made shall be deemed to have been requested by it (irrespective of the satisfaction of the conditions in Section 3.3, which conditions the Revolving Lenders irrevocably waive) and directs that all proceeds thereof shall be used to pay such amounts.

### Section 2.13     *Alternate Rate of Interest.*

If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(b)     the Administrative Agent is advised by the Requisite Lenders that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Revolving Borrowing to, or continuation of any Revolving Borrowing as, a Eurodollar Borrowing shall be ineffective, and (ii) if any Notice of Borrowing requests a Revolving Borrowing for a Eurodollar Rate Loans, such Borrowing shall be made as an CBFR Borrowing.

### Section 2.14     *Special Provisions Governing Eurodollar Rate Loans*

(a)     *Determination of Interest Rate*

The Adjusted LIBO Rate for each Interest Period for Eurodollar Rate Loans shall be determined by the Administrative Agent pursuant to the procedures set forth in the definition of "*Adjusted LIBO Rate*." The Administrative Agent's determination shall be presumed to be correct absent manifest error and shall be binding on the Borrower.

(b)     *Increased Costs*

If at any time any Lender reasonably determines in good faith that the introduction of, or any change in or in the interpretation of, any law, treaty or governmental rule, regulation or order (other

than any change by way of imposition or increase of reserve requirements included in determining the Adjusted LIBO Rate) or the compliance by such Lender with any guideline, request or directive from any central bank or other Governmental Authority (whether or not having the force of law) in each case after the Closing Date, shall have the effect of increasing the cost to such Lender of agreeing to make or making, funding or maintaining any Eurodollar Rate Loans, then the Borrower shall upon 10 days of written demand (including documentation reasonably supporting such request) by such Lender (with a copy of such written demand to the Administrative Agent), pay to the Administrative Agent for the account of such Lender additional amounts sufficient to compensate such Lender for such increased cost. A certificate as to the amount of such increased cost, submitted to the Borrower and the Administrative Agent by such Lender, shall be conclusive and binding for all purposes, absent manifest error.

(c) *Illegality*

Notwithstanding any other provision of this Agreement, if any Lender reasonably determines in good faith that the introduction of, or any change in or in the interpretation of, any law, treaty or governmental rule, regulation or order in each case after the Closing Date shall make it unlawful, or any central bank or other Governmental Authority shall assert that it is unlawful, for any Lender to make Eurodollar Rate Loans or to continue to fund or maintain any Eurodollar Rate Loans, then, on written notice thereof and written demand therefor by such Lender to the Borrower through the Administrative Agent, (i) the obligation of such Lender to make or to continue Eurodollar Rate Loans and to convert CBFR Loans into Eurodollar Rate Loans shall be suspended, and each such Lender shall make a CBFR Loan as part of any requested Borrowing of Eurodollar Rate Loans and (ii) if the affected Eurodollar Rate Loans are then outstanding, the Borrower shall immediately convert each such Loan into a CBFR Loan. If, at any time after a Lender gives notice under this clause (d), such Lender determines that it may lawfully make Eurodollar Rate Loans, such Lender shall promptly give notice of that determination to the Borrower and the Administrative Agent, and the Administrative Agent shall promptly transmit the notice to each other Lender. The Borrower's right to request, and such Lender's obligation, if any, to make Eurodollar Rate Loans shall thereupon be restored.

(d) *Breakage Costs*

In addition to all amounts required to be paid by the Borrower pursuant to Section 2.9, the Borrower shall compensate each Lender, within 10 days' of written demand (including documentation reasonably supporting such request), for all losses, expenses and liabilities (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to fund or maintain such Lender's Eurodollar Rate Loans to the Borrower or that would have been incurred if the Lender had match-funded such Loans in such manner, but excluding any loss of the Applicable Margin on the relevant Loans or other consequential damages) that such Lender may sustain (i) if for any reason (other than solely by reason of such Lender being a Non-Funding Lender) a proposed Borrowing, conversion into or continuation of Eurodollar Rate Loans does not occur on a date specified therefor in a Borrowing notice or notice given in connection with a conversion or continuation of a Loan given by the Borrower or in a telephonic request by it for Revolving Borrowing or conversion or continuation or a successive Interest Period does not commence after notice therefor is given pursuant to Section 2.10, (ii) if for any reason any Eurodollar Rate Loan is prepaid (including mandatorily pursuant to Section 2.8) on a date that is not the last day of the applicable Interest Period, (iii) as a consequence of a required conversion of a Eurodollar Rate Loan to a CBFR Loan as a result of any of the events indicated in *clause (d)* above or (iv) as a consequence of any failure by the Borrower to repay Eurodollar Rate Loans when required by the terms hereof. The Lender making demand for such compensation shall deliver to the Borrower concurrently with such demand a written statement as to such losses, expenses and liabilities, and this statement shall be conclusive as to the amount of compensation due to such Lender, absent manifest error.

The agreements contained in this Section 2.14 shall survive the termination of this Agreement and the payment of all amounts payable hereunder; *provided, however,* that the Borrower shall not be required to compensate a Lender pursuant to *clauses (b), (c)* and *(d)* of this Section 2.14 for any such increased cost or reduction incurred more than 180 days prior to the date that such Lender demands, or notifies the Borrower of its intention to demand, compensation therefor; *provided,* that, if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

### Section 2.15    *Capital Adequacy*

If at any time any Lender determines that (a) the adoption of, or any change in or in the interpretation of, any law, treaty or governmental rule, regulation or order after the Closing Date regarding capital adequacy, (b) compliance with any such law, treaty, rule, regulation or order enacted after the Closing Date or (c) compliance with any guideline or request or directive from any central bank or other Governmental Authority (whether or not having the force of law) enacted after the Closing Date shall have the effect of reducing the rate of return on such Lender's (or any corporation controlling such Lender's) capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change, compliance or interpretation, then, upon demand from time to time by such Lender (with a copy of such demand to the Administrative Agent), the Borrower shall pay to the Administrative Agent for the account of such Lender, from time to time as specified by such Lender, additional amounts sufficient to compensate such Lender for such reduction. A certificate as to such amounts submitted to the Borrower and the Administrative Agent by such Lender shall be conclusive and binding for all purposes absent manifest error.

The agreements contained in this Section 2.15 shall survive the termination of this Agreement and the payment of all amounts payable hereunder; *provided, however,* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.15 for any such increased cost or reduction incurred more than 180 days prior to the date that such Lender demands, or notifies the Borrower of its intention to demand, compensation therefor; *provided,* that, if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

### Section 2.16    *Taxes*

(a)    Except as otherwise provided in this Section 2.16, any and all payments by or on behalf of any Loan Party under each Loan Document shall be made free and clear of and without deduction or withholding for or on account of any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (including any interest, additions to tax or penalties applicable thereto), excluding in the case of the Administrative Agent, each Lender or each Issuer, taxes measured by its net income and franchise taxes (imposed in lieu of net income taxes) imposed on it as a result of a present or former connection between the Administrative Agent, such Lender or such Issuer (as the case may be) and the jurisdiction of the Governmental Authority imposing such tax or any taxing authority thereof or therein, other than any such connection arising solely from the Administrative Agent, such Lender or such Issuer having executed, delivered or performed its obligations or received a payment under, or enforced, any Loan Document (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "*Taxes*"). If any Taxes shall be required by law to be deducted from or in respect of any sum payable under any Loan Document to any Lender, any Issuer or the Administrative Agent, as determined in good faith by the applicable withholding agent, (i) the sum payable by the applicable Loan Party shall be increased as may be

necessary so that, after making all required deductions (including deductions applicable to additional sums payable under this Section 2.16), such Lender, such Issuer or the Administrative Agent (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the relevant Loan Party shall make such deductions, (iii) the relevant Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iv) the relevant Loan Party shall deliver to the Administrative Agent evidence of such payment in accordance with Section 2.16(d) below; *provided, however*, that the Borrower shall not be required to increase any sum payable to any Lender with respect to any Taxes (y) that are attributable to such Lender's failure to comply with the requirements of Section 2.16 (f), or (z) that are United States withholding taxes payable with respect to payments under the Loan Documents under laws (including any statute, treaty or regulation) in effect on the Closing Date (or, in the case of (A) an Eligible Assignee, the date of the Assignment and Acceptance, (B) a successor Administrative Agent, the date of the appointment of such Administrative Agent, and (C) a successor Issuer, the date such Issuer becomes an Issuer) applicable to such Lender, such Issuer or the Administrative Agent, as the case may be (each such date, the "Applicable Date"), except to the extent that such Lender's assignor (if any), a predecessor Administrative Agent or a predecessor Issuer, as the case may be, was entitled, on the Applicable Date, to receive additional sums payable with respect to such Taxes under this Section 2.16 or that such Taxes are payable as a result of any change in such laws occurring after the Applicable Date.

(b)     In addition, the Borrower shall pay to the relevant Governmental Authority in accordance with applicable law any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any foreign jurisdiction, and all liabilities with respect thereto (including any interest, additions to tax or penalties applicable thereto), in each case arising from any payment made under any Loan Document or from the execution, delivery, enforcement or registration of, or otherwise with respect to, any Loan Document (collectively, "*Other Taxes*").

(c)     The Loan Parties shall, jointly and severally, indemnify each Lender, each Issuer and the Administrative Agent for the full amount of Taxes and Other Taxes (including any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 2.16) paid or payable by such Lender, such Issuer or the Administrative Agent (as the case may be) and any liability (including for penalties, interest and expenses) arising therefrom or with respect thereto (including as a result of any Loan Party's failure to pay such Taxes or Other Taxes when due to the relevant Governmental Authority or to furnish the required receipts under Section 2.16(d)), whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be made within 30 days from the date such Lender, such Issuer or the Administrative Agent (as the case may be) makes written demand (including documentation reasonably supporting such request) therefor.

(d)     Within 30 days after the date of any payment of Taxes or Other Taxes by any Loan Party, the Borrower shall furnish to the Administrative Agent, at its address referred to in Section 13.7, the original or a certified copy of a receipt evidencing payment thereof.

(e)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.16 shall survive the payment in full of the Obligations, *provided, however,* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.16 for any taxes incurred more than 180 days prior to the date that such Lender demands, or notifies the borrower of its intention to demand, compensation therefor; *provided*, that, it the circumstance giving rise to such increased

cost or reduction is retroactive, then such 180 day period referred to above shall be extended to include the period of retroactive effect thereof.

(f)     (i) Prior to the Closing Date in the case of each Non-U.S. Lender that is a signatory hereto, and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender or on the date a successor Issuer becomes an Issuer or on the date a successor Administrative Agent becomes the Administrative Agent, as the case may be, in the case of each other Non-U.S. Lender, on or before the date that any such form or certification expires or becomes obsolete, after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if requested by the Borrower or the Administrative Agent, each Non-U.S. Lender that is entitled at such time to an exemption from United States withholding tax, or that is subject to such tax at a reduced rate under an applicable tax treaty, shall provide the Administrative Agent and the Borrower with two properly completed and duly executed originals of each of the following, as applicable: (v) Form W-8IMY (together with any applicable underlying IRS forms, documentation or certificates) or successor form, (w) Form W-8ECI (claiming exemption from U.S. withholding tax because the income is effectively connected with a U.S. trade or business) or any successor form, (x) Form W-8BEN (claiming exemption from, or a reduction of, U.S. withholding tax under an income tax treaty) or any successor form, (y) in the case of a Non-U.S. Lender claiming exemption under Sections 871(h) or 881(c) of the Code, a Form W-8BEN (claiming exemption from U.S. withholding tax under the portfolio interest exemption) or any successor form and a certificate substantially in the form of *Exhibit F* or (z) any other applicable form, certificate or document prescribed by the IRS or any applicable law certifying as to such Non-U.S. Lender's entitlement to such exemption from United States withholding tax or reduced rate with respect to all payments to be made to such Non-U.S. Lender under the Loan Documents. Unless the Borrower and the Administrative Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender are not subject to United States withholding tax or are subject to such tax at a rate reduced by an applicable tax treaty, the Loan Parties and the Administrative Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate. Notwithstanding any other provision of this Section 2.16(f) a Non-U.S. Lender shall not be required to deliver any form pursuant to this Section 2.16 that such Non-U.S. Lender is not legally able to deliver.

(ii)     Prior to the Closing Date in the case of each U.S. Lender that is a signatory hereto, and on the date of the Assignment and Acceptance pursuant to which it becomes a Lender, or on the date a successor Issuer becomes an Issuer or on the date a successor Administrative Agent becomes the Administrative Agent, as the case may be, in the case of each other U.S. Lender, on or before the date that any such form or certification expires or becomes obsolete, after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it to the Borrower and the Administrative Agent, and from time to time thereafter if requested by the Borrower or the Administrative Agent, each U.S. Lender shall provide the Administrative Agent and the Borrower with two completed originals of Form W-9 (certifying that such U.S. Lender is entitled to an exemption from U.S. backup withholding tax) or any successor form. Solely for purposes of this Section 2.16(f), a U.S. Lender shall not include a Lender, an Issuer or an Administrative Agent that may be treated as an exempt recipient based on the indicators described in Treasury Regulation section 1.6049-4(c)(1)(ii).

(g)     Any Lender claiming any additional amounts payable pursuant to this Section 2.16 shall, if requested by the Borrower, use commercially reasonable efforts (consistent

with its internal policies and Requirements of Law) to change the jurisdiction if the making of such a change would avoid the need for, or reduce the amount of, any such additional amounts that would be payable or may thereafter accrue and would not, in the sole determination of such Lender, be otherwise disadvantageous to such Lender; *provided, that,* nothing in this Section 2.16(g) shall affect or postpone any of the obligations of the Borrower or any other Loan Party or the rights of any Lender under this Section 2.16.

(h)     Each Lender shall indemnify the Administrative Agent for the full amount of any taxes, levies, imposts, duties, charges, fees, deductions, withholdings or similar charges imposed by any Governmental Authority that are attributable to such Lender and that are payable or paid by the Administrative Agent, together with all interest, penalties, reasonable costs and expenses arising therefrom or with respect thereto, as determined by the Administrative Agent in good faith. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

### Section 2.17     Substitution of Lenders

(a)     In the event that (i)(A) any Lender makes a claim under Section 2.14(b) or Section 2.15, (B) it becomes illegal for any Lender to continue to fund or make any Eurodollar Rate Loan and such Lender notifies the Borrower pursuant to Section 2.14(c), (C) any Loan Party is required to make any payment pursuant to Section 2.16 that is attributable to a particular Lender or (D) any Lender becomes a Non-Funding Lender and (ii) in the case of *clause (i)(A)* above, as a consequence of increased costs in respect of which such claim is made, the effective rate of interest payable to such Lender under this Agreement with respect to its Loans materially exceeds the effective average annual rate of interest payable to the Requisite Lenders under this Agreement (any such Lender, an "*Affected Lender*"), the Borrower may substitute any Lender and any other Eligible Assignee (a "*Substitute Institution*") for such Affected Lender hereunder, after delivery of a written notice (a "*Substitution Notice*") by the Borrower to the Administrative Agent and the Affected Lender within a reasonable time (in any case not to exceed 90 days) following the occurrence of any of the events described in *clause (i)* above that the Borrower intends to make such substitution; *provided, however,* that, if more than one Lender claims increased costs, illegality or right to payment arising from the same act or condition and such claims are received by the Borrower within 30 days of each other, then the Borrower may substitute all, but not (except to the extent the Borrower has already substituted one of such Affected Lenders before the Borrower's receipt of the other Affected Lenders' claim) less than all, Lenders making such claims.

(b)     If the Substitution Notice was properly issued under this Section 2.17, the Affected Lender shall sell, and the Substitute Institution shall purchase, all rights and claims of such Affected Lender under the Loan Documents, and the Substitute Institution shall assume, and the Affected Lender shall be relieved of, the Affected Lender's Revolving Commitments and all other prior unperformed obligations of the Affected Lender under the Loan Documents (other than in respect of any damages (other than exemplary or punitive damages, to the extent permitted by applicable law) in respect of any such unperformed obligations). Such purchase and sale (and the corresponding assignment of all rights and claims hereunder) shall be recorded in the Register maintained by the Administrative Agent and shall be effective on (and not earlier than) the later of (i) the receipt by the Affected Lender of its Revolving Percentage of the Revolving Outstandings or Term Percentage of Term Loans, as applicable, together with any other Obligations owing to it, (ii) the receipt by the Administrative Agent of an agreement in form and substance reasonably satisfactory to it and the Borrower whereby the Substitute Institution shall agree to be bound by the terms hereof and (iii) the payment in full to the Affected Lender in cash of all fees, unreimbursed costs and expenses and indemnities accrued pursuant to the terms of the Loan Documents and

unpaid through such effective date. Upon the effectiveness of such sale, purchase and assumption, the Substitute Institution shall become a "*Lender*" hereunder for all purposes of this Agreement having a Commitment in the amount of such Affected Lender's Commitment assumed by it and such Commitment of the Affected Lender shall be terminated; *provided, however,* that all indemnities under the Loan Documents shall continue in favor of such Affected Lender.

(c)     Each Lender agrees that, if it becomes an Affected Lender and its rights and claims are assigned hereunder to a Substitute Institution pursuant to this Section 2.17, it shall execute and deliver to the Administrative Agent an Assignment and Acceptance to evidence such assignment, together with any Promissory Note (if such Loans are evidenced by a Promissory Note) evidencing the Loans subject to such Assignment and Acceptance; *provided, however,* that the failure of any Affected Lender to execute an Assignment and Acceptance shall not render such assignment invalid.

### Section 2.18    Defaulting Lenders.

Notwithstanding any provision of this Agreement to the contrary, if any Revolving Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Revolving Lender is a Defaulting Lender if any Letter of Credit Obligations exist at the time a Revolving Lender becomes a Defaulting Lender, then the Borrower shall within 15 Business Days (or such longer period as the Administrative Agent and relevant Issuer may agree to) following written notice by the Administrative Agent to the Borrower (A) cash collateralize such Defaulting Lender's share of the Letter of Credit Obligations in accordance with the procedures set forth in Section 9.3 for so long as such Letter of Credit Obligations are outstanding, or (B) enter into other arrangements reasonably satisfactory to the Administrative Agent, the Issuer and the Borrower (it being understood and agreed that once a Revolving Lender is no longer a Defaulting Lender and has satisfied all of its obligations under this Agreement, the cash collateral referenced in *clause (A)* above of this Section 2.18 shall be returned promptly to the Borrower).

The rights and remedies against a Defaulting Lender under this Section 2.18 are in addition to other rights and remedies that Borrower, the Administrative Agent, the Issuer and the non-Defaulting Lenders may have against such Defaulting Lender. The arrangements permitted or required by this Section 2.18 shall be permitted under this Agreement, notwithstanding any limitation on Liens or otherwise.

### Section 2.19    Priority and Liens.

The Debtors hereby covenant, represent and warrant that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Debtors hereunder and under the other Loan Documents, each Cash Management Document, each Hedging Contract and the obligations of the Debtors pursuant to Article XI, (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on all Collateral that is otherwise not encumbered by a valid and perfected Lien as of the Petition Date or a valid Lien perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under Section 546(b) of the Bankruptcy Code and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected junior Lien upon all Collateral that is subject to valid, perfected and non-avoidable Liens in existence on the Petition Date or valid Liens perfected (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under Section 546(b) of the Bankruptcy Code, subject, in each case, only to (x) in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements (the "*Professional Fees*") incurred at any time after the first business

day following delivery of written notice from the Administrative Agent to the U.S. Trustee and each of the lead counsel for the Debtors and the Committee (as defined below) (the "*Trigger Notice*") of the occurrence of an Event of Default (to the extent allowed by the Bankruptcy Court at any time) by the Loan Parties and any statutory committees appointed in the Cases (each a "*Committee*") in an aggregate amount not in excess of $1,500,000 (the "*Carve Out Cap*"), (y) all unpaid Professional Fees incurred by the Loan Parties and any Committee at any time on or prior to the first business day following delivery of the Trigger Notice to the extent allowed by the Bankruptcy Court at any time, and the payment of fees pursuant to 28 U.S.C. §1930 and (z) fees and expenses up to $250,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (x) or (y) above) (the amounts described in *clauses (x), (y)* and *(z)* collectively, the "*Carve Out*"). Notwithstanding the foregoing, (i) the Carve Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Administrative Agent, the Lenders or the administrative agent under the Prepetition Credit Agreement, (ii) so long as an Event of Default shall not have occurred and be continuing, the Debtors shall be permitted to pay any professional fees and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and § 331, as the same may be due and payable, and the same shall not reduce the Carve Out and (iii) the Carve Out Cap shall not be reduced by the payment of Professional Fees incurred on or prior to the first business day following delivery of a Trigger Notice without regard to when such amounts are allowed by the Bankruptcy Court. Upon the commencement of a liquidation, the Debtors are directed to deposit an amount equal to the unpaid Professional Fees, including the Carve Out Cap, prior to making any distributions to creditors in a segregated account solely for payment of Professional Fees that are within the Carve Out. Nothing herein shall be construed as a waiver of the right of the Administrative Agent or any Lender to object to the allowance of any Professional Fees and disbursements.

As to all Collateral, including without limitation, all cash, Cash Equivalents and Real Property the title to which is held by any Debtor, or the possession of which is held by any Debtor in the form of a leasehold interest, each Debtor hereby grants a security interest in, hypothecates, mortgages, pledges to the Administrative Agent, for the benefit of the Lenders and the other holders of the Obligations, all of the right, title and interest of the Borrower and such Debtor in all of such Collateral, including without limitation, all cash, Cash Equivalents and owned Real Property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower and such Debtor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. The Borrower and each Debtor acknowledges that, pursuant to the Orders, the Liens granted in favor of the Administrative Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. The Borrower and each Guarantor further agrees that (a) the Administrative Agent shall have the rights and remedies set forth in Article IX and Article XII and the Orders in respect of the Collateral and (b) if requested by the Administrative Agent, the Borrower and each of the other Debtors shall enter into separate security agreements, pledge agreements and fee mortgages with respect to such Collateral on terms reasonably satisfactory to the Administrative Agent.

**Section 2.20    *Payment of Obligations.***Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement, any of the other Loan Documents, each Cash Management Document and each Hedging Contract, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

**Section 2.21    *No Discharge; Survival of Claims.***

Each Debtor agrees that to the extent its Obligations (other than contingent indemnification and fees obligations not yet due and owing) hereunder are not satisfied in full, (a) its

Obligations arising hereunder shall not be discharged by the entry of a Confirmation Order (and each Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and described in Section 2.19 and the Liens granted to the Administrative Agent pursuant to the Orders and described in Section 2.19 shall not be affected in any manner by the entry of a Confirmation Order.

### Section 2.22    *Conflicts.*

To the extent of any conflict between the provisions of this Agreement and provisions contained in the Interim Order (or the Final Order, as applicable), the provisions of the applicable Order shall govern in all respects.

### Section 2.23    *Fifteen Month Facility Extension Option.*

The Borrower may extend the Scheduled Termination Date to [July __], 2011 (the "*Fifteen Month Facility Extension Option*") subject to, and the Scheduled Termination Date shall be so extended upon satisfaction or waiver of, the following conditions precedent:

(a)    the Borrower shall provide written notice to the Administrative Agent at least thirty (30) days and no more than forty-five (45) days prior to [April __], 2011 of its intention to exercise the Fifteen Month Facility Extension Option;

(b)    the Borrower shall pay a fee to the Administrative Agent on or before the initial Scheduled Termination Date for the account of the Lenders equal to 1.0% of the sum of (i) the Revolving Commitments and (ii) the outstanding principal balance of the Terms Loans, in each case as [April __], 2011;

(c)    the Loan Parties shall have filed with the Bankruptcy Court a plan of reorganization with the Bankruptcy Court;

(d)    the Administrative Agent and the Lenders shall have received monthly Budgets through [July __], 2011;

(e)    no Default or Event of Default shall have occurred and be continuing as of [April __], 2011; and

(f)    the representations and warranties of the Borrower and each other Loan Party contained in Article IV or any other Loan Document shall be true and correct in all material respects on and as of [April __], 2011 and shall be true and correct in all material respects on and as of [April __], 2011 with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

The Administrative Agent will notify the Borrower and the Lenders upon the effectiveness of the Fifteen Month Facility Extension Option.

## ARTICLE III
## Conditions to Loans and Letters of Credit

**Section 3.1**     *Conditions to the Initial Extension of Credit*

The agreement of each Lender to make the Term Loans on the Closing Date and any Revolving Loans requested to be made by it during the period on and from the Closing Date until the Final Closing Date and of each Issuer to Issue any Letter of Credit during the period on and from the Closing Date until the Final Closing Date is subject to the satisfaction or waiver, prior to or concurrently with the making of such extension of credit, of the following conditions precedent:

(a)     *Certain Documents.* The Administrative Agent shall have received on or prior to the Closing Date each of the following, each dated the Closing Date unless otherwise indicated or agreed to by the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent:

(i)     this Agreement, duly executed and delivered by the Borrower, each Guarantor and, for the account of each Lender requesting the same at least two Business Days prior to the Closing Date, a Promissory Note of the Borrower conforming to the requirements set forth herein;

(ii)     the Pledge and Security Agreement, duly executed and delivered by each Loan Party;

(iii)     each Deposit Account Control Agreement and Securities Account Control Agreement required to be delivered pursuant to this Agreement or any other Loan Document;

(iv)     the executed Notes Forbearance Agreement, which (x) shall be in full force and effect and (y) reasonably satisfactory to the Administrative Agent.

(v)     a Borrowing Base Certificate which calculates the Borrowing Base as of the end of April 23, 2010;

(vi)     (x) a customary opinion of Kirkland & Ellis, LLP, counsel to the Debtors and (y) a customary opinion of Kirkland & Ellis, LLP, counsel to the Specified Non-Filers;

(vii)     a copy of the articles or certificate of incorporation (or equivalent Constituent Document) of each Loan Party, certified as of a recent date by the Secretary of State of the state of organization of such Loan Party, together with certificates of such official attesting to the good standing or existence, as applicable, of each such Loan Party;

(viii)     a certificate of the Secretary or an Assistant Secretary of each Loan Party certifying (A) the names and true signatures of each officer of such Loan Party that has been authorized to execute and deliver any Loan Document or other document required hereunder to be executed and delivered by or on behalf of such Loan Party on the Closing Date, (B) the by-laws (or equivalent Constituent Document) of such Loan Party as in effect on the date of such certification, (C) the resolutions of such Loan Party's Board of Directors (or equivalent governing body) approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and (D) that there have been no changes in the certificate of incorporation (or equivalent Constituent Document) of such Loan Party from the certificate of incorporation (or equivalent Constituent Document) delivered pursuant to *clause (vi)* above;

(ix)     a certificate of a Responsible Officer of the Borrower to the effect that (A) the condition set forth in Section 3.3(b) has been satisfied and (B) there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority that (x) would result in a Material Adverse Change or (y) restrains, prevents or imposes or can reasonably be expected to impose materially adverse conditions upon the Facilities;

(x)     evidence reasonably satisfactory to the Administrative Agent that the insurance policies required to be maintained by Section 7.5 and any Collateral Document have been obtained and are in full force and effect, together with, unless otherwise agreed by the Administrative Agent, endorsements naming the Administrative Agent, on behalf of the Secured Parties, as an additional insured or loss payee under all insurance policies as to which the Administrative Agent shall have reasonably requested to be so named;

(xi)     the results of recent lien searches conducted in the jurisdictions in which the Loan Parties are organized, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 8.2 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent; and

(xii)     such other certificates, documents, agreements and information respecting any Loan Party as any Lender through the Administrative Agent may reasonably request.

(b)     *Consents, Etc.*   Each of the Borrower and its Subsidiaries shall have received, on reasonably satisfactory terms, all consents and authorizations required pursuant to any material Contractual Obligation (other than the Related Documents or material Contractual Obligations which are in default directly or indirectly as a result of the Cases) with any other Person and shall have obtained all Permits of, and effected all notices to and filings with, any Governmental Authority, in each case, as may be necessary to allow each of the Borrower and its Subsidiaries lawfully (i) to execute, deliver and perform, in all material respects, their respective obligations hereunder and under the other Loan Documents to which each of them, respectively, is, or shall be, a party and each other agreement or instrument to be executed and delivered by each of them, respectively, pursuant thereto or in connection therewith and (ii) to create and perfect the Liens on the Collateral to be owned by each of them in the manner and for the purpose contemplated by the Loan Documents.

(c)     *Interim Order*.   The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the Administrative Agent, the Interim Order no later than three Business Days after the Petition Date (or such later date agreed to by the Administrative Agent in its sole discretion) approving and authorizing the Facilities, the Loan Documents and all provisions thereof and the priorities and liens granted under Bankruptcy Code Section 364(c) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, as well as the Requisite Lenders, and including without limitation, provisions (i) granting the Superpriority Claims and the Superpriority Liens in favor of the Lenders on the Collateral pursuant to Section 2.19, (ii) providing for the automatic vacation of such stay to permit the enforcement of the Administrative Agent's or the Lenders' remedies hereunder and under the Loan Documents, (iii) prohibiting the incurrence of Indebtedness with priority equal to or greater than the Lenders' under the Loans, except as expressly allowed hereunder, (iv) prohibiting any granting or imposition of Liens, except as expressly allowed hereunder, (v) authorizing the repayment in full of all the obligations outstanding under the Prepetition Credit Agreement, (vi) authorizing the payment of all fees and expenses due to the Lenders and the Administrative Agent, (vii) finding that the Lenders

are extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code, (viii) authorizing extensions of credit in the form of revolving loans to the Borrower in amounts not in excess of $30,000,000 (the "*Revolving Interim Availability Amount*") and (ix) authorizing extensions of credit in the form of term loans to the Borrower in an amount equal to $45,000,000;

(d) *Effectiveness of Interim Order*. The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner adverse to the Lenders, without the consent of the Administrative Agent and the Requisite Lenders;

(e) *Compliance with Interim Order*. The Loan Parties shall be in compliance in all respects with the Interim Order pursuant to the terms therein;

(f) *First Day Motion/Orders*. The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter, including in respect of amounts of critical vendor payments, if any, shall be reasonably satisfactory in form and substance to the Administrative Agent;

(g) *No Trustee*. No trustee, receiver, interim receiver or receiver and manager shall be appointed in any of the Cases, or a responsible officer or an examiner with enlarged powers shall be appointed in any of the Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(h) *Fees and Expenses*. The Lenders, the Administrative Agent and the Arranger shall have received all fees and invoiced reasonable out-of-pocket expenses earned, due and payable on or before the Closing Date;

(i) *Available Credit*. After giving effect to the Loans funded and the Letters of Credit Issued on the Closing Date, the Available Credit shall be equal to or greater than $11,000,000 as of the Closing Date;

(j) *Repayment of Prepetition Credit Agreement*. The loans under the Prepetition Credit Agreement shall have been repaid in full in cash and all commitments relating thereto shall have been terminated, and all liens and security interests related thereto shall have been terminated or released, in each case contemporaneous with such repayment and the Administrative Agent shall have received a payoff letter in form and substance reasonably satisfactory to it in connection therewith;

(k) *Litigation*. There shall not exist any action, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that could reasonably be expected to have a Material Adverse Effect;

(l) *Financial Statements*. The Administrative Agent and the Lenders shall have received (i) audited consolidated financial statements of the Borrower for the three most recent Fiscal Years and (ii) unaudited consolidated financial statements of the Borrower for the fiscal quarter ended March 31, 2010, subject to the absence of footnote disclosure and normal year end audit adjustments;

(m) *Pro Forma Balance Sheets*. The Administrative Agent and the Lenders shall have received a pro forma consolidated balance sheet of the Borrower as at the date of the

most recent balance sheet delivered pursuant *clause (l)* above prepared to give effect to the consummation of the funding of the Loans as if such funding had occurred on such date or on the first day of such period, as applicable, and consistent in all material respects with information previously provided by the Borrower;

(n)     *Budget.* The Administrative Agent and the Lenders shall have received the Budget, which shall be in substance reasonably satisfactory to the Administrative Agent and the Lenders;

(o)     *Cash Flow Forecasts.* The Administrative Agent and the Lenders shall have received a 13-week cash flow projection of the Borrower and its Subsidiaries, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders (the "*Initial Cash Flow Forecast*");

(p)     *Pledged Stock; Stock Powers; Pledged Notes.* The Administrative Agent shall have received, to the extent applicable, (i) the certificates representing the shares of Stock pledged pursuant to the Collateral Documents and/or the Orders, together with (where permissible under applicable law) an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Administrative Agent pursuant to the Collateral Documents and/or the Order endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof;

(q)     *Field Examination.* The Administrative Agent shall be reasonably satisfied with the results of a field examination of the Borrowing Base Contributors conducted by the Administrative Agent's field examiners;

(r)     *Patriot Act.* The Administrative Agent shall have received at least three days prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act;

(s)     *Mortgages.* The Administrative Agent shall have received counterparts of each of the following, each dated on or before the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent:

(i)     a Mortgage with respect to each Specified Real Property;

(ii)     an opinion of counsel in the states in which the Mortgages for each Specified Real Property is to be recorded;

(iii)     for each Specified Real Property with a net book value equal to or greater than $700,000 (other than the Designated Real Property) (x) a mortgagee's title policy (or policies) or marked-up unconditional binder (or binders) for such insurance (a "*Mortgagee's Title Insurance Policy*"), which shall (A) be issued at ordinary rates, (B) insure that the Lien granted pursuant to the Mortgage insured thereby creates a valid first Lien on such Specified Real Property free and clear of all defects and encumbrances, except for Customary Permitted Liens, (C) name the Administrative Agent for the benefit of the Secured Parties as the insured thereunder, (D) be in the form of the ALTA Loan Policy – 2006 (or equivalent policies), (E) contain such endorsements and affirmative coverages as the Administrative Agent, and be in an amount, shall reasonably request, and (F) be issued by one or more national title insurance companies and (y) a copy of all documents referred to, or listed as exceptions to title, in such title policy (or policies);

(iv)     for each Specified Real Property with a net book value equal to or greater than $700,000 (other than the Designated Real Property), evidence that all premiums in respect of each Mortgagee's Title Insurance Policy, all recording fees and stamp, documentary, intangible or mortgage taxes, if any, in connection with the Mortgage have been paid or delivered to the title company to pay;

(v)     for each Specified Real Property, a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination (together with a notice about special flood hazard area status and flood disaster assistance, duly executed by the applicable Borrower or the applicable Loan Party);

(vi)     with respect to any Specified Real Property that is a Flood Hazard Property, the Administrative Agent shall have received (A) evidence of flood insurance (to the extent such Mortgaged Property is located in a community which participates in the National Flood Insurance Program) in an amount which will cause such Mortgaged Property to comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973 and (B) confirmation that the Borrower or the applicable Loan Party has received the notice required pursuant to Section 208(e)(3) of Regulation H of the Board;

(vii)     if available and in possession of the Borrower, a Phase I environmental report with respect to each parcel of Specified Real Property;

(viii)     if available and in possession of the Borrower, a survey with respect to each parcel of Specified Real Property; and

(ix)     such other agreements, documents and instruments as the Administrative Agent deems reasonably necessary to create, register or otherwise perfect, maintain, evidence the existence, substance, form or validity of, or enforce a valid and enforceable first priority Lien on each parcel of Specified Real Property in favor of the Administrative Agent for the benefit of the Secured Parties (or in favor of such other trustee as may be required under local law) subject only to Permitted Liens.

**Section 3.2     *Conditions to the Final Extension of Credit***

The agreement of each Lender to make any Revolving Loans requested to be made by it on and after the Final Closing Date and of each Issuer to Issue any Letter of Credit on and after the Final Closing Date is subject to the satisfaction or waiver, prior to or concurrently with the making of such extension of credit, of the following conditions precedent:

(a)     *Final Order*. Not later than 45 days following the entry of the Interim Order (or such later date agreed to by the Administrative Agent), the Final Order shall have been entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Administrative Agent and the Requisite Lenders on a motion by the Loan Parties that is in form and substance reasonably satisfactory to the Administrative Agent, approving and authorizing on a final basis the matters and containing the provisions described in Section 3.1(c) and containing a waiver of the Debtors' rights under Section 506(c) of the Bankruptcy Code;

(b)     *Effectiveness of Final Order*. The Final Order shall not have been reversed, modified, amended, stayed or vacated in a manner adverse to the Lenders;

(c)     *Compliance with Final Order*. The Loan Parties shall be in compliance with the Final Order in accordance with the terms therein;

(d)     *Cash Flow Forecasts.*  The Lenders shall have received the Cash Flow Forecast and variance reports then required pursuant to Section 6.1(i) and Section 6.1(j), each in form reasonably satisfactory to the Administrative Agent;

(e)     *Fees and Expenses.*  The Lenders, the Administrative Agent and the Arranger shall have received all fees and invoiced reasonable out-of-pocket expenses earned, due and payable on or before the Final Closing Date;

(f)     *Mortgages.*  The Administrative Agent shall have received counterparts of each of the following, each dated on or before the Final Closing Date, in form and substance reasonably satisfactory to the Administrative Agent:

(i)     a Mortgage with respect to each Non-Specified Real Property;

(ii)     an opinion of counsel in the states in which the Mortgages for each Non-Specified Real Property is to be recorded;

(iii)     for each Non-Specified Real Property a "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination (together with a notice about special flood hazard area status and flood disaster assistance, duly executed by the applicable Borrower or the applicable Loan Party);

(iv)     with respect to any Non-Specified Property that is a Flood Hazard Property, the Administrative Agent shall have received (A) evidence of flood insurance (to the extent such Mortgaged Property is located in a community which participates in the National Flood Insurance Program) in an amount which will cause such Mortgaged Property to comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973 and (B) confirmation that the Borrower or the applicable Loan Party has received the notice required pursuant to Section 208(e)(3) of Regulation H of the Board;

(v)     if available and in possession of the Borrower, a Phase I environmental report with respect to each parcel of Non-Specified Real Property;

(vi)     if available and in possession of the Borrower, a survey with respect to each parcel of Non-Specified Real Property; and

(vii)     such other agreements, documents and instruments as the Administrative Agent deems reasonably necessary to create, register or otherwise perfect, maintain, evidence the existence, substance, form or validity of, or enforce a valid and enforceable first priority Lien on each parcel of Non-Specified Real Property in favor of the Administrative Agent for the benefit of the Secured Parties (or in favor of such other trustee as may be required under local law) subject only to Permitted Liens.

### Section 3.3     *Conditions Precedent to Each Loan and Letter of Credit*

The obligation of each Lender on any date (including the Closing Date and the Final Closing Date) to make any Loan and of each Issuer on any date (including the Closing Date and the Final Closing Date) to Issue any Letter of Credit is subject to the satisfaction of each of the following conditions precedent:

(a)     *Request for Borrowing or Issuance of Letter of Credit.*  With respect to any Loan, the Administrative Agent shall have received a duly executed Notice of Borrowing and with

respect to any Letter of Credit, the Administrative Agent and the Issuer shall have received a duly executed letter of credit application in form and substance reasonably satisfactory to the Issuer.

(b) *Representations and Warranties; No Defaults.* The following statements shall be true on the date of such Loan or Issuance, both before and after giving effect thereto and, in the case of any Loan, to the application of the proceeds thereof:

(i) the representations and warranties set forth in Article IV and in the other Loan Documents shall be true and correct on and as of the Closing Date and shall be true and correct in all material respects on and as of any such date after the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date; and

(ii) no Default or Event of Default shall have occurred and be continuing.

(c) *Borrowing Base.* The Borrower shall have delivered the Borrowing Base Certificate required to be delivered by Section 6.11(a). After giving effect to the Revolving Loans or Letters of Credit requested to be made or Issued on any such date and the use of proceeds thereof, (i) the Revolving Outstandings shall not exceed the Maximum Credit at such time and (ii) the Available Credit shall not be less than the Applicable Amount.

(d) *No Legal Impediments.* The making of the Loans or the Issuance of such Letter of Credit on such date does not violate any Requirement of Law on the date of or immediately following such Loan or Issuance of such Letter of Credit and is not enjoined, temporarily, preliminarily or permanently.

Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing and the acceptance by the Borrower of the proceeds of each Loan requested therein, and each Issuance of each Letter of Credit, shall be deemed to constitute a representation and warranty by the Borrower as to the matters specified in *clause (b)* above on the date of the making of such Loan or the Issuance of such Letter of Credit.

### Section 3.4    *Determinations of Borrowing Conditions*

For purposes of determining compliance with the conditions specified in Section 3.1, Section 3.2 and Section 3.3, each Lender shall be deemed to have consented to, approved, accepted or be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless the Administrative Agent shall have received notice from such Lender prior to such Borrowing or Issuance or deemed Issuance hereunder specifying its objection thereto and such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of such Borrowing.

## ARTICLE IV
## Representations and Warranties

To induce the Lenders, the Issuers and the Administrative Agent to enter into this Agreement, the Borrower represents and warrants each of the following to the Lenders, the Issuers and the Administrative Agent, on and as of the Closing Date and after giving effect to the making of the Loans and the other financial accommodations on the Closing Date, if any, and on and as of each date as required by Section 3.3(b)(i):

### Section 4.1    *Corporate Existence; Compliance with Law*

Each of the Borrower and the Borrower's Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) is duly qualified to do business as a foreign entity and in good standing or in existence, as applicable, under the laws of each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (c) subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order and to the terms thereof, has all requisite power and authority and the legal right to own, pledge, mortgage and operate its material properties, to lease the material property it operates under lease and to conduct its business as now or currently proposed to be conducted, (d) is in compliance with its Constituent Documents, (e) is in compliance with all applicable Requirements of Law except (x) where the failure to be in compliance could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (y) in the case of any Debtor, to the extent failure to comply therewith is permitted by Chapter 11 of the Bankruptcy Code and (f) subject, in the case of any Debtor, to the entry by the Bankruptcy Court of the Interim Order and the Final Order, has all necessary Permits from or by, has made all necessary filings with, and has given all necessary notices to, each Governmental Authority having jurisdiction, to the extent required for such ownership, operation and conduct, except for Permits or filings that can be obtained or made by the taking of ministerial action to secure the grant or transfer thereof or where the failure to obtain or make could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 4.2    *Corporate Power; Authorization; Enforceable Obligations*

(a)    The execution, delivery and performance by each Loan Party (and in the case of a Debtor, upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, as applicable)), of the Loan Documents to which it is a party and the consummation of the transactions contemplated thereby:

(i)    are within such Loan Party's corporate, limited liability company, partnership or other organizational powers;

(ii)    have been or, at the time of delivery thereof pursuant to Article III will have been duly authorized by all necessary action, including the consent of shareholders, partners and members where required;

(iii)    do not and will not (A) contravene such Loan Party's or any of its Subsidiaries' respective Constituent Documents, (B) violate in any material manner any other Requirement of Law applicable to such Loan Party (including Regulations T, U and X of the Federal Reserve Board), or any order or decree of any Governmental Authority or arbitrator applicable to such Loan Party, (C) conflict with or result in the breach of, or constitute a default under, or result in or permit the termination or acceleration of any material Contractual Obligation (other than the Related Documents or any material Contractual Obligation in default directly or indirectly as a result of the Cases) of such Loan Party or any of its Subsidiaries or (D) result in the creation or imposition of any Lien upon any property of such Loan Party or any of its Subsidiaries, other than Liens permitted under Section 8.2; and

(iv)    do not require the consent of, authorization by, approval of, notice to, or filing or registration with, any Governmental Authority or any other Person, other than (x) those listed on *Schedule 4.2* or (y) those that have been or will be, prior to the Closing Date, obtained or made, and each of which on the Closing Date will be in full force and effect.

(b)     This Agreement has been, and each of the other Loan Documents will have been upon delivery thereof pursuant to the terms of this Agreement, duly executed and delivered by each Loan Party party thereto. This Agreement is, and the other Loan Documents will be, when delivered hereunder, the legal, valid and binding obligation of each Loan Party party thereto, enforceable against such Loan Party in accordance with its terms (except, as it relates to any Non-Filer, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

### Section 4.3     Ownership of Borrower; Subsidiaries

(a)     Set forth on *Schedule 4.3* is a complete and accurate list showing, as of the Closing Date, all Subsidiaries of the Borrower and, as to each such Subsidiary, the jurisdiction of its organization, the number of shares of each class of Stock authorized (if applicable), the number outstanding on the Closing Date and the number and percentage of the outstanding shares of each such class owned (directly or indirectly) by the Borrower or any Subsidiary of the Borrower as of the Closing Date. Except as set forth on *Schedule 4.3*, no Stock of any Subsidiary of the Borrower is subject to any outstanding option, warrant, right of conversion or purchase of any similar right as of the Closing Date. All of the outstanding Stock of each Subsidiary of the Borrower owned (directly or indirectly) by the Borrower or any other Subsidiary of the Borrower has been validly issued, is fully paid and non-assessable (to the extent applicable) and is owned by the Borrower or a Subsidiary of the Borrower, free and clear of all Liens (other than the Liens in favor of the Secured Parties created by this Agreement, the Orders, the Pledge and Security Agreement or any other Loan Document or otherwise permitted by Section 8.2). Except as permitted pursuant to Section 8.10, neither the Borrower nor any such Subsidiary is a party to, or has knowledge of, any agreement restricting the transfer or hypothecation of any Stock of any such Subsidiary, other than the Loan Documents.

### Section 4.4     Financial Statements

(a)     The Consolidated balance sheet of the Borrower and its Subsidiaries as at December 31, 2009 and the related Consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for the fiscal years then ended, certified by PricewaterhouseCoopers LLP, and the unaudited Consolidated balance sheet of the Borrower and its Subsidiaries as at March 31, 2010, and the related unaudited Consolidated statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for the twelve months then ended, copies of which have been furnished to each Lender, fairly present in all material respects, subject, in the case of said balance sheet as at March 31, 2010, and said statements of income, stockholders' equity and cash flows for the twelve months then ended, to the absence of footnote disclosure and normal year-end audit adjustments, the Consolidated financial condition of the Borrower and its Subsidiaries as at such dates and the Consolidated results of the operations of the Borrower and its Subsidiaries for the periods ended on such dates, all in conformity with GAAP.

(b)     None of the Borrower or any of its Subsidiaries has any material obligation, contingent liability or liability for taxes, long-term leases or unusual forward or long-term commitment that is not reflected in the Financial Statements referred to in *clause (a)* above or in the notes thereto and not otherwise permitted by this Agreement.

(c)     The Budget and Cash Flow Forecast have each been prepared by the Borrower in light of the past operations of its business. The Budget and Cash Flow Forecast are each based upon estimates and assumptions stated therein, all of which the Borrower believes to be reasonable and fair in light of current conditions and current facts known to the Borrower and, as of the Closing Date, reflect the Borrower's good faith and reasonable estimates of the future financial

performance of the Borrower and its Subsidiaries and of the other information projected therein for the periods set forth therein. While the assumptions and estimates upon which the Budget and Cash Flow Forecast are based were made in good faith and on the basis of information and assumptions that the Borrower believed to be reasonable at the time made, the Lenders, the Issuers and the Administrative Agent understand, acknowledge and agree that such assumptions and estimates as they relate to future events are not to be viewed as fact and that actual results during the period or periods covered by such assumptions and estimates may differ from the Budget and Cash Flow Forecast, respectively, by a material amount.

### Section 4.5     *Material Adverse Change*

Since December 31, 2009, there has been no Material Adverse Change and there have been no events or developments that, individually or in the aggregate, have had, or could reasonably be expected to have, a Material Adverse Effect.

### Section 4.6     *Litigation*

There are no pending or, to the knowledge of the Borrower, threatened actions, investigations or proceedings affecting the Borrower or any of its Subsidiaries before any court, Governmental Authority or arbitrator other than (x) the Cases and (y) those that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 4.7     *Taxes*

(a)     All federal, state, local and foreign income and franchise and other material tax returns, reports and statements required to be filed by the Borrower or any of its Tax Affiliates (collectively, the "*Tax Returns*") have been filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed, all such Tax Returns are true, complete and correct in all material respects, and all taxes, charges and other impositions reflected therein or otherwise due and payable have been paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for non-payment thereof except (i) where contested in good faith and by appropriate proceedings if adequate reserves therefor have been established on the books of the Borrower or such Tax Affiliate in conformity with GAAP or (ii) to the extent the aggregate liability of the Borrower or such Tax Affiliate does not exceed $1,000,000 at any time or (iii) to the extent stayed pursuant to the Cases. Except as set forth on Schedule 4.7, no Tax Return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for Taxes has been given or made by any Governmental Authority, in each case which would have a Material Adverse Effect. Proper and accurate amounts have been withheld by the Borrower and each of its Tax Affiliates from their respective employees for all periods in compliance in all material respects with the tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities. Except as set forth on Schedule 4.7, as of the Closing Date, no tax lien has been filed.

(b)     Except as set forth on Schedule 4.7, as of the Closing Date, in the last two years, none of the Borrower or any of its Tax Affiliates has (i) executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for the filing of any Tax Return or the assessment or collection of any charges, (ii) incurred any obligation under any tax sharing agreement or arrangement other than those of which the Administrative Agent has received a copy prior to the Closing Date or (iii) been a member of an affiliated, combined or unitary group other than the group of which the Borrower (or its Tax Affiliate) is the common parent.

### Section 4.8 Full Disclosure

The written information prepared or furnished by or on behalf of the Borrower and its Subsidiaries in connection with this Agreement (including any information provided to the Bankruptcy Court) or the consummation of the transactions contemplated hereunder taken as a whole, when delivered and taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein or herein not misleading. All facts known to the Borrower as of the Closing Date and material to an understanding of the financial condition, business, properties or prospects of the Borrower and its Subsidiaries taken as one enterprise have been disclosed on or prior to the Closing Date to the Administrative Agent; *provided* that, with respect to the Budget and Cash Flow Forecast, estimates, budgets or other general market data, the Borrower represents only that such information was prepared in good faith based on assumptions and estimates believed to be reasonable at the time made, and the Lenders, the Issuers and the Administrative Agent understand, acknowledge and agree that such assumptions and estimates as they relate to future events are not to be viewed as fact and that actual results during the period or periods covered by such assumptions and estimates may differ from the Budget and Cash Flow Forecast, estimates, budgets or other general market data by a material amount.

### Section 4.9 Margin Regulations

The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Federal Reserve Board), and no proceeds of any Loan will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock in contravention of Regulation T, U or X of the Federal Reserve Board.

### Section 4.10 No Burdensome Restrictions; No Defaults

(a) No Debtor (i) is a party to any Contractual Obligation the compliance with one or more of which would have, in the aggregate, a Material Adverse Effect or the performance of which by any thereof, either unconditionally or upon the happening of an event, would result in the creation of a Lien (other than a Lien (x) permitted under Section 8.2 or (y) created pursuant to the Related Documents) on the assets of any thereof or (ii) is subject to one or more charter or corporate restrictions that would, in the aggregate, have a Material Adverse Effect.

(b) Neither the Borrower nor any Subsidiary of the Borrower is in default under or with respect to any Contractual Obligation (other than (i) in the case of any Debtor, entered into prior to the Petition Date, (ii) any default under the Related Documents or (iii) any default arising directly or indirectly as a result of the Cases) owed by it and, to the knowledge of the Borrower, no other party is in default under or with respect to any Contractual Obligation owed to any Loan Party or to any Subsidiary of any Loan Party, other than, in either case, those defaults that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c) No Default or Event of Default has occurred and is continuing.

(d) To the best knowledge of the Borrower, there are no Requirements of Law applicable to any Loan Party or any Subsidiary of any Loan Party the compliance with which by such Loan Party or such Subsidiary, as the case may be, would, in the aggregate, have a Material Adverse Effect.

### Section 4.11    Investment Company Act

Neither the Borrower nor any Subsidiary of the Borrower is an "*investment company*" or an "*affiliated person*" of, or "*promoter*" or "*principal underwriter*" for, an "*investment company,*" as such terms are defined in the Investment Company Act of 1940, as amended.

### Section 4.12    Use of Proceeds

From and after the Closing Date, the proceeds of the Loans and the Letters of Credit are being used by the Borrower (and, to the extent distributed to them by the Borrower, each other Loan Party) solely (a) for the payment of transaction costs, fees and expenses incurred in connection with this Agreement (including, without limitation, "Chapter 11 expenses" (or, "administrative costs reflecting Chapter 11 expenses")) and the transactions contemplated hereby and (b) for operating expenses, working capital and general corporate purposes and (c) on the Closing Date to repay in full the obligations outstanding under the Prepetition Credit Agreement.

### Section 4.13    Insurance

All policies of insurance of any kind or nature of the Borrower or any of its Subsidiaries, including policies of life, fire, theft, flood, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by (including through self insurance) businesses of the size and character of such Person.  None of the Borrower or any of its Subsidiaries has been refused insurance for any material coverage for which it had applied or had any policy of insurance terminated (other than at its request).

### Section 4.14    Labor Matters

(a)    There are no strikes, work stoppages, slowdowns or lockouts pending or, to the Borrower's knowledge, threatened against or involving the Borrower or any of its Subsidiaries, other than those that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There are (i) no unfair labor practices, grievances, complaints or arbitrations pending, or, to the Borrower's knowledge, threatened, against or involving the Borrower or any of its Subsidiaries or (ii) no arbitrations or grievances threatened involving the Borrower or any of its Subsidiaries, other than those, in each case that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)    Except as set forth on *Schedule 4.14*, as of the Closing Date, there is no collective bargaining agreement covering any employee of the Borrower or its Subsidiaries.

(d)    The public filings made by the Borrower with the Securities and Exchange Commission set forth, as of the Closing Date, a listing of all executive employment agreements and stock option plans of the Borrower and any of its Subsidiaries.

### Section 4.15    ERISA

(a)    Each employee benefit plan of the Borrower or any of the Borrower's Subsidiaries intended to qualify under Section 401 of the Code does so qualify, and any trust created thereunder is exempt from tax under the provisions of Section 501 of the Code, except where such failures could not reasonably be expected to have a Material Adverse Effect.

(b)     Each Title IV Plan is in compliance in all material respects with applicable provisions of ERISA, the Code and other Requirements of Law except for non-compliances that could not reasonably be expected to have a Material Adverse Effect.

(c)     There has been no, nor is there reasonably expected to occur, any ERISA Event other than those that could not reasonably be expected to have a Material Adverse Effect.

(d)     Neither Borrower nor any of the Borrower's Subsidiaries or ERISA Affiliates has an Unfunded Pension Liability, except as could not reasonably be expected to have a Material Adverse Effect.

(e)     Neither Borrower nor any of the Borrower's Subsidiaries or ERISA Affiliates has been assessed Withdrawal Liability except as could not reasonably be expected to have a Material Adverse Effect.

### Section 4.16    *Environmental Matters*

(a)     The operations of the Borrower and each of its Subsidiaries are, and have been, in compliance with all Environmental Laws, including obtaining and complying with all required environmental, health and safety Permits, other than non-compliances that, in the aggregate, would not have a reasonable likelihood of the Borrower and its Subsidiaries incurring Environmental Liabilities and Costs in excess of $1,000,000.

(b)     None of the Borrower or any of its Subsidiaries or any Real Property currently or, to the knowledge of the Borrower, previously owned, operated or leased by or for the Borrower or any of its Subsidiaries has caused or experienced a Release or is subject to, or is the subject of, any pending or, to the knowledge of the Borrower, threatened, Remedial Action litigation, claim, order, agreement, notice of violation, notice of potential liability proceeding or governmental investigation under or pursuant to Environmental Laws other than those that, in the aggregate, are not reasonably likely to result in the Borrower and its Subsidiaries incurring Environmental Liabilities and Costs in excess of $1,000,000.

(c)     Except as disclosed on *Schedule 4.16*, as of the Closing Date none of the Borrower or any of its Subsidiaries is a treatment, storage or disposal facility requiring a Permit under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*, the regulations thereunder or any state analog.

(d)     There are no facts, circumstances or conditions arising out of or relating to the operations or ownership of the Borrower or of Real Property owned, operated or leased by the Borrower or any of its Subsidiaries that are not specifically included in the financial information furnished to the Lenders other than those that, in the aggregate, would not have a reasonable likelihood of the Borrower and its Subsidiaries incurring Environmental Liabilities and Costs in excess of $1,000,000.

(e)     As of the Closing Date, no Environmental Lien has attached to any property of the Borrower or any of its Subsidiaries and, to the knowledge of the Borrower, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such property.

(f)     As of the Closing Date, the Borrower and each of its Subsidiaries has provided the Administrative Agent with an opportunity to review all environmental, health or safety audits, studies, assessments, inspections, investigations or other environmental health and safety

reports relating to the operations of the Borrower or any of its Subsidiaries or any Real Property of any of them that are in the possession, custody or control of the Borrower or any of its Subsidiaries.

### Section 4.17    Intellectual Property

The Borrower and its Subsidiaries own or license or otherwise have the right to use all licenses, permits, patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, copyright applications, Internet domain names, franchises, authorizations and other intellectual property rights (including all Intellectual Property as defined in the Pledge and Security Agreement) that are necessary for the operations of their respective businesses, without infringement upon or conflict with the rights of any other Person with respect thereto, including all trade names associated with any private label brands of the Borrower or any of its Subsidiaries, except to the extent the failure to so own, license or use such rights would to have a Material Adverse Effect.  To the Borrower's knowledge, no license, permit, patent, patent application, trademark, trademark application, service mark, trade name, copyright, copyright application, Internet domain name, franchise, authorization, other intellectual property right (including all *"Intellectual Property"* as defined in the Pledge and Security Agreement), slogan or other advertising device, product, process, method, substance, part or component, or other material now employed, or now contemplated to be employed, by the Borrower or any of its Subsidiaries infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, in either case, which would have a Material Adverse Effect.

### Section 4.18    Title; Real Property

(a)    Each of the Borrower and its Subsidiaries has good and marketable title to, or valid leasehold interests in, all material Real Property and good title to leasehold interests in or rights in all material personal property, in each case that is purported to be owned or leased by it, including those reflected on the most recent Financial Statements delivered by the Borrower, and none of such properties and assets is subject to any Lien, except Liens permitted under Section 8.2. The Borrower and its Subsidiaries have received all deeds, assignments, waivers, consents, non-disturbance and recognition or similar agreements, bills of sale and other documents in respect of, and have duly effected all recordings, filings and other actions necessary to establish, protect and perfect, the Borrower's and its Subsidiaries' right, title and interest in and to all such property, except to the extent the failure to have received or effected the same could reasonably be expected to have a Material Adverse Effect.

(b)    Set forth on *Schedule 4.18* is a complete and accurate list of all Real Property of each Loan Party and its Subsidiaries and showing, as of the Closing Date, the current street address (including city and state) and the Subsidiary which is the owner or lessee thereof.

(c)    All Permits required to have been issued or appropriate to enable all Real Property of the Borrower or any of its Subsidiaries (and in the case of a Debtor, subject to the Interim Order (and the Final Order when entered)) to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are in full force and effect, other than those that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 4.19    Collateral.

(a)    Subject to the Carve Out, with respect to the Debtors, the Interim Order is (and the Final Order when entered will be) effective to create in favor of the Lenders legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral described therein.

(b)        Without limiting the foregoing, the Loan Documents are effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable (except, as it relates to any Non-Filer, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity) security interest in the Collateral described therein and upon the filing of any UCC financing statements and the taking of any other actions (including providing control (as defined in the UCC) or notating the Administrative Agent's lien on certificates of title) or making of filings required for perfection under the laws of the relevant jurisdictions and specified in such Loan Documents, as necessary, and, if applicable, the taking of actions or making of filings with respect to Intellectual Property registrations or applications issued or pending, and, in the case of any real property, filing of the Mortgages as necessary, such Liens constitute perfected and continuing liens on such Collateral, securing the applicable obligations described in such Loan Documents, enforceable (except, as it relates to any Non-Filer, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity) against the applicable Loan Party and all third parties, and having priority over all other Liens on such Collateral, except in the case of Liens permitted pursuant to Section 8.2 hereunder, to the extent such Liens would have priority over the Liens in favor of the Administrative Agent pursuant to any applicable law and to the extent perfection may be achieved by the foregoing filings; *provided, however*, that additional filings may be required to perfect the security interest for the benefit of the Lenders in Intellectual Property acquired after the date hereof.

### Section 4.20    *The Orders.*

Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of Article IX and the applicable provisions of the Orders, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court. The Interim Order (or the Final Order, as applicable) is in full force and effect and not subject to appeal, reversal modification or stay.

## ARTICLE V
## Financial Covenants

The Borrower agrees with the Lenders, the Issuers and the Administrative Agent to each of the following, so long as any Obligation or any Commitment remains outstanding:

### Section 5.1    *Minimum EBITDAR*

The Borrower shall not permit EBITDAR of the Borrower as at the last day of any Test Period ending on any date set forth below, to be less than the amount set forth below opposite such date:

| Date | Cumulative Consolidated EBITDAR |
|------|---------------------------------|
| May 31, 2010 | $166,000 |
| June 30, 2010 | $2,024,000 |
| July 31, 2010 | $4,140,000 |
| August 31, 2010 | $7,525,000 |

| September 30, 2010 | $11,308,000 |
| October 31, 2010 | $16,277,000 |
| November 30, 2010 | $17,127,000 |
| December 31, 2010 | $16,291,000 |
| January 31, 2011 | $16,738,000 |
| February 28, 2011 | $18,749,000 |
| March 31, 2011 | $21,370,000 |
| April 30, 2011 | $24,031,000 |
| May 31, 2011 | $25,847,000 |
| June 30, 2011 | $30,020,000 |

### Section 5.2    *Maximum Capital Expenditures*

The Borrower shall not make or incur, or permit to be made or incurred, Capital Expenditures during any Test Period ending on any date set forth below to exceed the amount set forth opposite such date:

| Capital Expenditure Test Period Ending | Cumulative Capital Expenditure Amount |
| --- | --- |
| June 30, 2010 | $1,454,000 |
| September 30, 2010 | $5,549,000 |
| December 31, 2010 | $7,147,000 |
| March 31, 2011 | $11,647,000 |
| June 30, 2011 | $13,647,000 |

## ARTICLE VI
## Reporting Covenants

The Borrower agrees with the Lenders, the Issuers and the Administrative Agent to each of the following, as long as any Obligation or any Commitment remains outstanding:

### Section 6.1    *Financial Statements*

The Borrower shall furnish to the Administrative Agent (it being understood that reports on Form 8-K, Form 10-Q or Form 10-K shall be deemed furnished at such time as the same are publicly available on EDGAR) each of the following:

(a)    *Monthly Reports.*  With respect to each fiscal month in each Fiscal Year (each, a "*referent month*"), on or prior to the last day of the fiscal month following the end of each such referent month, financial information regarding the Borrower and its Subsidiaries in the form of *Exhibit G*, including, without limitation, (i) Consolidated unaudited statements of income for such referent month and that portion of the current Fiscal Year ending as of the close of such month, setting forth in comparative form the figures for the corresponding period in the prior year and the figures contained in the Budget or, if applicable, the latest business plan provided pursuant

to *clause (f)* below for the current Fiscal Year, in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end and quarter-end audit adjustments), (ii) the total amount of Capital Expenditures made during such referent month (and on a cumulative basis since the Closing Date for the portion of the Fiscal Year then ended), (iii) the gross amount of Accounts, Trucks and Inventory as of the end of such referent month and (iv) updates to the most recently delivered narrative discussion and analysis described in *clause (b)* below.

(b)     *Quarterly Reports.*  Within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, financial information regarding the Borrower and its Subsidiaries consisting of (i) Consolidated unaudited balance sheets as of the close of such quarter and the related statements of income and cash flow for such quarter and that portion of the Fiscal Year ending as of the close of such quarter, setting forth in comparative form the figures for the corresponding period in the prior year and the figures from the statements of income contained in the Budgets or, if applicable, the latest business plan provided pursuant to *clause (f)* below for the current Fiscal Year and (ii) narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for the applicable Fiscal Quarter,  in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and cash flow for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(c)     *Annual Reports.*  Within 90 days after the end of each Fiscal Year, audited financial information regarding the Borrower and its Subsidiaries consisting of Consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such year and related statements of income and cash flows of the Borrower and its Subsidiaries for such Fiscal Year, all prepared in conformity with GAAP and certified, in the case of such Consolidated Financial Statements, without qualification or exception (other than a "going concern" exception or similar exception or qualification), together with the report of such accounting firm stating that (i) such Financial Statements fairly present in all material respects the Consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and cash flow for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except for changes with which the Borrower's Accountants shall concur and that shall have been disclosed in the notes to the Financial Statements) and (ii) the examination by the Borrower's Accountants in connection with such Consolidated Financial Statements has been made in accordance with generally accepted auditing standards, and accompanied by a certificate stating that in the course of the regular audit of the business of the Borrower and its Subsidiaries such accounting firm has obtained no knowledge that a Default or Event of Default has occurred and is continuing, or, if in the opinion of such accounting firm, a Default or Event of Default has occurred and is continuing, a statement as to the nature thereof.

(d)     *Compliance Certificate.*  Together with each delivery of any Financial Statement pursuant to *clauses (a), (b)* or *(c)* above, a certificate of a Responsible Officer of the Borrower (each, a "*Compliance Certificate*") (i) showing in reasonable detail the calculations used in demonstrating compliance with each of the financial covenants contained in Article V for the applicable Test Period and (ii) stating that no Default or Event of Default has occurred and is continuing or, if a Default or an Event of Default has occurred and is continuing, stating the nature thereof and the action that the Borrower proposes to take with respect thereto.

(e)     *Corporate Chart and Other Collateral Updates.*  Together with each delivery of any Financial Statement pursuant to *clause (b)* or *(c)* above, (i) a certificate of a Responsible Officer of the Borrower certifying that the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this *clause (e)*) is true, correct, complete and current as of the date of such Financial Statement and (ii) a certificate of a Responsible Officer of the Borrower in form and substance satisfactory to the Administrative Agent that all certificates, statements, updates and other documents (including updated schedules) required to be delivered pursuant to the Pledge and Security Agreement by any Loan Party in the preceding Fiscal Quarter have been delivered thereunder (or such delivery requirement was otherwise duly waived or extended).  The reporting requirements set forth in this *clause (e)* are in addition to, and are not intended to and shall not replace or otherwise modify, any obligation of any Loan Party under any Loan Document (including other notice or reporting requirements).

(f)     *Business Plan.*  Not later than 45 days after the end of each Fiscal Year, and containing substantially the types of financial information contained in the Budgets, (i) the annual business plan of the Borrower and its Subsidiaries for the next succeeding Fiscal Year approved by the Board of Directors of the Borrower, (ii) forecasts prepared by management of the Borrower for each fiscal month in the next succeeding Fiscal Year and (iii) forecasts prepared by management of the Borrower for each of the succeeding Fiscal Years through the Fiscal Year in which the Termination Date is scheduled to occur, including, in each instance described in *clauses (ii) and (iii)* above, (x) a projected year-end income statement and (y) a statement of all of the material assumptions on which such forecasts are based.

(g)     *Management Letters, Etc.*  Within 10 Business Days after receipt thereof by any Loan Party, copies of each final management letter, exception report or similar letter or report received by such Loan Party from its independent certified public accountants (including the Borrower's Accountants).

(h)     *Intercompany Loan Balances.*  Together with each delivery of any Financial Statement pursuant to *clause (a)* above, a summary of the outstanding balance of all intercompany Indebtedness as of the last day of the fiscal month covered by such Financial Statement, certified by a Responsible Officer of the Borrower.

(i)     *Cash Flow Forecasts.*  No later than Thursday of every other calendar week, commencing May 6, 2010, a rolling 13-week cash flow projection of the Borrower and its Subsidiaries substantially in the form of the Initial Cash Flow Forecast (each, a "*Cash Flow Forecast*"), which shall be reasonably satisfactory to the Administrative Agent, certified by a Responsible Officer of the Borrower as being prepared based upon good faith estimates and assumptions that are believed by senior management of Borrower to be reasonable at the time made and as of the date of delivery that such Responsible Officer is not aware of (x) any information contained in such cash flow forecast which is false or materially misleading or (y) any omission of information which causes such cash flow forecast to be false or materially misleading (it being understood that any such forecasts are estimates and that actual results may vary materially from such forecasts).

(j)     *Variance Reports.*  No later than Thursday of every other calendar week, commencing May 6, 2010, a variance report in form reasonably satisfactory to the Administrative Agent, showing on a line item basis the percentage and dollar variance of actual cash disbursements and cash receipts for the prior week from the amounts set forth for each such period in the most recent Cash Flow Forecast and a narrative analysis of each material variance for the prior two week period.

(k)     *Bankruptcy Documents.*  Substantially contemporaneously upon such filing with the Bankruptcy Court, copies of all orders, pleadings and motions, applications, judicial information, financial information, plan of reorganization or liquidation and/or any disclosure statement related to such plan and other documents to be filed by or on behalf of the Borrower or any of its Subsidiaries with the Bankruptcy Court or the United States Trustee in the Cases, or to be distributed by or on behalf of the Borrower or any of its Subsidiaries to any Committee (other than (i) pleadings, motions, applications or other filings which would reasonably expected to be immaterial to the Administrative Agent and the Lenders, (ii) emergency pleadings, motions or other filings where, despite such Debtor's best efforts, such contemporaneous delivery is impracticable, which shall be delivered as soon as commercially practicable after the filing or distribution thereof and (iii) copies of pleadings and motions in connection with the Facilities, which shall be delivered as soon as commercially practicable in advance of the filing or distribution thereof).

### Section 6.2     Default Notices

As soon as practicable, and in any event within 5 Business Days after a Responsible Officer of any Loan Party has actual knowledge of the existence of any Default, Event of Default or other event having had a Material Adverse Effect or having any reasonable likelihood of causing or resulting in a Material Adverse Change, the Borrower shall give the Administrative Agent notice specifying the nature of such Default or Event of Default or such other event, including the anticipated effect thereof, which notice, if given by telephone, shall be promptly confirmed in writing on the next Business Day.

### Section 6.3     Litigation

Promptly after the commencement thereof, the Borrower shall give the Administrative Agent written notice of the commencement of all actions, suits and proceedings before any domestic or foreign Governmental Authority or arbitrator affecting the Borrower or any of Subsidiary of the Borrower that (i) seeks injunctive or similar relief or (ii) in the reasonable judgment of the Borrower or such Subsidiary, expose the Borrower or such Subsidiary to liability that would have a Material Adverse Effect.

### Section 6.4     Asset Sales

Prior to the consummation of any Asset Sale which would require a mandatory prepayment to be made pursuant to Section 2.8, the Borrower shall use commercially reasonable efforts to send the Administrative Agent a notice (i) describing such Asset Sale, (ii) stating the estimated Net Cash Proceeds anticipated to be received by the Borrower or any of its Subsidiaries and (iii) describing any reinvestment in connection therewith contemplated pursuant to the terms of Section 2.8(a).

### Section 6.5     SEC Filings; Press Releases

Promptly after the sending or filing thereof, the Borrower shall send the Administrative Agent copies of (a) all reports that the Borrower sends to its security holders generally, (b) all reports and registration statements that the Borrower or any of its Subsidiaries files with the Securities and Exchange Commission or any national or foreign securities exchange or the National Association of Securities Dealers, Inc. (it being understood that reports on Form 8-K, Form 10-Q or Form 10-K shall be deemed delivered at such time as the same are publicly available on EDGAR) and (c) all other statements concerning material changes or developments in the business of such Loan Party made available by any Loan Party to the public or any other creditor (in each case, unless such information has been disclosed pursuant to the terms of this Agreement).

### Section 6.6    Labor Relations

Promptly after becoming aware of the same, the Borrower shall give the Administrative Agent written notice of (a) any labor dispute to which the Borrower or any of its Subsidiaries is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities which could reasonably be expected to have a Material Adverse Effect, and (b) any Worker Adjustment and Retraining Notification Act or related liability incurred with respect to the closing of any plant or other facility of any such Person.

### Section 6.7    Tax Returns

Promptly following the reasonable request of any Lender, through the Administrative Agent, the Borrower shall provide copies of (a) all federal and all material state and local tax returns and reports filed by the Borrower or any Subsidiary of the Borrower in respect of taxes measured by income (excluding sales, use and like taxes) and (b) written notices or other information reasonably requested by any Lender, through the Administrative Agent, with respect to any actual audits of the tax returns described in *clause (a)* above.

### Section 6.8    Insurance

Within 90 days after the end of each Fiscal Year, the Borrower shall furnish the Administrative Agent with (a) a report in form and substance reasonably satisfactory to the Administrative Agent and the Lenders outlining all material insurance coverage maintained as of the date of such report by the Borrower or any Subsidiary of the Borrower and the duration of such coverage and (b) an insurance broker's statement that all premiums then due and payable with respect to such coverage have been paid and confirming that the Administrative Agent has been named as loss payee or additional insured, as applicable.

### Section 6.9    ERISA Matters

The Borrower shall furnish the Administrative Agent (with sufficient copies for each of the Lenders) each of the following:

(a)    promptly and in any event within 30 days after the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, written notice describing such event;

(b)    promptly and in any event within 10 days after the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate knows or has reason to know that a request for a minimum funding waiver under Section 412 of the Code has been filed with respect to any Title IV Plan, a written statement of a Responsible Officer of the Borrower describing such ERISA Event or waiver request and the action, if any, the Borrower, its Subsidiaries and ERISA Affiliates propose to take with respect thereto and a copy of any notice filed with the PBGC or the IRS pertaining thereto;

(c)    simultaneously with the date that the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate files a notice of intent to terminate any Title IV Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, a copy of each notice; and

(d)    promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that the Borrower, any Subsidiary of the Borrower or any

ERISA Affiliate may request with respect to any Multiemployer Plan; *provided*, that if the Borrower, Subsidiaries or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of the Administrative Agent, the Borrower, Subsidiaries and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent (on behalf of each Lender) promptly after receipt thereof.

### Section 6.10    Environmental Matters

The Borrower shall provide the Administrative Agent promptly and in any event within 10 days after the Borrower or any Subsidiary of the Borrower obtaining knowledge of any of the following, written notice of each of the following:

(a)    that any Loan Party is or may be liable to any Person as a result of a Release or threatened Release that could reasonably be expected to subject such Loan Party to Environmental Liabilities and Costs exceeding $1,000,000;

(b)    the receipt by any Loan Party of notification that any real or personal property of such Loan Party is or is reasonably likely to be subject to any Environmental Lien;

(c)    the receipt by any Loan Party of any notice of violation of or potential liability under, or knowledge by such Loan Party that there exists a condition that could reasonably be expected to result in a violation of or liability under, any Environmental Law, except for violations and liabilities the consequence of which, in the aggregate, would not be reasonably likely to subject the Loan Parties collectively to Environmental Liabilities and Costs exceeding $1,000,000;

(d)    the commencement of any judicial or administrative proceeding or investigation alleging a violation of or liability under any Environmental Law, that, in the aggregate, if adversely determined, would have a reasonable likelihood of subjecting the Loan Parties collectively to Environmental Liabilities and Costs exceeding $1,000,000;

(e)    any proposed acquisition of stock, assets or real estate, any proposed leasing of property or any other action by any Loan Party or any of its Subsidiaries other than those the consequences of which, in the aggregate, would not have a reasonable likelihood of subjecting the Loan Parties collectively to Environmental Liabilities and Costs exceeding $1,000,000;

(f)    any proposed action by any Loan Party or any of its Subsidiaries or any proposed change in Environmental Laws that, in the aggregate, have a reasonable likelihood of requiring the Loan Parties to obtain additional environmental, health or safety Permits or make additional capital improvements to obtain compliance with Environmental Laws that, in the aggregate, would have cost $1,000,000 or more or that shall subject the Loan Parties to additional Environmental Liabilities and Costs exceeding $1,000,000 to the extent not fully covered by insurance; and

(g)    upon written request by any Lender through the Administrative Agent, a report providing an update of the status of any environmental, health or safety compliance, hazard or liability issue identified in any notice or report delivered pursuant to this Agreement.

### Section 6.11    *Borrowing Base Deliverables and Determination*

(a)    The Borrower shall deliver, not later than 3 Business Days after the end of the last day of each week, a Borrowing Base Certificate as of the end of such period (containing available updated figures for Eligible Receivables) executed by a Responsible Officer of the Borrower.

(b)    The Borrower shall conduct, or shall cause to be conducted, at its reasonable expense and upon the request of the Administrative Agent (*provided* that so long as no Default or Event of Default has occurred and is continuing, such request shall be made no more than twice in any twelve consecutive months), and, promptly upon completion, present to the Administrative Agent for approval, such appraisals by third party appraisers reasonably satisfactory to the Administrative Agent, investigations and reviews as the Administrative Agent shall request for the purpose of determining the Borrowing Base (it being understood that the Truck appraisal conducted in September 2009 and previously delivered to the Administrative Agent shall satisfy this requirement for the six month period ending March 30, 2010 and, absent the continuation of a Default or Event of Default, no inventory appraisal shall be required during the six months following the Closing Date). The Borrower shall promptly furnish to the Administrative Agent any information that the Administrative Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of Accounts referred to in the Borrowing Base.

(c)    The Borrower shall promptly notify the Administrative Agent in writing in the event that at any time the Borrower receives or otherwise gains knowledge (i) that the outstanding Revolving Outstandings exceed the Borrowing Base as a result of a decrease therein, in which case such notice shall also include the amount of such excess or (ii) that Available Credit is at any time less than $3,000,000.

(d)    The Administrative Agent may, at the Borrower's sole reasonable cost and expense, make test verifications of the Accounts and physical verifications of the Inventory in any manner and through any medium that the Administrative Agent considers advisable, which such verifications shall be made at the reasonable discretion of the Administrative Agent during normal business hours and, as long as no Default or Event of Default has occurred and is continuing, following reasonable prior notice to the Borrower, and the Borrower shall furnish all such assistance and information as the Administrative Agent may reasonably require in connection therewith. At any time and from time to time, promptly following the Administrative Agent's reasonable request and at the reasonable expense of the Borrower, the Borrower shall cause independent public accountants or others reasonably satisfactory to the Administrative Agent to furnish to the Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Accounts. Additionally, the Administrative Agent may at any time (with prior notice to the Borrower), at the Borrower's sole cost and expense, in the Administrative Agent's own name, in the name of a nominee of the Administrative Agent, or in the name of any Borrowing Base Contributor communicate (by mail, telephone, facsimile or otherwise) with the Account Debtors of any such Borrowing Base Contributor, parties to contracts with any such Borrowing Base Contributor and obligors in respect of Instruments of any such Borrowing Base Contributor to verify with such Persons, to the Administrative Agent's satisfaction, the existence, amount, terms of, and any other matter relating to, Accounts, Instruments, chattel paper, payment intangibles and/or other receivables.

(e)     The Borrower shall permit the Administrative Agent or any of its Affiliates (or one of their representatives), at the Borrower's sole reasonable cost and expense, to conduct field examinations of the Borrowing Base Collateral, which such examinations shall be made at the reasonable discretion of the Administrative Agent during normal business hours and, as long as no Default or Event of Default has occurred and is continuing, following reasonable prior notice to the Borrower, *provided* that so long as no Default or Event of Default has occurred and is continuing, such examinations shall not be conducted more than four times in any twelve month period, *provided further* that the field exam performed in advance of the Closing Date shall constitute one field exam for the purposes of this Section 6.11(e).

(f)     Within 10 Business Days of the end of each calendar month, as of the period then ended, all delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent:

(i)     a detailed aging report of the Borrowing Base Contributors' Accounts in a form reasonably acceptable to the Administrative Agent;

(ii)     a schedule detailing the Borrowing Base Contributors' Inventory by unit, in form reasonably satisfactory to the Administrative Agent, by location (any Inventory located with a third party under any consignment or Collateral Access Agreement), by class (raw material, work-in-process and finished goods), which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Eligibility Reserves as the Administrative Agent has previously indicated to the Borrower are deemed by the Administrative Agent to be appropriate;

(iii)     a worksheet of calculations prepared by the Borrowing Base Contributors to determine Eligible Receivables and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Receivables and Eligible Inventory and the reason for such exclusion with respect to the last Borrowing Base Certificate delivered for such month;

(iv)     a reconciliation of the Borrowing Base Contributors' Accounts and Inventory between the amounts shown in the Borrowing Base Contributors' general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above; and

(v)     a reconciliation of the loan balance per the Borrowing Base Contributors' general ledger to the loan balance under this Agreement.

(vi)     a schedule and aging of the Borrowing Base Contributors' accounts payable, delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent.

(g)     At such other times as may be requested by the Administrative Agent, a list of all customer addresses, delivered electronically in a text formatted file reasonably acceptable to the Administrative Agent.

(h)     Promptly upon the Administrative Agent's reasonable request:

(i)     copies of invoices in connection with the invoices issued by the Borrowing Base Contributors in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)     copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory or Equipment purchased by any Loan Party; and

(iii)    a schedule detailing the balance of all intercompany accounts of the Loan Parties.

### Section 6.12     Other Information

The Borrower shall promptly provide the Administrative Agent or any Lender with such other information respecting the business, properties, condition, financial or otherwise, or operations of the Borrower or any Subsidiary of the Borrower as the Administrative Agent or such Lender through the Administrative Agent may from time to time reasonably request (excluding privileged information and information otherwise subject to confidentiality restrictions whereby such restrictions prohibit dissemination to the Administrative Agent and the Lenders).

## ARTICLE VII
## Affirmative Covenants

Each Loan Party agrees with the Lenders, the Issuers and the Administrative Agent to each of the following, as long as any Obligation or any Commitment remains outstanding:

### Section 7.1     Preservation of Corporate Existence, Etc.

Each Loan Party shall, and shall cause each of its Subsidiaries to, preserve and maintain (a) its legal existence and (b) except to the extent any failure to preserve and maintain the same could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, its rights (charter and statutory) and franchises, except, in each case, as permitted by Section 8.3, Section 8.4 and Section 8.7.

### Section 7.2     Compliance with Laws, Etc.

Each Loan Party shall, and shall cause each of its Subsidiaries to (and in the case of a Debtor, subject to the effect of the Cases) comply with all applicable Requirements of Law, Contractual Obligations (other than the Related Documents or other Contractual Obligations of which the Loan Parties or any Subsidiary is in breach as a direct or indirect result of the Cases) and Permits, except where the failure so to comply could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 7.3     Conduct of Business

Subject to the effect of (or changes as a result of) the Cases, each Loan Party shall, and shall cause each of its Subsidiaries to, (a) conduct its business in the ordinary course and consistent with past practice and (b) use its reasonable efforts, in the ordinary course and consistent with past practice, to preserve its business and the goodwill and business of the customers, advertisers, suppliers and others having business relations with the Borrower or any of its Subsidiaries, except in each case where the failure to comply with the covenants in each of *clauses (a)* and *(b)* above could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### Section 7.4     Payment of Taxes, Etc.

Each Loan Party shall, and shall cause each of its Subsidiaries to, pay and discharge before the same shall become delinquent, all lawful governmental claims, taxes, assessments, charges and